## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| MARGARET E. KELLY, et al., | No. 1:16-cv-2835 |
| *Plaintiffs*, | |
| v. | AMENDED COMPLAINT— CLASS ACTION |
| THE JOHNS HOPKINS UNIVERSITY, | JURY TRIAL DEMANDED |
| *Defendant*. | |

### AMENDED COMPLAINT

1.     Plaintiffs Margaret E. Kelly, Katrina Allen, Jeremiah M. Daley, Jr., Treva N. Boney, Tracy L. McCracken, Jerrell Baker, Lourdes Cordero, and Francine Lampros-Klein, individually and as representatives of a class of participants and beneficiaries of The Johns Hopkins University 403(b) Plan ("Plan") bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plan against Defendant The Johns Hopkins University, for breach of fiduciary duties under ERISA.[1]

2.     "ERISA imposes high standards of fiduciary duty on those responsible for the administration of employee benefit plans and the investment and disposal of plan assets." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 355 (4th Cir. 2014). ERISA fiduciary duties are "the highest known to the law." *Id.* at 356 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410,

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

3.      The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plan—which is among the largest 0.02% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As a fiduciary to the Plan, Defendant is obligated to limit the Plan's expenses to a reasonable amount, to ensure that *each* fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan; and to analyze the costs and benefits of alternatives for the Plan's administrative and investment structure. Defendant must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plan's service providers.

4.      Instead of using the Plan's bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plan, Defendant squandered that leverage by allowing the Plan's conflicted third-party service providers—TIAA-CREF, Fidelity, American Century, VALIC, and Vanguard—to dictate the Plan's investment lineup, to include over 440 of their proprietary mutual funds in the Plan, to link their recordkeeping services to the

placement of those funds in the Plan, and to collect nearly unlimited asset-based compensation from their proprietary products. Defendant even admitted years ago that complying with ERISA required significant changes to the Plan, yet failed to do so, thereby knowingly allowing participants to continue to be harmed by this imprudent arrangement. *See infra* ¶¶175–176.

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendant's personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendant's use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7.      **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendant resides or may be found.

8.     **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and remains exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a.     The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Defendant's inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendant had satisfied its fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.     The named Plaintiffs and all participants in the Plan were financially harmed by Defendant's improper bundling of some of the Plan's

4

investment products, improperly allowing the companies who did recordkeeping for the Plan to require inclusion of their investment products in the Plan, instead of each investment option being independently selected.

      c.    The named Plaintiffs' individual accounts in the Plan were further harmed by Defendant's breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in the CREF Stock and TIAA Real Estate accounts—which were improperly bundled with TIAA's recordkeeping services and which Defendant also failed to remove from the Plan when it was clear from past poor performance and their excessive fees that they were imprudent investments—at a time when those options underperformed prudent alternatives in which those assets would have been invested had Defendant not breached its fiduciary duties (Plaintiffs Kelly and McCracken), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plan's recordkeepers and higher-cost share classes of mutual funds priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available to the Plan because of its enormous size (all Plaintiffs), and (3) through the fees charged on their investments in those mutual funds and other investments, paid a portion of the Plan's excessive administrative and recordkeeping fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan (all Plaintiffs).

d.    Specifically, during the class period, Plaintiff Kelly invested in the higher-cost share classes of Vanguard Explorer, Vanguard Growth and Income, Vanguard Total Bond Market Index, as well as CREF Stock, CREF Growth, CREF Equity Index, CREF Global Equities, CREF Money Market, and TIAA Traditional; Plaintiff Allen invested in the Fidelity Asset Manager 85% Fund; Plaintiff Baker invested in the higher-cost share class of TIAA-CREF Lifecycle 2035; Plaintiff Boney invested in TIAA Traditional; Plaintiff Cordero invested in the higher-cost share classes of Vanguard FTSE Social Index, Vanguard High-Yield Corporate, Vanguard Short-Term Investment Grade, Vanguard Energy, Vanguard Long-Term Treasury, and Vanguard Total Bond Market Index (among many others). the higher-cost share classes of American Century Inflation-Adjusted Bond, Fidelity Contrafund, Fidelity Diversified International, and Fidelity Freedom 2020 (among others), as well as CREF Money Market; Plaintiff Daley invested in TIAA Traditional and VALIC Fixed Account Plus; Plaintiff Lampros-Klein invested in the higher-cost share class of Fidelity Contrafund, Fidelity Mid-Cap Stock, Fidelity Diversified International and Fidelity Balanced (among others); Plaintiff McCracken invested in CREF Stock, CREF Growth, CREF Equity Index, CREF Global Equities, CREF Money Market, CREF Social Choice, TIAA Traditional and TIAA Real Estate (among others). Through their investments in these funds, each Plaintiff paid excessive investment management fees and each was assessed a portion of the Plan's excessive

administrative and recordkeeping fees. Plaintiffs would not have suffered these losses if Defendant had monitored revenue sharing, solicited competitive bids, consolidated recordkeepers, or reduced fees to reasonable levels in accordance with its fiduciary duties under ERISA.

## PARTIES

### Johns Hopkins University 403(b) Plan

9.      The Johns Hopkins University 403(b) Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

10.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Plan was organized effective July 1, 1969 as "The Johns Hopkins University Faculty and Senior Staff Retirement Plan." Effective July 1, 2011, The Johns Hopkins University Staff Voluntary 403(b) Plan merged into and with the Plan and the Plan's name changed to The Johns Hopkins University 403(b) Plan.

11.     Johns Hopkins faculty and staff members are eligible to participate in the Plan. The Plan provides the only source of retirement income for many Johns Hopkins employees. An employee's retirement income is based solely upon deferrals of employee compensation, employer matching contributions, and performance of investment options net of fees and expenses. 29 U.S.C. §1002(34).

12.     As of June 30, 2015, the Plan held $4.3 billion in assets and had 24,561 participants with account balances. It is among the largest 0.02% of all defined

contribution plans in the United States based on total assets. Plans of such great size are commonly referred to as "jumbo plans."

## Plaintiffs

13.     Margaret E. Kelly resides in Hydes, Maryland and is an Administrative Secretary at the Maryland Space Grant Consortium at Johns Hopkins University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

14.     Katrina Allen resides in Middle River, Maryland, and previously worked as a Budget Specialist in the Department of Orthopedic Surgery at Johns Hopkins University School of Medicine. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Jeremiah M. Daley, Jr. resides in Baltimore, Maryland, and is a Campus Police Officer at Johns Hopkins University. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16.     Treva N. Boney resides in Severn, Maryland, and is a Facilities Manager at the Center for Talented Youth at Johns Hopkins University. She is participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Tracy L. McCracken resides in Baltimore, Maryland, and is a Senior Research Analyst at Johns Hopkins University. She is a participant in the Plan

under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

18.     Jerrell Baker resides in Owings Mills, Maryland, and is a Senior Transformation Facilitator at Johns Hopkins University. He is participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

19.     Lourdes Cordero resides in Crofton, Maryland, and is retired. She previously was employed by Johns Hopkins University and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

20.     Francine Lampros-Klein resides in Baltimore, Maryland, and is a Research Program Manager at Johns Hopkins University School of Medicine Pulmonary Division. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendant

21.     The Johns Hopkins University is a non-profit corporation organized under Maryland law with its principal place of business in Baltimore, Maryland. The University is governed by a Board of Trustees, which currently has 38 members.

22.     Under Sections 1.14, 7.01, and 7.02 of the Plan, Johns Hopkins University is the Employer, Named Fiduciary, and Plan Administrator with fiduciary responsibility for the control, management and administration of the Plan,

9

in accordance with 29 U.S.C. §1102(a). Under the terms of the Plan, Johns Hopkins University has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable Johns Hopkins to properly carry out such responsibilities. Its fiduciary responsibilities include the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

23.     Under Section 7.02 of the Plan, Johns Hopkins as the Plan Administrator is responsible for all matters relating to the Plan, including, but not limited to: resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and resolving questions regarding the Plan's administration and operation. Section 7.03 of the Plan authorizes the Plan Administrator to delegate responsibility for any aspect of the Plan's administration to other individuals or entities. However, Johns Hopkins remains the Named Fiduciary and Plan Administrator under 29 U.S.C. §1002(16)(A)(i).

24.     Johns Hopkins is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

10

## ERISA FIDUCIARY STANDARDS

25.     ERISA imposes strict fiduciary duties of loyalty and prudence upon

the Defendant as a fiduciary of the Plan. 29 U.S.C. §1104(a), states, in relevant

part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries;
> > and
> >
> > (ii)    defraying reasonable expenses of administering the
> > plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a
> like capacity and familiar with such matters would use in the
> conduct of an enterprise of like character and with like aims.

25.     Under ERISA, fiduciaries that exercise any authority or control over

plan assets, including the selection of plan investments and service providers, must

act prudently and for the *exclusive* benefit of participants in the plan, and not for

the benefit of third parties including service providers to the plan such as

recordkeepers and those who provide investment products. Fiduciaries must ensure

that the amount of fees paid to those service providers is no more than reasonable.

DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan

assets "shall be held for the exclusive purposes of providing benefits to participants

in the plan and their beneficiaries and defraying reasonable expenses of

administering the plan").

26.    "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros,* 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828–29.

27.    The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *
> (C)    furnishing of goods, services, or facilities between the plan and party in interest;

(D)     transfer to, or use by or for the benefit of a party in interest, of any
         assets of the plan ...

29.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.

29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly failing to cure any

breach of another fiduciary:

> In addition to any liability which he may have under any other provisions
> of this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan
> in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal,
>          an act or omission of such other fiduciary, knowing such act or
>          omission is a breach; [or]
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in the
>          administration of his specific responsibilities which give rise to his
>          status as a fiduciary, he has enabled such other fiduciary to commit
>          a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he
>          makes reasonable efforts under the circumstances to remedy the
>          breach.

30.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil

action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any
> of the responsibilities, obligations, or duties imposed upon fiduciaries
> by this subchapter shall be personally liable to make good to such plan
> any losses to the plan resulting from each such breach, and to restore
> to such plan any profits of such fiduciary which have been made
> through use of assets of the plan by the fiduciary, and shall be subject

to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

**I.   Defined contribution plans, services, and fees.**

31.   When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).

32.   Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

33.   The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

34.   A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers

14

for the plan, such as a recordkeeper, and for negotiating and approving the amount

of fees paid to those administrative service providers. The fiduciaries also have

exclusive control over the menu of investment options to which participants may

direct the assets in their accounts. Those selections each have their own fees, which

are deducted from the returns that participants receive on their investments.

35.    These fiduciary decisions have the potential to dramatically affect the

amount of money that participants are able to save for retirement. According to the

U.S. Department of Labor, a 1% difference in fees over the course of a 35-year

career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A

Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[2] Accordingly, fiduciaries of defined

contribution plans must engage in a rigorous process to control these costs and

ensure that participants pay no more than a reasonable level of fees. This is

particularly true for multi-billion dollar plans like the Plan, which have the

bargaining power to obtain the highest level of service and the lowest fees. The fees

available to multi-billion dollar retirement plans are orders of magnitude lower

than the much higher retail fees available to small investors.

36.    The entities that provide services to defined contribution plans have an

incentive to maximize their fees by putting their own higher-cost funds in plans and

collecting the highest amount possible for recordkeeping. For each additional dollar

in fees paid to a service provider, participants' retirement savings are directly

reduced by the same amount, and participants lose the potential for those lost

---

[2] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

37.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—i.e., proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II.     Defined contribution recordkeeping.

38.     Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

39.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a

recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (e.g., recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

40. Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

## III. Defined contribution investment options.

41. Defined contribution fiduciaries have exclusive control over the particular investment alternatives available in the plan to which participants direct and allocate their plan accounts, and the returns on which are credited to participants' accounts.

42. Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds may include

conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

43.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

44.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[3] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

45.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

46.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

47.     The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted

costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S.

Ct. at 1828 (analyzing common law of trusts and Restatement (Third) of Trusts §90

in finding a continuing duty to monitor under ERISA). As the Restatement

explains, "cost-conscious management is fundamental to prudence in the

investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary

may consider higher-cost, actively-managed mutual funds as an alternative to index

funds, "active management strategies involve investigation expenses and other

transaction costs . . . that must be considered, realistically, in relation to the

likelihood of increased return from such strategies." Restatement (Third) of Trusts

ch. 17, intro. note; *id.* § 90 cmt. h(2).

48.     Academic and financial industry literature demonstrates that high

expenses are not correlated with superior investment management. Indeed, funds

with high fees on average perform worse than less expensive funds even on a *pre-fee*

*basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee*

*Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG.

871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities*

*Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous

studies showing that "the most consistent predictor of a fund's return to investors is

the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not
> priced through higher expense ratios. On the contrary, it appears
> that the effect of expenses on after-expense performance (even
> after controlling for funds' observable characteristics) is more than
> one-to-one, which would imply that low-quality funds charge

> higher fees. Price and quality thus seem to be inversely related in
> the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

49.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## IV.    Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

50.     There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

51.     In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

52.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

53.     As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000-participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

54.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing

the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

55.     Defendant uses a different method of paying for recordkeeping for the Plan, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

56.     In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained

benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

57.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

58.     As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In multi-billion dollar plans with over 10,000 participants, such as the Plan, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—i.e*.,* a bid from another service provider—

[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

59.    Industry experts recognize that this principle applies fully in the 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*.[4] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*.[5] Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

**V.      Bundled services and open architecture.**

60.    As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services companies entered this burgeoning retirement plan market. These

---

[4] Available at http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2.

[5] Available at http://www.wphealthcarenews.com/403b-retirement-plans-why-a-due-diligence-request-for-proposal/.

providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant condition—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of handpicked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

61.     In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates

negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

62.     Open, transparent architecture allows for greater control over revenue sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it provides revenue sharing.

## VI.    403(b) plans share common fiduciary duties with 401(k) plans.

63.     Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to

27

as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

64.     Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plan has never qualified for the safe harbor, and thus has long been subject to ERISA's fiduciary requirements. In the Plan's annual reports (Forms 5500) filed with the Department of Labor, Defendant has acknowledged that the Plan is subject to ERISA.

65.     Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plan that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plan's status for ERISA fiduciary purposes; ERISA already required

Defendant to be actively involved in exercising care, prudence, skill, and diligence in administering the Plan for the exclusive benefit of participants.

66.     When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial accounts holding mutual fund shares. 26 U.S.C. §403(b)(7).

67.     Regardless of any differences between 401(k) and 403(b) plans, both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that retirement savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

## VII.   Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.

68.     As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the

employer or plan administrator, instead of fiduciaries evaluating investment

options placed in the plan. Field Assistance Bulletin 2009-02.

69.     Some 403(b) plans historically before 2009 included multiple bundled

service providers, with each performing the recordkeeping function for its own

investment products in the plan, unlike 401(k) plans which had a single

recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record

keepers and their representatives rather than offered by plan sponsors as evaluated

investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher

Education: What is a Plan Sponsor's Responsibility to Participants?*[6] Indeed,

sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This

practice resulted in plans having excessive recordkeeping costs and structures

involving multiple recordkeepers with each recordkeeper having its own investment

options in the plan. This left participants with the task of navigating a haphazard

collection of duplicative and overlapping investment options from the various

recordkeepers, and ultimately led to them paying excessive and unnecessary fees,

both for recordkeeping and for investment products in the plans. *Id*. In some cases

the recordkeeper insisted on its own funds being included in the plan without any

resistance or analysis of those funds by the fiduciaries.

---

[6] Available at http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

## VIII. TIAA-CREF's bundled 403(b) plan services.

70.     TIAA-CREF is an insurance company financial services provider that

historically has dominated the market for services to educational institution 403(b)

plans, and has heavily marketed to them. TIAA-CREF consists of two companion

organizations: Teachers Insurance and Annuity Association of America (TIAA), and

College Retirement Equities Fund (CREF). The services that TIAA-CREF provides

to 403(b) plans include annuities, mutual funds, insurance coverage, trust services,

and administrative services.

71.     Although TIAA-CREF's marketing materials suggest that it is a

"nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's

and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because

TIAA-CREF "competed directly with for-profit insurance companies and mutual

fund groups." Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax

Exemption*, N.Y. Times (July 30, 2007).[7] As a result, they are subject to federal

income taxation and are not 501(c)(3) charitable organizations.

72.     While CREF is organized as a New York not-for-profit corporation,

TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating

surplus" is spent, loaned, and otherwise distributed to some of its subsidiaries as

well. An example is Nuveen Investments, a for-profit investment manager, which

---

[7] Available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.[8]

73.     TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA, including the following subsidiaries for which TIAA files consolidated federal income tax returns:

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| 730 Texas Forests Holdings, Inc. | | X |
| Covariance Capital Management, Inc. | | X |
| GreenWood Resources, Inc. | | X |
| JWL Properties, Inc. | | X |
| ND Properties, Inc. | | X |
| Nuveen Asia Investments, Inc. | | X |
| Nuveen Holdings, Inc. | | X |
| Nuveen Investments, Inc. | | X |
| Nuveen Investments Advisers, Inc. | | X |
| Nuveen Investments Holdings, Inc. | | X |
| Nuveen Investments Institutional Services Group, LLC | | X |
| Nuveen Investment Solutions, Inc. | | X |
| Nuveen Securities, LLC | | X |
| Oleum Holding Company, Inc. | | X |
| Rittenhouse Asset Management, Inc. | | X |
| T-C Europe Holdings, Inc. | | X |
| T-C SP, Inc. | | X |
| T-C Sports Co., Inc. | | X |
| T-Investment Properties Corp. | | X |
| TCT Holdings, Inc. | | X |
| Teachers Advisors, Inc. | | X |

---

[8] Available at https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
| --- | --- | --- |
| Teachers Personal Investors Service, Inc. | | X |
| Terra Land Company | | X |
| TIAA Asset Management Finance Company, LLC | | X |
| TIAA-CREF Life Insurance Company. | | X |
| TIAA-CREF Tuition Financing, Inc. | | X |
| TIAA-CREF Trust Company, FSB | | X |
| Westchester Group Asset Management, Inc. | | X |
| Westchester Group Farm Management, Inc. | | X |
| Westchester Group Investment Management Holding, Inc. | | X |
| Westchester Group Investment Management, Inc. | | X |
| Westchester Group Real Estate, Inc. | | X |

*See 2015 Annual Statement of the Teachers Insurance and Annuity Association of America* 39, 112–19 (Jan. 26, 2016).[9]

74.     Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the

---

[9] Available at https://www.tiaa.org/public/pdf/tiaa_annual_statement_2015.pdf. This list does not include the hundreds of TIAA's for-profit, joint venture subsidiaries, all of which are controlled by TIAA. *See id.* at 112–19; *see also* https://www.sec.gov/Archives/edgar/data/1429401/000119312510093446/dex21.htm.

very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[10] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. *Id.* When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies.



---

[10] TIAA Compensation Disclosures, Executive Compensation Discussion and Analysis 20 (May 2016), available at
https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

75.     Adding to this, and undercutting any claim that it operates as a non-profit, TIAA's compensation disclosures further state that its employees' compensation and benefits programs are linked to "*profitability*." TIAA Compensation Disclosures (emphasis added).

76.     Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF responded that such extremely high pay was justified because "the company had to compete for top-level employees with major financial services corporations." Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History.*[11] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id.*

77.     In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

---

[11] Available at http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

78.     TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, Defendant locked the Plan into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments or would become imprudent in the future.* By accepting this arrangement, Defendant failed to implement an open architecture platform and use another recordkeeper who could provide the same administrative services at lower cost. Compounding this bundling requirement by TIAA, Defendant used multiple recordkeepers, each with their own investment products, resulting in an inefficient and excessively expensive plan structure, as described in more detail below.

79.     There is no shortage of high-quality, low-cost alternatives to TIAA-CREF's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option,

providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost. In light of TIAA-CREF's restrictions and superior alternatives in the market, fiduciaries of 403(b) defined contribution plans must evaluate each investment option and engage in a cost-benefit analysis to determine whether it is prudent and in the exclusive best interest of participants to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees. Defendant failed to perform such an evaluation of the funds and services TIAA-CREF required. Defendant also failed to evaluate whether participants would be better served by using superior low-cost alternatives to TIAA-CREF's products given that the Plan could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have engaged in this analysis and overhauled their plans for the benefit of participants.

## IX.    Move to consolidation and open architecture in 403(b) plans.

80.    Under the 2007 final regulations that became effective January 1, 2009,[12] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the

---

[12] The regulations gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

81.     Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations—whether on an ongoing basis or for the first time—required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants. While the Plan has long been subject to ERISA because the employer match was sufficient for the Plan to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed Defendant has informed the Department of Labor in the Plan's Forms 5500 that the Plan is subject to ERISA— even if the Plan had not previously been subject to ERISA, there can be no doubt that 403(b) plan fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

82.     Once the regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they

38

would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

83.    For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party." *See* LMU 403(b) Retirement Plan Project Overview, at 1.[13] "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services." *Id*. at 2. Beginning in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF.[14] LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the

---

[13] Available at http://www.lmu.edu/AssetFactory.aspx?vid=33038.
[14] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.

recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009. LMU 403(b) Retirement Plan Project Overview, at 2. Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." *Id.* LMU was therefore able to offer "best in class" funds in each fund category. *Id.* at 6.

84.     Similarly, following the new IRS 403(b) regulations, the fiduciaries of the Pepperdine University Retirement Plan recognized the implications of maintaining four different recordkeepers. In order to comply with the regulations and its fiduciary responsibilities, Pepperdine determined that it must make certain changes to the plan, including "Consolidating recordkeeping (by having one fund provider manage administration for multiple providers or by moving to a sole administrator scenario)." *See* Pepperdine University Participant Q & A.[15] Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as

---

[15] Available at
http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.

well as a streamlined compliance process and simplified data coordination. *Id.*

Pepperdine acknowledged that maintaining a multiple-vendor platform was not a

"cost-effective, viable option." Paul B. Lasiter, *Single Provider, Multiple Choices*,

NACUBO.[16] Recognizing the inefficiencies and overlapping work in a multiple

recordkeeper arrangement, Pepperdine determined that costs were "higher in a

multivendor arrangement, because each vendor receives only a portion of the

ongoing total plan contributions," while a single provider allowed to "realize true

economies of scale." *Id.*

85.    Pepperdine also recognized that the bundled model demanded by

certain providers was not in participants' interest. Using those providers "meant

being obligated to offer some or all of that provider's proprietary funds on the plan's

investment menu—*whether or not those investments offered participants the best*

*range of choice, value, and relative performance.*" *Id.* (emphasis added). Acting in

participants' interest required that the fiduciaries instead have the ability to select

those "funds that the university—working with an independent financial adviser—

could identify as being the 'best options in their respective asset classes.'" *Id.* After

weighing and analyzing a variety of factors, Pepperdine determined that

"consolidating with a single vendor has been the straightforward solution to

achieving" the objective of acting "for the exclusive benefit of plan participants." *Id.*

The benefits of consolidation included "[a] better fiduciary process with ongoing

---

[16] Available at
http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_201
0/Si ngle_Provider_Multiple_Choices.html.

evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants." *Id.*

86.     In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector.*" James S. Almond, *403(b) Plan Redesign-Making a Good Retirement Plan Better*, PURDUE UNIVERSITY (emphasis added).[17] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower

---

[17] Available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_B etter.docx.

administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." *Id.* Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." *Id.* Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3-4 million per year* which is then compounded over time." *Id.* (emphasis added).

87.     Likewise, the California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting. *Caltech Names TIAA-CREF Recordkeeper,* INSTITUTIONAL INVESTOR (Dec. 10, 2009).[18] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

---

[18] Available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

88.     Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

89.     In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014).[19] Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market." *Id.* at 3.

90.     Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff." *Id.* at 4. "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully

_____

[19] Available at https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.

higher than under a single recordkeeper model." *Id.* at 5. Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants." *Id.*

91.    *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." *Id.* Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." *Id.* at 6. An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id.* An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup. *Id.*

92.    Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[20]

93.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Johns Hopkins Plan, the overwhelming

---

[20] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Ins titute/News_Center/Reports/130329-01exec.pdf.

majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[21] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.[22]

94.     The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[23] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from." *Id.* Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

---

[21] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.

[22] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.

[23] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

95.     AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[24]

96.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[25]

97.     The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. *See, e.g.,* Kristen Heinzinger,

---

[24] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whi tep aper_FINAL.pdf.aspx.

[25] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

*Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[26] Paul B. Lasiter, *Single Provider, Multiple Choices,* BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[27]

98.     Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less,* PLAN SPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation,

---

[26] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[27] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_201 0/Si ngle_Provider_Multiple_Choices.html.

plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[28]

## DEFENDANT BREACHED ITS FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

99.    Defendant's longstanding retention of five recordkeepers and over 400 of their proprietary funds—which the recordkeepers required to be included in the Plan—while excluding superior low-cost alternatives from other managers, demonstrates that, in contrast with the comprehensive plan reviews conducted by the similarly situated fiduciaries described above, Defendant failed to adequately engage in a similar analysis. Had Defendant conducted such a review of the Plan, Defendant would not have allowed the Plan to continue to pay excessive administrative fees; would not have maintained an inefficient five-recordkeeper structure; would not have continued to include well over *400* investment options in the Plan, including duplicative funds in numerous investment styles and higher-cost retail share classes for which identical lower-cost versions of the same funds were available; and would not have retained investment options which had a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

## I.    The Plan's 445 investment options and five recordkeepers.

100.    Defendant exercised and continues to exercise discretionary authority and control over the investment options that are included in the Plan.

---

[28] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

101.    Prior to January 2016, Defendant designated as available investment alternatives over *440* different mutual funds or insurance company products from the Plan's *five* recordkeepers: American Century ("American Century"), Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), Fidelity Investments Institutional Operations Company ("Fidelity"), the Variable Annuity Life Insurance Company of America ("VALIC"), and the Vanguard Group, Inc. ("Vanguard").

102.    Among the available investments, 76 were American Century options holding $256 million in Plan assets, 25 were TIAA-CREF options holding $1.9 billion, 193 were Fidelity options holding $764 million, 62 were VALIC options holding $85 million, and 89 were Vanguard options holding $1.3 billion.

103.    Defendant allowed the Plan's recordkeepers to essentially put the entirety of their investment offerings in the Plan. Specifically, Defendant agreed to include in the Plan nearly every Fidelity mutual fund available in the market, including newly-created funds. As a result, Defendant caused *hundreds* of mutual fund investments to be offered to participants in the Plan without making any independent determination that such investments were prudent, reasonably priced, and provided for the exclusive purpose of providing benefits to Plan participants. Thus, Defendant failed to employ a prudent and loyal process for the selection and retention of Plan investment options.

104.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets

invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent upon the claims-paying ability of TIAA. The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan.

105.   The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

106.   The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. An insurance company separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets.

107.   The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

108.   The Vanguard, Fidelity, and American Century investment options offered to Plan participants are exclusively mutual funds that charge varying

amounts for investment management and other expenses, depending on the type of investment and share class.

109.    VALIC issued a fixed and variable insurance annuity program to the Plan, from which participants could direct their contributions among various fixed and variable return account options. The value of each participant's investment in these variable accounts will change over time based on the investment experience and expenses applied to the accounts. The variable accounts include insurance company pooled separate accounts that invest in underlying mutual funds advised by VALIC or other mutual fund companies, such as Vanguard. For these options, VALIC charges fees *in addition to* the expense ratio of the underlying mutual funds, which can reach *multiples* of the total fees charged by the mutual funds. For instance, VALIC charged 120 bps for the VALIC Vanguard LifeStrategy Conservative Growth Fund when the underlying Vanguard LifeStrategy Conservative Growth Fund (VSCGX) charged 15 bps, an increase of *700%. See infra* ¶134.

110.    The VALIC fixed accounts invest in the general account of VALIC and depend upon the claims-paying ability of VALIC. These options offer a fixed rate of return to participants.

111.    In January 2016, Defendant reduced the Plan's recordkeeping and administrative service providers from five to three. Despite this change, and as set forth in further detail below, Defendant continues to include high-priced investment

options in the Plan, and continues to allow excessive recordkeeping fees to be charged to the Plan.

## II.  Defendant improperly allowed TIAA-CREF to require the inclusion of its investment products in the Plan and improperly allowed TIAA to require it to provide recordkeeping for its proprietary options.

112.   ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments no matter how long they have been in a plan, *Tibble*, 135 S. Ct. at 1828–29.

113.   As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products. By agreeing to TIAA's mandate that its recordkeeping services had to be linked to including its funds in the Plan, Defendant promoted TIAA's financial interests at the expense of participants and drove excessive and uncapped revenue to TIAA's recordkeeping arm for years.

114.   By allowing the Plan to enter such a bundled arrangement with TIAA-CREF, Johns Hopkins agreed to lock its employees into funds which Johns Hopkins did not analyze. It can never be prudent to lock in a fund in a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. Defendant thus failed to

discharge its duty to independently evaluate whether each investment option was prudent for the Plan; whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants; and whether it was prudent to include and retain the CREF Stock and Money Market accounts and the TIAA Traditional in the Plan. Instead of acting solely in the interest of participants, Defendant allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement. Because Defendant allowed CREF Stock to be locked into the Plan, Defendant could not satisfy its duty to evaluate the option for inclusion and retention in the Plan, whether it was prudent at the time of inclusion and whether it should be removed if imprudent. As a result of Defendant's breach in allowing CREF Stock to be retained in the Plan because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plan suffered massive losses compared to prudent alternatives, as discussed in more detail below. *See infra* ¶¶181–204.

115.    As noted above, the Plan offers the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. An example of the restrictions and penalties for withdrawal imposed by this Annuity include a 2.5% surrender charge if a participant withdraws his or her investment in a single lump sum within 120 days of termination of employment. Participants who wish to withdraw their savings without this 2.5% penalty can only do so by spreading their withdrawal over a *ten-year period*.

116.    The Plan includes TIAA-CREF's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style.

117.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

    a.    "administrative expense" charge (24 bps);[29]

    b.    "distribution expense" charge (9.5 bps);

    c.    "mortality and expense risk" charge (0.5 bps); and

    d.    "investment advisory expense" charge (ranging from 4 to 12.5 bps).

118.    Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plan's participants, and the other two layers of fees pay for services that provide *no* benefit to the Plan's participants.

    **a.  Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of

---

[29] Expenses are stated as of May 1, 2014.

assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plan's assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

**b. Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

**c. Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plan, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the

participant derives no benefit for paying such a charge, year after year,

and TIAA-CREF provides no actual services or incurs any risk to justify

the fee until a decision is made at retirement to convert the value of the

lump sum to an annuity. Moreover, most participants in retirement plans

recordkept by TIAA-CREF do not elect to annuitize their holdings in their

variable annuity accounts upon retirement. Yet, *all* participants pay

these fees for many years regardless of whether they annuitize their

variable annuity account.

**d.  Investment advisory expense charge (or investment**

**management fees):** It is a fundamentally established principle of

investment management that larger asset size enables the asset holder to

obtain lower investment management fees as a percentage of assets. Fund

managers institute breakpoints, whereby the investment management fee

is reduced, as asset size goes up, at pre-specified asset thresholds to pass

along economies of scale to the investor. For example, if $5 million is a

breakpoint, one fee, based on a percentage of assets, will be charged on

the first $5 million, and a lesser percentage will be charged on the next

portion of the assets, or on all assets. A large investor will therefore be

charged a lower fee, on a percentage of assets, than a smaller investor to

recognize the economies of scale generated from the higher asset levels.

Jumbo plans, such as the Johns Hopkins Plan, can command extremely

low fees. Despite this recognized principle, TIAA-CREF has not instituted

*any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plan's fiduciaries did not obtain the lower investment management fees that come with the Plan's enormous asset size. As a result, the Plan, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by Johns Hopkins' employees and retirees. The Plan subsidized these efforts for years, often at a loss—compounding their conflict and breaching their duty to participants under ERISA.

119.    The excessiveness of this investment management fee is even more egregious because of the way critics have documented how CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. *See supra* ¶76.

120.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

   a.   "administrative expense" charge (26.5 bps);

   b.   "distribution expense" charge (8 bps);

   c.   "mortality and expense risk" charge (0.5 bps);

    d.  "liquidity guarantee" (18 bps); and

    e.  "investment management expense" charge (36.5 bps).

121.   The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index (Inst), which has a *total* expense ratio of 8 bps. *See infra* ¶¶206–208.

122.   As noted, the TIAA-CREF mutual funds in the Plan charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class. Thus, Johns Hopkins Plan participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plan do not include such marketing costs.

## III.  Defendant caused the Plan to pay excessive administrative and recordkeeping fees.

123.   As set forth above, the market for defined contribution recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Plan and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

124.   Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate

for a complex jumbo plan is to obtain an actual fee quote comparison, prudent

fiduciaries of jumbo defined contribution plans put their plans' recordkeeping and

administrative services out for competitive bidding at regular intervals of

approximately three years.

125.   As detailed above, extensive industry literature and the experience of

similarly situated fiduciaries has shown that multiple recordkeeper platforms are

inefficient and result in excessive fees, while the use of a single recordkeeper offers

many benefits such as leveraging the plan's participant base to obtain economies of

scale to ensure that participants pay only reasonable recordkeeping fees, while also

simplifying personnel and payroll data feeds, reducing electronic fund transfers, and

avoiding duplication of services when more than one recordkeeper is used. Instead of

leveraging the size of the participant base to take advantage of economies of scale,

using multiple recordkeepers eliminates a plan's leverage. Rather than obtaining

pricing based on a 25,000-participant plan from one recordkeeper, Defendant spread

recordkeeping of participants among *five* recordkeepers, who pushed each of their

own products on the Plan. This took away the Plan's ability to obtain favorable

pricing and resulted in the Plan including hundreds of investment options that

Defendant never reviewed.

126.   Despite the long-recognized benefits of a single recordkeeper for a

defined contribution plan, Defendant continued to contract with *five* separate

recordkeepers for the Plan: TIAA-CREF, Vanguard, Fidelity, American Century,

and VALIC. As of January 2016, Defendant continues to contract with *three*

recordkeepers (TIAA-CREF, Fidelity, and Vanguard). The inefficient and costly structure maintained by Defendant has caused Plan participants to incur, and continue to pay, duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There was no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Plan before January 2016, as well as before 2009, or to continue with three recordkeepers to the present.

127.    The Plan's recordkeepers receive compensation through revenue sharing payments from the Plan's investments.

128.    Instead of obtaining a flat per-participant rate or sufficient rebates of all excessive revenue sharing back to the Plan, Defendant allowed the Plan's five recordkeepers to collect excessive asset-based revenue sharing as payment for these duplicative administrative services.

129.    Based upon information from sources including industry experts, the Plan's TIAA-CREF investments kicked back the following amounts of asset-based revenue sharing to the TIAA-CREF recordkeeping entity:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

130.    Fidelity and Vanguard are also compensated for recordkeeping services based on revenue sharing payments from their proprietary Fidelity or Vanguard mutual funds, including from higher-cost retail share classes of those funds that Defendant included in the Plan instead of available lower-cost institutional class shares. Similarly, American Century and VALIC were compensated based on revenue sharing payments from their proprietary investment options.

131.    In addition, the Plan's recordkeepers receive additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

132.    Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 25,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plan would have been a fixed amount between $500,000 and $850,000 (approximately $35 per participant with an account balance).

133.    Based on schedules regarding service provider compensation in the Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Plan paid at least $4.5 million to $6.1 million per year from 2010 to 2015 (or approximately $225–$340 per participant per year), over *860%* higher than a reasonable fee for these services.

This resulted in the Plan paying millions of dollars in excessive recordkeeping fees each year.

134.   This is a *very* conservative total because this amount excludes asset-based revenue sharing payments VALIC received for recordkeeping and administrative services from the VALIC variable and fixed accounts. This information was not disclosed to Plan participants. These asset-based payments are substantial. For instance, on each of the variable accounts, VALIC charged fees *48% to 700%* higher than the fees actually charged by the underlying mutual funds, and received additional compensation through revenue sharing payments from the underlying proprietary mutual funds and other third-party mutual funds. Based on information presently available to Plaintiffs, as of 2015, the amounts charged by VALIC on its variable annuity products and the expenses of the underlying mutual funds are set forth below.

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC American Beacon Holland Large Cap Growth Fund | 196 bps | American Beacon Holland Large Cap Growth (Inv) (LHGFX) | 124 bps | 58.06% |
| VALIC Ariel Appreciation Fund | 192 bps | Ariel Appreciation (Inv) (CAAPX) | 112 bps | 71.43% |
| VALIC Ariel Fund | 183 bps | Ariel Fund (Inv) (ARGFX) | 102 bps | 79.41% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC SunAmerica 2020 High Watermark (A) Fund | 223 bps | SunAmerica 2020 High Watermark (A) (HWKAX) | 85 bps | 162.35% |
| VALIC Asset Allocation Fund | 151 bps | VALIC Company I Asset Allocation (VCAAX) | 68 bps | 122.06% |
| VALIC Blue Chip Growth Fund | 163 bps | VALIC Company I Blue Chip Growth (VCBCX) | 83 bps | 96.39% |
| VALIC Broad Cap Value Income Fund | 165 bps | VALIC Company I Broad Cap Value Income (VBCVX) | 85 bps | 94.12% |
| VALIC Capital Conservation Fund | 144 bps | VALIC Company I Capital Conservation (VCCCX) | 63 bps | 128.57% |
| VALIC Core Equity Fund | 160 bps | VALIC Company I Core Equity (VCCEX) | 80 bps | 100.00% |
| VALIC Dividend Value Fund | 162 bps | VALIC Company I Dividend Value (VCIGX) | 82 bps | 97.56% |
| VALIC Emerging Economies Fund | 175 bps | VALIC Company I Emerging Economies (VCGEX) | 94 bps | 86.17% |
| VALIC Foreign Value Fund | 160 bps | VALIC Company I Foreign Value (VCFVX) | 79 bps | 102.53% |
| VALIC Global Real Estate Fund | 166 bps | VALIC Company I Global Real Estate (VGREX) | 85 bps | 95.29% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Global Social Awareness Fund | 144 bps | VALIC Company I Global Social Awareness (VCSOX) | 62 bps | 132.26% |
| VALIC Global Strategy Fund | 144 bps | VALIC Company I Global Strategy (VGLSX) | 64 bps | 125.00% |
| VALIC Government Securities Fund | 145 bps | VALIC Company I Government Securities (VCGSX) | 64 bps | 126.56% |
| VALIC Growth & Income Fund | 165 bps | VALIC Company I Growth & Income (VCGAX) | 85 bps | 94.12% |
| VALIC Growth Fund | 161 bps | VALIC Company I Growth (VCULX) | 80 bps | 101.25% |
| VALIC Health Sciences Fund | 191 bps | VALIC Company I Health Sciences (VCHSX) | 109 bps | 75.23% |
| VALIC Inflation Protected Fund | 139 bps | VALIC Company I Inflation Protected (VCTPX) | 58 bps | 139.66% |
| VALIC International Equities Index Fund | 126 bps | VALIC Company I International Equities Index (VCIEX) | 44 bps | 186.36% |
| VALIC International Government Bond Fund | 145 bps | VALIC Company I International Government Bond (VCIFX) | 65 bps | 123.08% |
| VALIC International Growth Fund | 181 bps | VALIC Company I International Growth (VCINX) | 101 bps | 79.21% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Large Cap Core Fund | 164 bps | VALIC Company I Large Cap Core (VLCCX) | 82 bps | 100.00% |
| VALIC Large Capital Growth Fund | 156 bps | VALIC Company I Large Capital Growth (VLCGX) | 75 bps | 108.00% |
| VALIC Mid Cap Index Fund | 116 bps | VALIC Company I Mid Cap Index (VMIDX) | 36 bps | 222.22% |
| VALIC Mid Cap Strategic Growth Fund | 162 bps | VALIC Company I Mid Cap Strategic Growth (VMSGX) | 80 bps | 102.50% |
| VALIC Money Market I Fund | 131 bps | VALIC Company I Money Market I (VCIXX) | 14 bps | 835.71% |
| VALIC NASDAQ-100 Index Fund | 133 bps | VALIC Company I Nasdaq-100 Index (VCNIX) | 53 bps | 150.94% |
| VALIC Science & Technology Fund | 179 bps | VALIC Company I Science & Technology (VCSTX) | 97 bps | 84.54% |
| VALIC Small Cap Fund | 173 bps | VALIC Company I Small Cap (VCSMX) | 92 bps | 88.04% |
| VALIC Small Cap Aggressive Growth Fund | 179 bps | VALIC Company I Small Cap Aggressive Growth (VSAGX) | 99 bps | 80.81% |
| VALIC Small Cap Index Fund | 120 bps | VALIC Company I Small Cap Index (VCSLX) | 40 bps | 200.00% |
| VALIC Small Cap Special Value Fund | 168 bps | VALIC Company I Small Cap Special Values (VSSVX) | 86 bps | 95.35% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Small-Mid Growth Fund | 180 bps | VALIC Company I Small-Mid Growth (VSSGX) | 99 bps | 81.82% |
| VALIC Stock Index Fund | 115 bps | VALIC Company I Stock Index (VSTIX) | 34 bps | 238.24% |
| VALIC Value Fund | 165 bps | VALIC Company I Value (VAVAX) | 85 bps | 94.12% |
| VALIC Aggressive Growth Lifestyle Fund | 143 bps | VALIC Company II Aggressive Growth Lifestyle (VAGLX) | 85 bps | 68.24% |
| VALIC Capital Appreciation Fund | 140 bps | VALIC Company II Capital Appreciation (VCCAX) | 84 bps | 66.67% |
| VALIC Conservative Growth Lifestyle Fund | 143 bps | VALIC Company II Conservative Growth Lifestyle (VCGLX) | 87 bps | 64.37% |
| VALIC Core Bond Fund | 132 bps | VALIC Company II Core Bond (VCCBX) | 77 bps | 71.43% |
| VALIC High Yield Bond Fund | 151 bps | VALIC Company II High Yield Bond (VCHYX) | 96 bps | 57.29% |
| VALIC International Opportunities Fund | 155 bps | VALIC Company II International Opportunities (VISEX) | 99 bps | 56.57% |
| VALIC Large Cap Value Fund | 136 bps | VALIC Company II Large Cap Value (VACVX) | 80 bps | 70.00% |
| VALIC Mid Cap Growth Fund | 140 bps | VALIC Company II Mid Cap Growth (VAMGX) | 84 bps | 66.67% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Mid Cap Value Fund | 160 bps | VALIC Company II Mid Cap Value (VMCVX) | 105 bps | 52.38% |
| VALIC Moderate Growth Lifestyle Fund | 142 bps | VALIC Company II Moderate Growth Lifestyle (VMGLX) | 85 bps | 67.06% |
| VALIC Money Market II Fund | 110 bps | VALIC Company II Money Market II (VIIXX) | 15 bps | 633.33% |
| VALIC Small Cap Growth Fund | 171 bps | VALIC Company II Small Cap Growth (VASMX) | 115 bps | 48.70% |
| VALIC Small Cap Value Fund | 150 bps | VALIC Company II Small Cap Value (VCSVX) | 95 bps | 57.89% |
| VALIC Socially Responsible Fund | 116 bps | VALIC Company II Socially Responsible (VCSRX) | 56 bps | 107.14% |
| VALIC Strategic Bond Fund | 140 bps | VALIC Company II Strategic Bond (VCSBX) | 87 bps | 60.92% |
| VALIC Vanguard LifeStrategy Conservative Growth Fund | 120 bps | Vanguard LifeStrategy Conservative Growth (Inv) (VSCGX) | 15 bps | 700.00% |
| VALIC Vanguard LifeStrategy Moderate Growth Fund | 121 bps | Vanguard LifeStrategy Moderate Growth (Inv) (VSMGX) | 16 bps | 656.25% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Vanguard Long-Term Investment-Grade Fund | 102 bps | Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 22 bps | 363.64% |
| VALIC Vanguard Long-Term Treasury Fund | 100 bps | Vanguard Long-Term Treasury (Inv) (VUSTX) | 20 bps | 400.00% |
| VALIC Vanguard Wellington Fund | 131 bps | Vanguard Wellington (Inv) (VWELX) | 26 bps | 403.85% |
| VALIC Vanguard Windsor II Fund | 141 bps | Vanguard Windsor II (Inv) (VWNFX) | 34 bps | 314.71% |

140.    Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendant also failed to adequately negotiate rebates of excessive fee payments to TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard. As a specific example, because the multi-billion dollar plans paid the same percentage of asset-based fees as much smaller plans that used TIAA-CREF's products and services, Defendant could have demanded "plan pricing" rebates from TIAA-CREF based on the Plan's economies of scale. Just as with investment management fees, the Plan's size would have enabled Defendant to command a much lower fee. Defendant could have also demanded and obtained similar rebates of all excessive fee payments from Vanguard, VALIC, American Century, and Fidelity. Had Defendant adequately negotiated for these

rebates, the Plan's recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

141.   The impact of excessive fees on employees' and retirees' retirement assets is dramatic, as the U.S. Department of Labor has found. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013) (finding that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career).[30]

142.   Defendant also failed to control recordkeeping costs as Plan assets grew. From June 30, 2009 to June 30, 2015, the Plan's assets increased from $2.1 billion to over $4.2 billion, an increase of *100%*. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets doubled, even though the administrative services provided to the Plan remained the same. Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other loyally and prudently administered plans do, but failed to do so.

143.   Upon information and belief, Defendant also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendant to select a recordkeeper charging reasonable fees, obtain a

---

[30] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

144.    Defendant failed to prudently monitor and control the compensation paid by the Plan for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers. Had Defendant monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $35 million of their retirement savings in the last six years alone.[31]

## IV.    Defendant caused the Plan to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.

145.    Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

---

[31] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class-ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[32]

146.    Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost chare class of the same fund is available, to avoid saddling the plan with unnecessary fees.

147.    Jumbo investors like the Plan can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

148.    Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plan. Institutional share classes sometimes have a minimum investment threshold to qualify for the institutional rate. However,

> For large 401(k) plans with over a billion dollars in total assets ... mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and

---

[32] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

request waivers of the investment minimums so as to secure the
institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D.

Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

149.   In fact, Vanguard expressly states in its SEC filings that it "reserves

the right to establish higher or lower minimum amounts for certain investors",

including when the "plan sponsor's aggregate assets within the Vanguard Funds

will likely generate substantial economies in the servicing of their accounts."[33]

150.   As further support of the routine waiver of investment minimums for

large institutional investors, fiduciaries of other defined contribution plans have

successfully negotiated on behalf of their plans less expensive institutional share

classes of Vanguard, TIAA-CREF, Fidelity, American Century, and VALIC mutual

fund options despite not meeting the minimum investment thresholds.

151.   Therefore, Defendant knew or should have known that investment

providers would have allowed the Plan to provide lower-cost share classes to

participants if Defendant had asked.

152.   Defendant selected and continues to retain Plan investment options

with far higher costs than were and are available for the Plan based on its size. This

includes Defendant selecting and continuing to offer far higher-cost share classes

---

[33] *See* Vanguard Funds Multiple Class Plan, available at
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multiplecla
ssplanvanguardfun.pdf.

even though lower-cost share classes of the *exact same mutual funds* were available. The following table sets forth each higher-cost mutual fund share class that was included in the Plan during the proposed class period for which a significantly lower-cost, but otherwise identical, share class of the same mutual fund was available. The expense ratios identified for the Plan's investment option and the lower-cost share class alternative are based on the earliest date during the proposed class period that the higher-cost fund was included in the Plan:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Amana Growth (Inv) (AMAGX) | 109 bps | Amana Growth (Inst) (AMIGX) | 87 bps | 25.29% |
| American Century All Capital Growth (Inv) (TWGTX) | 100 bps | American Century All Capital Growth (Inst) (ACAJX) | 80 bps | 25.00% |
| American Century Alternatives Equity Market Neutral (Inv) (ALHIX) | 309 bps | American Century Alternatives Equity Market Neutral (Inst) (ALISX) | 289 bps | 6.92% |
| American Century Alternatives Market Neutral Value (Inv) (ACVVX) | 160 bps | American Century Alternatives Market Neutral Value (Inst) (ACVKX) | 140 bps | 14.29% |
| American Century Balanced (Inv) (TWBIX) | 91 bps | American Century Balanced (Inst) (ABINX) | 71 bps | 28.17% |
| American Century Capital Value (Inv) (ACTIX) | 109 bps | American Century Capital Value (Inst) (ACPIX) | 89 bps | 22.47% |
| American Century Core Equity Plus (Inv) (ACPVX) | 130 bps | American Century Core Equity Plus (Inst) (ACPKX) | 110 bps | 18.18% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century Disciplined Growth (Inv) (ADSIX) | 105 bps | American Century Disciplined Growth (Inst) (ADCIX) | 85 bps | 23.53% |
| American Century Disciplined Growth Plus (Inv) (ACDJX) | 146 bps | American Century Disciplined Growth Plus (Inst) (ACDKX) | 126 bps | 15.87% |
| American Century Diversified Bond (Inv) (ADFIX) | 58 bps | American Century Diversified Bond (Inst) (ACBPX) | 38 bps | 52.63% |
| American Century Emerging Markets (Inv) (TWMIX) | 172 bps | American Century Emerging Markets (Inst) (AMKIX) | 152 bps | 13.16% |
| American Century Emerging Markets Value (Inv) (AEVVX) | 146 bps | American Century Emerging Markets Value (Inst) (AEVNX) | 126 bps | 15.87% |
| American Century Equity Growth (Inv) (BEQGX) | 70 bps | American Century Equity Growth (Inst) (AMEIX) | 50 bps | 40.00% |
| American Century Equity Income (Inv) (TWEIX) | 97 bps | American Century Equity Income (Inst) (ACIIX) | 77 bps | 25.97% |
| American Century Equity Income (Inv) (TWEIX) | 93 bps | American Century Equity Income (R6) (AEUDX) | 58 bps | 60.34% |
| American Century Equity Index (Inv) (ACIVX) | 49 bps | American Century Equity Index (Inst) (ACQIX) | 29 bps | 68.97% |
| American Century Focused Growth (Inv) (AFSIX) | 102 bps | American Century Focused Growth (Inst) (AFGNX) | 82 bps | 24.39% |
| American Century Fundamental Equity (Inv) (AFDIX) | 102 bps | American Century Fundamental Equity (Inst) (AFEIX) | 82 bps | 24.39% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century Ginnie Mae (Inv) (BGNMX) | 54 bps | American Century Ginnie Mae (Inst) (AGMNX) | 34 bps | 58.82% |
| American Century Global Bonds (Inv) (AGBVX) | 96 bps | American Century Global Bonds (Inst) (AGBNX) | 76 bps | 26.32% |
| American Century s (Inv) (AGBVX) | 96 bps | American Century Global Bonds (R6) (AGBDX) | 71 bps | 35.21% |
| American Century Global Gold (Inv) (BGEIX) | 69 bps | American Century Global Gold (Inst) (AGGNX) | 49 bps | 40.82% |
| American Century Global Growth (Inv) (TWGGX) | 116 bps | American Century Global Growth (Inst) (AGGIX) | 96 bps | 20.83% |
| American Century Global Growth (Inv) (TWGGX) | 108 bps | American Century Global Growth (R6) (AGGDX) | 73 bps | 47.95% |
| American Century Global Real Estate (Inv)  (ARYVX) | 121 bps | American Century Global Real Estate (Inst)  (ARYNX) | 101 bps | 19.80% |
| American Century Government Bond (Inv)  (CPTNX) | 48 bps | American Century Government Bond (Inst)  (ABTIX) | 28 bps | 71.43% |
| American Century Growth (Inv) (TWCGX) | 100 bps | American Century Growth (Inst) (TWGIX) | 80 bps | 25.00% |
| American Century Heritage (Inv) (TWHIX) | 101 bps | American Century Heritage (Inst) (ATHIX) | 81 bps | 24.69% |
| American Century Heritage (Inv) (TWHIX) | 100 bps | American Century Heritage (R6) (ATHDX) | 65 bps | 53.85% |
| American Century High-Yield  (Inv) (ABHIX) | 77 bps | American Century High-Yield  (Inst) (ACYIX) | 57 bps | 35.09% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century High-Yield (Inv) (ABHIX) | 85 bps | American Century High-Yield (R6) (AHYDX) | 60 bps | 41.67% |
| American Century High-Yield Municipal (Inv) (ABHYX) | 61 bps | American Century High-Yield Municipal (Inst) (AYMIX) | 41 bps | 48.78% |
| American Century Income and Growth (Inv) (BIGRX) | 70 bps | American Century Income and Growth (Inst) (AMGIX) | 50 bps | 40.00% |
| American Century Inflation Adjusted Bond (Inv) (ACITX) | 48 bps | American Century Inflation Adjusted Bond (Inst) (AIANX) | 28 bps | 71.43% |
| American Century Inflation Protection Bond (Inv) (APOIX) | 51 bps | American Century Inflation Protection Bond (Inst) (APISX) | 30 bps | 70.00% |
| American Century Inflation Protection Bond (Inv) (APOIX) | 57 bps | American Century Inflation Protection Bond (R6) (APODX) | 32 bps | 78.13% |
| American Century International Bond (Inv) (BEGBX) | 82 bps | American Century International Bond (Inst) (AIDIX) | 62 bps | 32.26% |
| American Century International Core Equity (Inv) (ACIMX) | 118 bps | American Century International Core Equity (Inst) (ACIUX) | 98 bps | 20.41% |
| American Century International Growth (Inv) (TWIEX) | 135 bps | American Century International Growth (Inst) (TGRIX) | 115 bps | 17.39% |
| American Century International Growth (Inv) (TWIEX) | 118 bps | American Century International Growth (R6) (ATGDX) | 83 bps | 42.17% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century International Opportunities (Inv) (AIOIX) | 189 bps | American Century International Opportunities (Inst) (ACIOX) | 169 bps | 11.83% |
| American Century International Value (Inv)  (ACEVX) | 132 bps | American Century International Value (Inst)  (ACVUX) | 112 bps | 17.86% |
| American Century International Value (Inv)  (ACEVX) | 130 bps | American Century International Value (R6)  (ACVDX) | 95 bps | 36.84% |
| American Century Large Company Value (Inv) (ALVIX) | 85 bps | American Century Large Company Value (Inst) (ALVSX) | 65 bps | 30.77% |
| American Century Large Company Value (Inv) (ALVIX) | 85 bps | American Century Large Company Value (R6) (ALVDX) | 50 bps | 70.00% |
| American Century Legacy Focused Large Cap (Inv) (ACFOX) | 111 bps | American Century Legacy Focused Large Cap (Inst) (ACFSX) | 91 bps | 21.98% |
| American Century Legacy Large Cap (Inv)  (ACGOX) | 111 bps | American Century Legacy Large Cap (Inst)  (ACGHX) | 91 bps | 21.98% |
| American Century Legacy Multi Cap (Inv)  (ACMNX) | 116 bps | American Century Legacy Multi Cap (Inst)  (ACMHX) | 96 bps | 20.83% |
| American Century Livestrong 2015 (R) (ARFRX) | 130 bps | American Century Livestrong 2015 (Inst)   (ARNIX) | 60 bps | 116.67% |
| American Century Livestrong 2020 (Inv) (ARBVX) | 83 bps | American Century Livestrong 2020 (Inst) (ARBSX) | 63 bps | 31.75% |
| American Century Livestrong 2025 (Inv)  (ARWIX) | 86 bps | American Century Livestrong 2025 (Inst)  (ARWFX) | 66 bps | 30.30% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century Livestrong 2030 (Inv) (ARCVX) | 89 bps | American Century Livestrong 2030 (Inst) (ARCSX) | 69 bps | 28.99% |
| American Century Livestrong 2035 (Inv)  (ARYIX) | 91 bps | American Century Livestrong 2035 (Inst)  (ARLIX) | 71 bps | 28.17% |
| American Century Livestrong 2040 (Inv)  (ARDVX) | 94 bps | American Century Livestrong 2040 (Inst)  (ARDSX) | 74 bps | 27.03% |
| American Century Livestrong 2045 (Inv)  (AROIX) | 95 bps | American Century Livestrong 2045 (Inst)  (AOOIX) | 75 bps | 26.67% |
| American Century Livestrong 2050 (Inv)  (ARFVX) | 95 bps | American Century Livestrong 2050 (Inst)  (ARFSX) | 75 bps | 26.67% |
| American Century Livestrong 2055 (Inv)  (AREVX) | 101 bps | American Century Livestrong 2055 (Inst)  (ARENX) | 81 bps | 24.69% |
| American Century Livestrong Income Retirement (Inv) (ARTOX) | 77 bps | American Century Livestrong Income Retirement (Inst) (ATTIX) | 57 bps | 35.09% |
| American Century Midcap Value (Inv) (ACMVX) | 100 bps | American Century Midcap Value (Inst) (AVUAX) | 80 bps | 25.00% |
| American Century Midcap Value (Inv) (ACMVX) | 100 bps | American Century Midcap Value (R6) (AMDVX) | 65 bps | 53.85% |
| American Century New Opportunities (Inv)  (TWNOX) | 150 bps | American Century New Opportunities (Inst)  (TWNIX) | 130 bps | 15.38% |
| American Century Real Estate (Inv) (REACX) | 116 bps | American Century Real Estate (Inst) (REAIX) | 96 bps | 20.83% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century Real Estate (Inv) (REACX) | 114 bps | American Century Real Estate (R6) (AREDX) | 79 bps | 44.30% |
| American Century Select (Inv) (TWCIX) | 101 bps | American Century Select (Inst) (TWSIX) | 81 bps | 24.69% |
| American Century Select (Inv) (TWCIX) | 100 bps | American Century Select (R6) (ASDEX) | 65 bps | 53.85% |
| American Century Short Duration (Inv) (ACSNX) | 61 bps | American Century Short Duration (Inst) (ACSUX) | 41 bps | 48.78% |
| American Century Short Term Government (Inv) (TWUSX) | 56 bps | American Century Short Term Government (Inst) (TWUOX) | 36 bps | 55.56% |
| American Century Small Cap Growth (Inv) (ANOIX) | 142 bps | American Century Small Cap Growth (Inst) (ANONX) | 122 bps | 16.39% |
| American Century Small Cap Growth (Inv) (ANOIX) | 140 bps | American Century Small Cap Growth (R6) (ANODX) | 107 bps | 30.84% |
| American Century Small Cap Value (Inv) (ASVIX) | 125 bps | American Century Small Cap Value (Inst) (ACVIX) | 105 bps | 19.05% |
| American Century Small Cap Value (Inv) (ASVIX) | 122 bps | American Century Small Cap Value (R6) (ASVDX) | 87 bps | 40.23% |
| American Century Small Company (Inv) (ASQIX) | 90 bps | American Century Small Company (Inst) (ASCQX) | 70 bps | 28.57% |
| American Century Strategic Allocation Aggressive (Inv) (TWSAX) | 121 bps | American Century Strategic Allocation Aggressive (Inst) (AAAIX) | 101 bps | 19.80% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century Strategic Allocation Aggressive (Inv) (TWSAX) | 117 bps | American Century Strategic Allocation Aggressive (R6) (AAAUX) | 80 bps | 46.25% |
| American Century Strategic Allocation Conservative (Inv) (TWSCX) | 100 bps | American Century Strategic Allocation Conservative (Inst) (ACCIX) | 80 bps | 25.00% |
| American Century Strategic Allocation Conservative (Inv) (TWSCX) | 99 bps | American Century Strategic Allocation Conservative (R6) (AACDX) | 64 bps | 54.69% |
| American Century Strategic Allocation Moderate (Inv) (TWSMX) | 107 bps | American Century Strategic Allocation Moderate (Inst) (ASAMX) | 87 bps | 22.99% |
| American Century Strategic Allocation Moderate (Inv) (TWSMX) | 106 bps | American Century Strategic Allocation Moderate (R6) (ASMDX) | 71 bps | 49.30% |
| American Century Strategic Inflation Opportunities (Inv) (ASIOX) | 109 bps | American Century Strategic Inflation Opportunities (Inst) (ASINX) | 89 bps | 22.47% |
| American Century Ultra (Inv) (TWCUX) | 100 bps | American Century Ultra (Inst) (TWUIX) | 80 bps | 25.00% |
| American Century Ultra (Inv) (TWCUX) | 100 bps | American Century Ultra (R6) (AULDX) | 65 bps | 53.85% |
| American Century Value (Inv) (TWVLX) | 1943 bps | American Century Value (Inst) (AVLIX) | 80 bps | 2328.75% |
| American Century Value (Inv) (TWVLX) | 98 bps | American Century Value (R6) (AVUDX) | 62 bps | 58.06% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Century Veedot (Inv) (AMVIX) | 126 bps | American Century Veedot (Inst) (AVDIX) | 106 bps | 18.87% |
| American Century Vista (A) (TWVAX) | 126 bps | American Century Vista (Inst) (TWVIX) | 81 bps | 55.56% |
| Fidelity Balanced (FBALX) | 61 bps | Fidelity Balanced (K) (FBAKX) | 47 bps | 29.79% |
| Fidelity Blue Chip Growth (FBGRX) | 93 bps | Fidelity Blue Chip Growth (K) (FBGKX) | 74 bps | 25.68% |
| Fidelity Capital Appreciation (FDCAX) | 86 bps | Fidelity Capital Appreciation (K) (FCAKX) | 68 bps | 26.47% |
| Fidelity China Region  (FHKCX) | 98 bps | Fidelity China Region  (I) (FHKIX) | 93 bps | 5.38% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond (Inst) (FCNVX) | 30 bps | 33.33% |
| Fidelity Contrafund (FCNTX) | 91 bps | Fidelity Contrafund (K) (FCNKX) | 78 bps | 16.67% |
| Fidelity Disciplined Equity (FDEQX) | 68 bps | Fidelity Disciplined Equity (K) (FDEKX) | 51 bps | 33.33% |
| Fidelity Diversified International (FDIVX) | 96 bps | Fidelity Diversified International (K) (FDIKX) | 77 bps | 24.68% |
| Fidelity Dividend Growth (FDGFX) | 92 bps | Fidelity Dividend Growth (K) (FDGKX) | 71 bps | 29.58% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) (I) (FIEMX) | 119 bps | 5.04% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Emerging Markets (FEMKX) | 109 bps | Fidelity Emerging Markets (K) (FKEMX) | 84 bps | 29.76% |
| Fidelity Emerging Markets Discovery (FEDDX) | 144 bps | Fidelity Emerging Markets Discovery (Inst) (FEDIX) | 143 bps | 0.70% |
| Fidelity Equity Income II (FEQTX) | 69 bps | Fidelity Equity Income II (K) (FETKX) | 54 bps | 27.78% |
| Fidelity Equity-Income (FEQIX) | 74 bps | Fidelity Equity-Income (K) (FEIKX) | 54 bps | 37.04% |
| Fidelity Europe (FIEUX) | 101 bps | Fidelity Europe (I) (FHJMX) | 96 bps | 5.21% |
| Fidelity Export & Multinational (FEXPX) | 84 bps | Fidelity Export & Multinational (K) (FEXKX) | 64 bps | 31.25% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom K 2000 (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom K 2005 (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom K 2010 (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom K 2015 (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom K 2020 (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom K 2025 (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom K 2030 (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom K 2035 (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom K 2040 (FFKFX) | 62 bps | 30.65% |
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom K 2045 (FFKGX) | 62 bps | 32.26% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2050  (FFFHX) | 84 bps | Fidelity Freedom K 2050  (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom 2055 (FDEEX) | 78 bps | Fidelity Freedom K 2055 (FDENX) | 64 bps | 21.88% |
| Fidelity Freedom Income  (FFFAX) | 50 bps | Fidelity Freedom K Income  (FFKAX) | 42 bps | 19.05% |
| Fidelity Fund (FFIDX) | 60 bps | Fidelity Fund (K) (FFDKX) | 43 bps | 39.53% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Global Commodity Stock (I) (FFGIX) | 107 bps | 1.87% |
| Fidelity Growth & Income (FGRIX) | 74 bps | Fidelity Growth & Income (K) (FGIKX) | 53 bps | 39.62% |
| Fidelity Growth Company (FDGRX) | 89 bps | Fidelity Growth Company (K) (FGCKX) | 72 bps | 23.61% |
| Fidelity Growth Discovery (FDSVX) | 75 bps | Fidelity Growth Discovery (K) (FGDKX) | 52 bps | 44.23% |
| Fidelity Growth Strategies (FDEGX) | 77 bps | Fidelity Growth Strategies (K) (FAGKX) | 51 bps | 50.98% |
| Fidelity Independence (FDFFX) | 92 bps | Fidelity Independence (K) (FDFKX) | 77 bps | 19.48% |
| Fidelity International Discovery (FIGRX) | 100 bps | Fidelity International Discovery (K) (FIDKX) | 79 bps | 26.58% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth (Z) (FZAJX) | 88 bps | 18.18% |
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate (Inst) (FIRIX) | 109 bps | 4.59% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity International Small Cap (FISMX) | 142 bps | Fidelity International Small Cap (Inst) (FIXIX) | 131 bps | 8.40% |
| Fidelity International Small Cap Opportunities (FSCOX) | 89 bps | Fidelity International Small Cap Opportunities (Inst) (FOPIX) | 88 bps | 1.14% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Japan (I) (FJPIX) | 75 bps | 6.67% |
| Fidelity Large Cap Growth (FSLGX) | 86 bps | Fidelity Large Cap Growth (Inst) (FLNOX) | 74 bps | 16.22% |
| Fidelity Latin America  (FLATX) | 103 bps | Fidelity Latin America (Inst) (FLFIX) | 101 bps | 1.98% |
| Fidelity Leveraged Company Stock (FLVCX) | 88 bps | Fidelity Leveraged Company Stock (K) (FLCKX) | 69 bps | 27.54% |
| Fidelity Low-Priced Stock (FLPSX) | 99 bps | Fidelity Low-Priced Stock (K) (FLPKX) | 85 bps | 16.47% |
| Fidelity Magellan (FMAGX) | 74 bps | Fidelity Magellan (K) (FMGKX) | 58 bps | 27.59% |
| Fidelity Mega Cap Stock  (FGRTX) | 68 bps | Fidelity Mega Cap Stock (Z) (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 70 bps | Fidelity Mid Cap Growth (Inst) (FGCOX) | 59 bps | 18.64% |
| Fidelity Mid-Cap Stock (FMCSX) | 64 bps | Fidelity Mid-Cap Stock (K) (FKMCX) | 41 bps | 56.10% |
| Fidelity OTC (FOCPX) | 104 bps | Fidelity OTC (K) (FOCKX) | 88 bps | 18.18% |
| Fidelity Overseas (FOSFX) | 85 bps | Fidelity Overseas (K) (FOSKX) | 66 bps | 28.79% |
| Fidelity Puritan (FPURX) | 61 bps | Fidelity Puritan (K) (FPUKX) | 47 bps | 29.79% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Real Estate Income (I) (FRIRX) | 89 bps | 3.37% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Select Gold (I) (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Select Materials (I) (FMFEX) | 93 bps | 1.08% |
| Fidelity Small Cap Independence (FDSCX) | 106 bps | Fidelity Small Cap Independence (I) (FCDIX) | 105 bps | 0.95% |
| Fidelity Spartan 500 Index (Adv) (FUSVX) | 6 bps | Fidelity Spartan 500 Index (Adv Inst) (FXAIX) | 2 bps | 200.00% |
| Fidelity Spartan 500 Index (Inv) (FUSEX) | 10 bps | Fidelity Spartan 500 Index (Adm) (FUSVX) | 7 bps | 42.86% |
| Fidelity Spartan Emerging Markets Index (Adv) (FPMAX) | 22 bps | Fidelity Spartan Emerging Markets Index (Adv Inst) (FPADX) | 12 bps | 83.33% |
| Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index (Adv Inst) (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Extended Market Index (Inv) (FSEMX) | 10 bps | Fidelity Spartan Extended Market Index (Adv Inst) (FSMAX) | 6 bps | 66.67% |
| Fidelity Spartan Global ex-US Index (Adv) (FSGDX) | 18 bps | Fidelity Spartan Global ex-US Index (Adv Inst) (FSGGX) | 10 bps | 80.00% |
| Fidelity Spartan Inflation-Protected Index (Adv) (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index (Adv Inst) (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index (Adv) (FSIVX) | 12 bps | Fidelity Spartan International Index (Adv Inst) (FSPSX) | 6 bps | 100.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan International Index (Inv) (FSIIX) | 10 bps | Fidelity Spartan International Index (Adm) (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan Long Term Treasury Bond Index (Inv) (FLBIX) | 20 bps | Fidelity Spartan Long Term Treasury Bond Index (Adm) (FLBAX) | 10 bps | 100.00% |
| Fidelity Spartan Mid Cap Index (Adv) (FSCKX) | 12 bps | Fidelity Spartan Mid Cap Index (Adv Inst) (FSMDX) | 6 bps | 100.00% |
| Fidelity Spartan Real Estate Index (Adv) (FSRVX) | 9 bps | Fidelity Spartan Real Estate Index (Inst) (FSRNX) | 7 bps | 28.57% |
| Fidelity Spartan Short Term Treasury Index (Inv)  (FSBIX) | 20 bps | Fidelity Spartan Short Term Treasury Index (Adm)  (FSBAX) | 10 bps | 100.00% |
| Fidelity Spartan Small Cap Index (Adv) (FSSVX) | 17 bps | Fidelity Spartan Small Cap Index (Adv Inst) (FSSNX) | 11 bps | 54.55% |
| Fidelity Spartan Total Market Index (Adv) (FSTVX) | 7 bps | Fidelity Spartan Total Market Index (Adv Inst) (FSKAX) | 5 bps | 40.00% |
| Fidelity Spartan Total Market Index (Inv) (FSTMX) | 10 bps | Fidelity Spartan Total Market Index (Adm) (FSTVX) | 7 bps | 42.86% |
| Fidelity Spartan Total Market Index (Inv) (FSTMX) | 10 bps | Fidelity Spartan Total Market Index (Adv Inst) (FSKAX) | 5 bps | 100.00% |
| Fidelity Spartan U.S. Bond Index (Adv) (FSITX) | 10 bps | Fidelity Spartan U.S. Bond Index (Adv Inst) (FXNAX) | 5 bps | 100.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan US Bond Index (Inv)  (FBIDX) | 32 bps | Fidelity Spartan US Bond Index (F) (FUBFX) | 22 bps | 45.45% |
| Fidelity Spartan US Bond Index (Inv)  (FBIDX) | 22 bps | Fidelity Spartan US Bond Index (Adv Inst) (FXNAX) | 5 bps | 340.00% |
| Fidelity Stock Selector (FDSSX) | 86 bps | Fidelity Stock Selector (K) (FSSKX) | 66 bps | 30.30% |
| Fidelity Stock Selector Small Cap (FDSCX) | 72 bps | Fidelity Stock Selector Small Cap (I) (FCDIX) | 62 bps | 16.13% |
| Fidelity Total Bond (FTBFX) | 45 bps | Fidelity Total Bond (Z) (FBKWX) | 36 bps | 25.00% |
| Fidelity Value (FDVLX) | 63 bps | Fidelity Value (K) (FVLKX) | 46 bps | 36.96% |
| Fidelity Value Discovery (FVDFX) | 95 bps | Fidelity Value Discovery (K) (FVDKX) | 74 bps | 28.38% |
| Fidelity Value Strategies (FSLSX) | 80 bps | Fidelity Value Strategies (K) (FVSKX) | 56 bps | 42.86% |
| Strategic Advisers Core Multi-Manager (FLAUX) | 97 bps | Strategic Advisers Core Multi-Manager (F) (FHJSX) | 87 bps | 11.49% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager (F) (FMBKX) | 107 bps | 8.41% |
| Strategic Advisers Small Mid Cap Multi- Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi- Manager (F) (FARMX) | 106 bps | 9.43% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Strategic Advisers Value Multi-Manager (FKMOX) | 97 bps | Strategic Advisers Value Multi-Manager (F) (FGWBX) | 87 bps | 11.49% |
| TIAA-CREF International Equity (Ret) (TRERX) | 78 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF Lifecycle 2010 (Ret) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Ret) (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Inst) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Ret) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Inst) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Ret) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Inst) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Ret) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Inst) (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035 (Ret) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040 (Ret) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Ret) (TTFRX) | 70 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 45 bps | 55.56% |
| TIAA-CREF Lifecycle 2050 (Ret) (TLFRX) | 70 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 45 bps | 55.56% |
| TIAA-CREF Lifecycle 2055 (Ret) (TTRLX) | 74 bps | TIAA-CREF Lifecycle 2055 (Inst) (TTRIX) | 49 bps | 51.02% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle Retirement Income (Ret) (TLIRX) | 63 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 38 bps | 65.79% |
| TIAA-CREF Small-Cap Equity (Ret) (TRSEX) | 80 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 55 bps | 45.45% |
| Vanguard 500 Index (Signal) (VIFSX) | 7 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 250.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation (Adm) (VAARX) | 19 bps | 42.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 26 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Inst Pl) (VDMPX) | 6 bps | 233.33% |
| Vanguard Dividend Appreciation Index (Inv) (VDAIX) | 20 bps | Vanguard Dividend Appreciation Index (Adm) (VDADX) | 10 bps | 100.00% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Inst) (VEMIX) | 15 bps | 133.33% |
| Vanguard Energy (Inv) (VGENX) | 38 bps | Vanguard Energy (Adm) (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard European Stock Index (Inv) (VEURX) | 26 bps | Vanguard European Stock Index (Inst) (VESIX) | 10 bps | 160.00% |
| Vanguard European Stock Index (Inv) (VEURX) | 26 bps | Vanguard European Stock Index (Inst Pl) (VEUPX) | 8 bps | 225.00% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Inst) (VIEIX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Inst Pl) (VEMPX) | 6 bps | 300.00% |
| Vanguard FTSE All-World ex-US Index (Inv) (VFWIX) | 35 bps | Vanguard FTSE All-World ex-US Index (Inst) (VFWSX) | 15 bps | 133.33% |
| Vanguard FTSE All-World ex-US Small-Cap Index (Inv)  (VFSVX) | 55 bps | Vanguard FTSE All-World ex-US Small-Cap Index (Inst)  (VFSNX) | 30 bps | 83.33% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Inst) (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA (Inv) (VFIIX) | 23 bps | Vanguard GNMA (Adm) (VFIJX) | 13 bps | 76.92% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |
| Vanguard Health Care (Inv) (VGHCX) | 36 bps | Vanguard Health Care (Adm) (VGHAX) | 29 bps | 24.14% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 86.67% |
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities (Inst) (VIPIX) | 7 bps | 214.29% |
| Vanguard Institutional Index (Inst) (VINIX) | 4 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 100.00% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Inst) (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index (Inst Pl) (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 12 bps | 108.33% |
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |
| Vanguard Large-Cap Index (Inv) (VLACX) | 26 bps | Vanguard Large-Cap Index (Inst) (VLISX) | 8 bps | 225.00% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Inst) (VBLLX) | 7 bps | 214.29% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index (Inst Pl) (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 100.00% |
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 26 bps | Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 300.00% |
| Vanguard Mid-Cap Growth Index (Inv) (VMGIX) | 24 bps | Vanguard Mid-Cap Growth Index (Adm) (VMGMX) | 10 bps | 140.00% |
| Vanguard Mid-Cap Value Index (Inv) (VMVIX) | 24 bps | Vanguard Mid-Cap Value Index (Adm) (VMVAX) | 10 bps | 140.00% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index (Inst) (VPKIX) | 10 bps | 160.00% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard REIT Index (Inv) (VGSIX) | 26 bps | Vanguard REIT Index (Inst) (VGSNX) | 9 bps | 188.89% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 11 bps | 100.00% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 20 bps | Vanguard Short-Term Bond Index (Inst Pl) (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Federal (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade (Inst) (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury (Inv)  (VFISX) | 22 bps | Vanguard Short-Term Treasury (Adm)  (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Inst) (VSGIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | 225.00% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Inst) (VSIIX) | 8 bps | 225.00% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Inst) (VTMNX) | 7 bps | 185.71% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Inst Pl)  (VDIPX) | 6 bps | 233.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total Bond Market Index (Inst)  (VBTIX) | 7 bps | Vanguard Total Bond Market Index (Inst Pl) (VBMPX) | 5 bps | 40.00% |
| Vanguard Total Bond Market Index (Signal) (VBTSX) | 12 bps | Vanguard Total Bond Market Index (Inst) (VBTIX) | 7 bps | 71.43% |
| Vanguard Total Bond Market Index (Signal) (VBTSX) | 11 bps | Vanguard Total Bond Market Index (Inst Pl) (VBMPX) | 5 bps | 120.00% |
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Inst Pl) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inst) (VITSX) | 4 bps | Vanguard Institutional Total Stock Market Index (Inst Pl) (VITPX) | 2 bps | 100.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Institutional Total Stock Market Index (Inst Pl) (VITPX) | 2 bps | 750.00% |
| Vanguard Total World Stock Index (Inv) (VTWSX) | 45 bps | Vanguard Total World Stock Index (Inst) (VTWIX) | 23 bps | 95.65% |
| Vanguard Total World Stock Index (Inv) (VTWSX) | 35 bps | Vanguard Total World Stock Index (Inst) (VTWIX) | 17 bps | 105.88% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Adm) (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellesley Income (Inv)  (VWINX) | 28 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 33.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II (Inv) (VWNFX) | 35 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 22 bps | 50.00% |

153.   These lower-cost share classes have been available to the Plan for years, some dating back to the early 2000s or before.

154.   Because the share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost, Defendant's failure to select the lower-cost share classes for the Plan's mutual fund options demonstrates that Defendant failed to prudently consider and use the size and purchasing power of the Plan when selecting the Plan's investment options.

155.   Defendant's use of the higher-cost share classes instead of the available lower-cost versions caused Plan participants to lose millions of dollars of their retirement savings due to wholly unnecessary fees.

**V.   Defendant selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.**

156.   Defendant provided a multitude of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces

investment fees, and leading to what industry experts have described as "decision paralysis" for participants. *See, e.g.*, Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009) ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions."). Defendant placed *over 440* investment options in the Plan, in the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and stable value.

157.    As Defendant has admitted (*see infra* ¶¶174–175), it was impossible for Defendant to monitor such a large number of investment options. Thus, Defendant did not—indeed could not—discharge its duty to "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original).

158.    Having such an overwhelming number of investment options also places a monumental burden on the Plan's participants in selecting options in which to invest. Mutual funds are required to offer a prospectus, which is designed to provide material information to potential investors to enable them to make an informed, prudent investment decision. The prospectus sets forth a fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information. For the Fidelity Freedom Funds alone, the prospectus and supporting materials filed with

the SEC span almost *800* printed pages.[34] If a Johns Hopkins Plan participant were to review the prospectuses of all *440-plus* investment options that were in the Plan, they would have to read many thousands of pages of materials. This is a virtually impossible burden. Even for the Plan's fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the more than 400 funds they selected and retained for the Plan.

159.    In comparison to the more than 440 options in the Johns Hopkins Plan, defined contribution plans in 2014 had an average of 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[35] This number of options provides participants with a choice of investment styles while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and obtaining lower fees. It also reflects an evaluation process designed to select the "best in class" investment choice in a particular investment style. Indeed, since it is the fiduciaries in a plan who ERISA holds to a standard of a prudent financial expert, it is important for fiduciaries to perform that selection role for the exclusive benefit of participants who are not financial experts.

---

[34] *See* Fidelity Freedom Funds Prospectus, Form N-1A (May 28, 2016), available at https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm.

[35] Available at https://www.callan.com/research/files/990.pdf.

160.    A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

161.    Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. Including a large number of alternatives removes the benefit of pooling assets consistent with the size of the Plan. Assembling a haphazard lineup of over 440 duplicative options, proprietary to the Plan's recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

162.    Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendant, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and

investment style. When many investment options in a single investment style are included in a plan, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

163.   Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do,[36] when many actively managed funds are included within the same investment style, this results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

164.   In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments*, T. ROWE PRICE

---

[36] Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476, 1481 (2015)("It is well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[37]

165.   Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

166.   Since 2010, the Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (37–38 options), fixed income and high yield bond (62–71 options), international (52–61 options), large cap domestic equities (87–93 options), mid cap domestic equities (30–33 options), small cap domestic equities (22–24 options), real estate (7–9 options), money market (17 options), and target date investments (4 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harms participants and can lead to decision paralysis.

167.   For illustration purposes, in the large cap blend investment style, Defendant included 24 actively managed or passively managed investment options in the Plan, for a combined asset amount of $692 million as of June 30, 2015. Those investments are summarized below and compared to a single lower-cost investment

---

[37] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April
_2009.pdf.

alternative that was available to the Plan, the Vanguard Institutional Index Fund

(Inst Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Investment | Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| Amana Income (Inst) | $116,446 | 87 bps | 2 bps | 4250% |
| American Century Core Equity Plus (Inv) | $136,759 | 130 bps | 2 bps | 6400% |
| American Century Equity Growth (Inv) | $5,960,378 | 67 bps | 2 bps | 3250% |
| American Century Fundamental Equity (Inv) | $209,378 | 99 bps | 2 bps | 4850% |
| American Century Legacy Focused Large Cap (Inv) | $29,765 | 111 bps | 2 bps | 5450% |
| American Century Veedot (Inv) | $882,392 | 126 bps | 2 bps | 6200% |
| CREF Equity Index | $72,825,074 | 37 bps | 2 bps | 1750% |
| CREF Stock | $455,814,787 | 46 bps | 2 bps | 2175% |
| Fidelity Disciplined Equity (K) | $1,409,766 | 79 bps | 2 bps | 3850% |
| Fidelity Growth & Income (K) | $8,914,870 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index | $124,370 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock | $2,016,719 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock | $1,903,614 | 67 bps | 2 bps | 3250% |
| Fidelity Spartan 500 Index (Adv) | $20,490,140 | 5 bps | 2 bps | 150% |

| Investment | Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| Fidelity Spartan Total Market Index (Adv) | $9,582,498 | 5 bps | 2 bps | 150% |
| Strategic Advisers Core Multi-Manager | $6,349 | 97 bps | 2 bps | 4750% |
| VALIC Growth & Income | $184,976 | 165 bps | 2 bps | 8150% |
| VALIC Large Cap Core | $139,232 | 164 bps | 2 bps | 8100% |
| VALIC Stock Index | $6,733,421 | 115 bps | 2 bps | 5650% |
| Vanguard Growth & Income (Inv) | $12,506,802 | 34 bps | 2 bps | 1600% |
| Vanguard Institutional Index (Inst) | $13,256,205 | 4 bps | 2 bps | 100% |
| Vanguard Large-Cap Index (Inv) | $13,462,592 | 20 bps | 2 bps | 900% |
| Vanguard PRIMECAP Core (Inv) | $11,642,022 | 47 bps | 2 bps | 2250% |
| Vanguard Total Stock Market Index (Inst) | $54,507,154 | 4 bps | 2 bps | 100% |
| **Total Assets** | **$692,855,709** | | | |

168.   With over *$500 million* held in the CREF Stock Account and the CREF

Equity Index Account, these large cap blend options were *23 and 18 times* more

expensive respectively than the lower-cost Vanguard option, with an expense ratio

of 2 bps.



169.    Many other large cap index funds were also available at far lower costs than the Plan's large cap blend funds. If the Plan's 24 funds were consolidated into a single large cap domestic blend investment, the Plan would have saved millions of dollars in investment management expenses. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment, such as the Vanguard Institutional Index Fund (Inst Plus), Plan participants would have avoided losing in excess of $3 million in fees for Plan-year 2014 alone, and many more millions since 2010.

170.    In addition, Defendant selected and continues to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as

the S&P 500, by holding a representative sample of securities in the index. Because no stock selection or research is needed, index fund fees are much lower than the fees of actively-managed funds in the same investment style, as set forth in ¶¶47–49, 183–187.

171.   For example, in the large cap blend investment style, Defendant provided ten index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

172.   Since index funds merely hold the same securities in the same proportions as the index,[38] having multiple index funds of the same category or investment style in the Plan provides no benefit to participants. As Morningstar CEO Joe Mansueto recently observed, "[b]asic market indexes are virtually interchangeable." Lewis Braham, *Morningstar Announces Free Use of Its Indexes*, Barron's (Nov. 5, 2016).[39] Including multiple similar index funds in the same investment style hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

---

[38] Another example of an index is the Dow Jones Industrial Average.
[39] Available at http://www.barrons.com/articles/morningstar-announces-free-use-of-its-indexes-1478322642.

173.    Had Defendant combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, as set forth in ¶167, the Plan would have generated higher investment returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

## VI.    Defendant has admitted that the Plan's prior structure was imprudent and that it had "no ability" to monitor the Plan's investment options.

174.    Defendant expressly acknowledged that the Plan's five recordkeepers and over four hundred investments made it impossible to monitor each fund as required under ERISA. According to minutes of a February 17, 2010 Faculty Senate meeting, Senior Director of Benefits Heidi Conway[40] presented a preview of proposed changes to the University retirement plans for faculty and staff. The proposed changes were necessary for the University "to comply with new federal defined contribution plan regulations with regard to fund offerings and reasonable and transparent fees."[41] The proposed arrangement would "permit the University to consolidate plan recordkeepers from the current five vendors down to one or two." *Id.*

175.    Defendant acknowledged that the proposed changes would result in "more investment fee transparency which will allow participants to better

---

[40] Ms. Conway currently serves as Vice President for Human Resources at Johns Hopkins University. She was appointed to this role on November 1, 2015. *See* Johns Hopkins University Human Resources, *About Our Vice President for Human Resources* available at https://hrnt.jhu.edu/about_vp.cfm.

[41] JHU Faculty Senate Minutes, February 17, 2010, available at http://www.hopkinsmedicine.org/faculty_senate/minutes/02_10.html.

understand and make decisions based on investment expenses associated with their investment options." *Id.* Defendant expressly admitted that it could not monitor the four hundred-plus investment options in the Plan: "The University currently offers 413 investment options through five vendors with *no ability to effectively monitor the funds.*" *Id.* (emphasis added).

176.   Plaintiffs had no knowledge of this admission until counsel discovered it on the Hopkins Medicine website in the process of preparing this amended complaint. According to internet archives, these meeting minutes were not posted on the Hopkins Medicine website until approximately June 2015.

177.   Despite this unambiguous admission that it could not fulfill its duty to monitor the more than four hundred options in the Plan, as ERISA requires, and recognition of the clear benefits of consolidation, Defendant did not reduce the Plan's five recordkeepers, or implement any lineup restructuring until January 2016. Thus, Defendant knowingly allowed participants to continue to be harmed by this imprudent arrangement for an *additional six years.* Even to this day Defendant continues to contract with three separate recordkeepers, causing the Plan's participants to incur duplicative and excessive recordkeeping expenses. Had Defendant implemented a prudent consolidation of recordkeepers, and reduced the overwhelming number of options in the lineup as of 2010 when it recognized it had "no ability to effectively monitor the funds[,]" Plan participants would have avoided millions of dollars in lost retirement savings due to unreasonable investment and administrative fees and performance losses.

## VII. Defendant imprudently and disloyally retained historically underperforming Plan investments.

178. The excessive fees in the Plan's investments were not justified by superior investment returns. Defendant's failure to conduct appropriate due diligence in selecting and monitoring the Plan's investments resulted in options being retained in the Plan despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives.

179. As of June 30, 2016, of the Plan's investment options which had at least a five-year performance history, *seventy percent* of those funds—270 out of 388—underperformed their respective benchmarks over the previous 5-year period.[42] These underperforming funds include the following:

| Fund Name | Ticker |
|---|---|
| Amana Growth INV | AMAGX |
| American Century Adaptive Equity INV | AMVIX |
| American Century All Capital Growth INV | TWGTX |
| American Century Balanced INV | TWBIX |
| American Century Capital Preservation  INV | CPFXX |
| American Century Capital Value INV | ACTIX |
| American Century Disciplined Growth INV | ADSIX |
| American Century Diversified Bond INV | ADFIX |

---

[42] These results are based on the performance and benchmark for each fund as shown on the Plan's quarterly Plan and Investment Notice, Section II, Part A, available at https://benefits.jhu.edu/documents/FeeDisclosure.pdf. This figure excludes 43 funds in the Plan (out of the 431) which did not have 5-year performance histories as of June 30, 2016. Nearly half of those funds—20 out of 43—underperformed their benchmarks on a one-year basis and since inception.

| Fund Name | Ticker |
|---|---|
| American Century Equity Growth INV | BEQGX |
| American Century Equity Income INV | TWEIX |
| American Century Focused Growth INV | AFSIX |
| American Century Fundamental Equity INV | AFDIX |
| American Century Ginnie Mae INV | BGNMX |
| American Century Global Gold INV | BGEIX |
| American Century Global Growth INV | TWGGX |
| American Century Government Bond INV | CPTNX |
| American Century Growth INV | TWCGX |
| American Century Heritage INV | TWHIX |
| American Century High-Yield  INV | ABHIX |
| American Century Income and Growth INV | BIGRX |
| American Century Inflation Adjusted Bond INV | ACITX |
| American Century Inflation Protection Bond INV | APOIX |
| American Century International Bond INV | BEGBX |
| American Century International Core Equity INV | ACIMX |
| American Century International Discovery INV | TWEGX |
| American Century Large Company Value INV | ALVIX |
| American Century Legacy Focused Large Cap INV | ACFOX |
| American Century Legacy Large Cap INV | ACGOX |
| American Century Legacy Multi Cap INV | ACMNX |
| American Century New Opportunities INV | TWNOX |
| American Century One Choice Portfolio Aggressive INV | AOGIX |
| American Century One Choice Portfolio Conservative INV | AOCIX |
| American Century One Choice Portfolio Moderate INV | AOMIX |
| American Century One Choice Portfolio Very Aggressive INV | AOVIX |
| American Century One Choice Portfolio Very Conservative INV | AONIX |
| American Century Premium Money Market INV | TCRXX |
| American Century Prime Money Market INV | BPRXX |

| Fund Name | Ticker |
|---|---|
| American Century Real Estate INV | REACX |
| American Century Select INV | TWCIX |
| American Century Short Term Government INV | TWUSX |
| American Century Small Cap Growth INV | ANOIX |
| American Century Strategic Allocation Aggressive INV | TWSAX |
| American Century Strategic Allocation Conservative INV | TWSCX |
| American Century Strategic Allocation Moderate INV | TWSMX |
| American Century Ultra INV | TWCUX |
| American Century Utilities | BULIX |
| American Century Value INV | TWVLX |
| American Century Zero Coupon 2020 INV | BTTTX |
| American Century Zero Coupon 2025 INV | BTTRX |
| CREF Equity Index R3 | QCEQIX |
| CREF Global Equities R3 | QCGLIX |
| CREF Growth R3 | QCGRIX |
| CREF Money Market R3 | QCMMIX |
| CREF Social Choice R3 | QCSCIX |
| CREF Stock R3 | QCSTIX |
| Fidelity Asset Manager 50% | FASMX |
| Fidelity Asset Manager 60% | FSANX |
| Fidelity Asset Manager 70% | FASGX |
| Fidelity Asset Manager 85% | FAMRX |
| Fidelity Balanced K | FBAKX |
| Fidelity Blue Chip Growth K | FBGKX |
| Fidelity Blue Chip Value | FBCVX |
| Fidelity Capital & Income | FAGIX |
| Fidelity Capital Appreciation K | FCAKX |
| Fidelity Cash Reserves Management | FDRXX |
| Fidelity Contrafund K | FCNKX |

| Fund Name | Ticker |
|---|---|
| Fidelity Convertible Securities | FCVSX |
| Fidelity Disciplined Equity K | FDEKX |
| Fidelity Dividend Growth K | FDGKX |
| Fidelity Dynamic Strategies | FDYSX |
| Fidelity Equity Dividend Income K | FETKX |
| Fidelity Equity-Income K | FEIKX |
| Fidelity Export & Multinational K | FEXKX |
| Fidelity Floating Rate High Income | FFRHX |
| Fidelity Focused High Income | FHIFX |
| Fidelity Focused Stock | FTQGX |
| Fidelity Four in One Index | FFNOX |
| Fidelity Freedom K 2015 | FKVFX |
| Fidelity Freedom K 2020 | FFKDX |
| Fidelity Freedom K 2025 | FKTWX |
| Fidelity Freedom K 2030 | FFKEX |
| Fidelity Freedom K 2035 | FKTHX |
| Fidelity Freedom K 2040 | FFKFX |
| Fidelity Freedom K 2045 | FFKGX |
| Fidelity Freedom K 2050 | FFKHX |
| Fidelity Freedom K 2055 | FDENX |
| Fidelity Freedom K Income | FFKAX |
| Fidelity Fund K | FFDKX |
| Fidelity Global Balanced | FGBLX |
| Fidelity Global Commodity Stock | FFGCX |
| Fidelity Global High Income | FGHNX |
| Fidelity Government Income | FGOVX |
| Fidelity Government Money Market | SPAXX |
| Fidelity Growth & Income K | FGIKX |
| Fidelity Growth Company K | FGCKX |

| Fund Name | Ticker |
|---|---|
| Fidelity Growth Discovery K | FGDKX |
| Fidelity Growth Strategies K | FAGKX |
| Fidelity High Income | SPHIX |
| Fidelity Independence K | FDFKX |
| Fidelity Inflation Protected Bond | FINPX |
| Fidelity Institutional Short-Intermediate Government | FFXSX |
| Fidelity Intermediate Government Income | FSTGX |
| Fidelity Japan | FJPNX |
| Fidelity Large Cap Core Enhanced Index | FLCEX |
| Fidelity Large Cap Growth Enhanced Index | FLGEX |
| Fidelity Large Cap Stock | FLCSX |
| Fidelity Latin America | FLATX |
| Fidelity Leveraged Company Stock K | FLCKX |
| Fidelity Magellan K | FMGKX |
| Fidelity Mega Cap Stock | FGRTX |
| Fidelity Mid Cap Value | FSMVX |
| Fidelity Mid-Cap Stock K | FKMCX |
| Fidelity Money Market | SPRXX |
| Fidelity Money Market Trust Retirement Government Money Market Portfolio | FGMXX |
| Fidelity NASDAQ Composite Index | FNCMX |
| Fidelity New Millennium | FMILX |
| Fidelity OTC K | FOCKX |
| Fidelity Puritan K | FPUKX |
| Fidelity Real Estate Income | FRIFX |
| Fidelity Retirement Money Market | FRTXX |
| Fidelity Select Automotive | FSAVX |
| Fidelity Select Banking | FSRBX |
| Fidelity Select Brokerage & Investment Management | FSLBX |
| Fidelity Select Communications Equipment | FSDCX |

| Fund Name | Ticker |
|---|---|
| Fidelity Select Computers | FDCPX |
| Fidelity Select Consumer Finance | FSVLX |
| Fidelity Select Energy | FSENX |
| Fidelity Select Energy Services | FSESX |
| Fidelity Select Environment and Alternative Energy | FSLEX |
| Fidelity Select Financial Services | FIDSX |
| Fidelity Select Gold | FSAGX |
| Fidelity Select Industrial Equipment | FSCGX |
| Fidelity Select Industrials | FCYIX |
| Fidelity Select Leisure | FDLSX |
| Fidelity Select Materials | FSDPX |
| Fidelity Select Natural Gas | FSNGX |
| Fidelity Select Natural Resources | FNARX |
| Fidelity Select Technology | FSPTX |
| Fidelity Select Telecommunications | FSTCX |
| Fidelity Select Transportation | FSRFX |
| Fidelity Select Utilities | FSUTX |
| Fidelity Select Wireless | FWRLX |
| Fidelity Small Cap Stock | FSLCX |
| Fidelity Spartan 500 Index ADV | FUSVX |
| Fidelity Spartan Intermediate Treasury Index ADV | FIBAX |
| Fidelity Spartan Long Term Treasury Bond Index ADV | FLBAX |
| Fidelity Spartan Short Term Treasury Index ADV | FSBAX |
| Fidelity Spartan Total Market Index ADV | FSTVX |
| Fidelity Spartan U.S. Bond Index ADV | FSITX |
| Fidelity Stock  Selector All Cap K | FSSKX |
| Fidelity Stock  Selector Large Cap Value | FSLVX |
| Fidelity Stock  Selector Small Cap | FSLCX |
| Fidelity Strategic Dividend & Income | FSDIX |

| Fund Name | Ticker |
|---|---|
| Fidelity Strategic Income | FSICX |
| Fidelity Strategic Real Return | FSRRX |
| Fidelity Telecom & Utilities | FIUIX |
| Fidelity Treasury Only Money Market | FDLXX |
| Fidelity Trend | FTRNX |
| Fidelity Value  K | FVLKX |
| Fidelity Value Discovery K | FVDKX |
| Fidelity Value Strategies K | FVSKX |
| Iman K | IMANX |
| TIAA Real Estate | QREARX |
| TIAA-CREF International Equity INST | TIIEX |
| TIAA-CREF Lifecycle 2015 INST | TCNIX |
| TIAA-CREF Lifecycle 2020 INST | TCWIX |
| TIAA-CREF Lifecycle 2025 INST | TCYIX |
| TIAA-CREF Lifecycle 2030 INST | TCRIX |
| TIAA-CREF Lifecycle 2035 INST | TCIIX |
| TIAA-CREF Lifecycle 2040 INST | TCOIX |
| TIAA-CREF Lifecycle 2045 INST | TTFIX |
| TIAA-CREF Lifecycle 2050 INST | TFTIX |
| TIAA-CREF Lifecycle 2055 INST | TTRIX |
| VALIC Annuity - Aggressive Growth Lifestyle | N/A |
| VALIC Annuity - American Beacon Holland Large Cap Growth Portfolio Director | N/A |
| VALIC Annuity - Ariel Appreciation Portfolio Director | N/A |
| VALIC Annuity - Ariel Fund Portfolio Director | N/A |
| VALIC Annuity - Asset Allocation | N/A |
| VALIC Annuity - Blue Chip Growth Portfolio Director | N/A |
| VALIC Annuity - Broad Cap Value Income Portfolio Director | N/A |
| VALIC Annuity - Capital Appreciation | N/A |
| VALIC Annuity - Capital Conservation Portfolio Director | N/A |

| Fund Name | Ticker |
|---|---|
| VALIC Annuity - Conservative Growth Lifestyle | N/A |
| VALIC Annuity - Core Bond Portfolio Director | N/A |
| VALIC Annuity - Core Equity Portfolio Director | N/A |
| VALIC Annuity - Dividend Value Portfolio Director | N/A |
| VALIC Annuity - Emerging Economies Portfolio Director | N/A |
| VALIC Annuity - Foreign Value Portfolio Director | N/A |
| VALIC Annuity - Global Real Estate Portfolio Director | N/A |
| VALIC Annuity - Government Securities Portfolio Director | N/A |
| VALIC Annuity - Growth & Income Portfolio Director | N/A |
| VALIC Annuity - Growth Portfolio Director | N/A |
| VALIC Annuity - High Yield Bond Portfolio Director | N/A |
| VALIC Annuity - Inflation Protected Portfolio Director | N/A |
| VALIC Annuity - International Equities Independence Plus Portfolio Director | N/A |
| VALIC Annuity - International Equities Index Portfolio Director | N/A |
| VALIC Annuity - International Government Bond Portfolio Director | N/A |
| VALIC Annuity - International Growth Portfolio Director | N/A |
| VALIC Annuity - International Opportunities Portfolio Director | N/A |
| VALIC Annuity - Large Cap Core Portfolio Director | N/A |
| VALIC Annuity - Large Capital Growth Portfolio Director | N/A |
| VALIC Annuity - Large Capital Value Portfolio Director | N/A |
| VALIC Annuity - Mid Cap Growth Portfolio Director | N/A |
| VALIC Annuity - Mid Cap Index Portfolio Director | N/A |
| VALIC Annuity - Mid Cap Strategic Growth Portfolio Director | N/A |
| VALIC Annuity - Mid Cap Value Portfolio Director | N/A |
| VALIC Annuity - Moderate Growth Lifestyle | N/A |
| VALIC Annuity - Money Market I Portfolio Director | N/A |
| VALIC Annuity - Money Market II Portfolio Director | N/A |
| VALIC Annuity - NASDAQ 100(R)Index Portfolio Director | N/A |

| Fund Name | Ticker |
|---|---|
| VALIC Annuity - Science & Technology Portfolio Director | N/A |
| VALIC Annuity - Small Cap Aggressive Growth Portfolio Director | N/A |
| VALIC Annuity - Small-Mid Growth Portfolio Director | N/A |
| VALIC Annuity - Small Cap Growth Portfolio Director | N/A |
| VALIC Annuity - Small Cap Index Portfolio Director | N/A |
| VALIC Annuity - Small Cap Portfolio Director | N/A |
| VALIC Annuity - Small Cap Value Portfolio Director | N/A |
| VALIC Annuity - Socially Responsible Portfolio Director | N/A |
| VALIC Annuity - Stock Index Portfolio Director | N/A |
| VALIC Annuity - Strategic Bond Portfolio Director | N/A |
| VALIC Annuity - SunAmerica 2020 High Watermark Portfolio Director | N/A |
| VALIC Annuity - Value Portfolio Director | N/A |
| VALIC Annuity - Vanguard LifeStrategy Conservative Growth Portfolio Director | N/A |
| VALIC Annuity - Vanguard LifeStrategy Moderate Growth | N/A |
| VALIC Annuity - Vanguard Long-Term Investment-Grade Portfolio Director | N/A |
| VALIC Annuity - Vanguard Long-Term Treasury Portfolio Director | N/A |
| VALIC Annuity - Vanguard Wellington | N/A |
| VALIC Annuity - Vanguard Windsor II Portfolio Director | N/A |
| Vanguard Admiral Treasury Money Market INV | VUSXX |
| Vanguard Capital Value INV | VCVLX |
| Vanguard Convertible Securities INV | VCVSX |
| Vanguard Diversified Equity INV | VDEQX |
| Vanguard Dividend Appreciation Index INV | VDAIX |
| Vanguard Energy INV | VGENX |
| Vanguard Explorer INV | VEXPX |

| Fund Name | Ticker |
|---|---|
| Vanguard Extended Market Index INV | VEXMX |
| Vanguard Federal Money Market INV | VMFXX |
| Vanguard FTSE All-World ex-US Small-Cap Index INV | VFSVX |
| Vanguard Institutional Index INST | VINIX |
| Vanguard Intermediate-Term Bond Index INV | VBIIX |
| Vanguard Intermediate-Term Investment-Grade INV | VFICX |
| Vanguard Intermediate-Term Treasury INV | VFITX |
| Vanguard International Explorer INV | VINEX |
| Vanguard Large-Cap Index INV | VLACX |
| Vanguard LifeStrategy Growth INV | VASGX |
| Vanguard Long-Term Bond Index INV | VBLTX |
| Vanguard Long-Term Treasury INV | VUSTX |
| Vanguard Mid Cap Growth INV | VMGRX |
| Vanguard Mid Cap Index INV | VIMSX |
| Vanguard Mid-Cap Growth Index INV | VMGIX |
| Vanguard Mid-Cap Value Index INV | VMVIX |
| Vanguard Morgan Growth INV | VMRGX |
| Vanguard Pacific Stock Index INV | VPACX |
| Vanguard Precious Metals and Mining INV | VGPMX |
| Vanguard PRIMECAP Core INV | VPCCX |
| Vanguard REIT Index INV | VGSIX |
| Vanguard Selected Value INV | VASVX |
| Vanguard Short-Term Bond Index INV | VBISX |
| Vanguard Short-Term Federal INV | VSGBX |
| Vanguard Short-Term Investment-Grade INV | VFSTX |
| Vanguard Short-Term Treasury INV | VFISX |
| Vanguard Small Cap Index INSTL | VSCIX |
| Vanguard Small Cap Value Index INV | VISVX |
| Vanguard Total Bond Market Index INST | VBTIX |

| Fund Name | Ticker |
|---|---|
| Vanguard U.S. Growth INV | VWUSX |
| Vanguard Value Index INV | VIVAX |
| Vanguard Wellington ADM | VWENX |
| Vanguard Windsor  II ADM | VWNAX |
| Vanguard Windsor ADM | VWNEX |
| Wasatch Large Cap Value INV | FMIEX |

180.   Had Defendant conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plan or replaced. Defendant's failure to do so caused the Plan substantial losses compared to prudent alternative investments that were available to the Plan. Two funds in particular demonstrate the severe harm to the Plan resulting from Defendant's breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

### a.  CREF Stock Account

181.   The CREF Stock Account is one of the largest investment options, by asset size, in the Plan with almost $500 million in assets, and has been included in the Plan from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark TIAA and Defendant told participants was the proper one, and underperformed lower-cost actively and passively managed investments

that were available to the Plan, yet has not been removed from the Plan nor frozen to new investments.

182.   TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. For its benefit, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plan and acting for the sole benefit of the Plan's participants as ERISA requires, Defendant allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plan. Defendant did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

183.   As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap market because such companies are the subject of many analysts' coverage, while

smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

184.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[43] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

185.    To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

186.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform

---

[43] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, J. Fin. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

187.   Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

188.   Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J. Fin. 549, 571 (1995).[44]

---

[44] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

189.    Academic literature overwhelmingly concludes that active managers

consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case
> for passive investing. Dozens of studies have examined the
> performance of mutual funds and other professional-managed assets,
> and virtually all of them have concluded that, on average, active
> managers underperform passive benchmarks ... The median active
> fund underperformed the passive index in 12 out of 18 years [for the
> large- cap fund universe] ... The bottom line is that, over most
> periods, the majority of mutual fund investors would have been better
> off investing in an S&P 500 Index fund.
> ****
> Most of the dismal comparisons for active managers are for large-
> cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

190.    Prudent fiduciaries of large defined contribution plans must conduct

an analysis to determine whether actively managed funds, particularly large cap,

will outperform their benchmark net of fees. Prudent fiduciaries then make a

reasoned decision as to whether it is in participants' best interest to offer an

actively managed large cap option for the particular investment style and asset

class, in light of the higher costs of active management.

191.    Defendant failed to undertake such an analysis, or any analysis, when

it allowed the actively managed CREF Stock Account to be included and retained in

the Plan. This is particularly true given TIAA-CREF's requirement that the CREF

Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. By

allowing the Plan to be bound by this requirement, Defendant failed to conduct an

independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plan.

192.    Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plan's participants. Defendant failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plan invested over *$450 million* in the CREF Stock Account.

193.    Had Defendant engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

194.    The CREF Stock Account did not merely experience poor performance in a single year or two. Its historical performance has been persistently poor for many years compared to both available lower-cost index funds and the Russell 3000 Index benchmark, provided to the Plan's participants as the appropriate benchmark in participant communications.

195.    Defendant and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results, as shown in the excerpt below that was provided to the Plan's participants.[45]

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol | Inception Date |
|---|---|---|---|
| CREF Stock Account R3 | Large Blend | QCSTIX | 04/24/2015 |
| Russell 3000 Index | | | |

196.    The CREF Stock Account did not merely underperform in a single year or two. Historical performance of the CREF Stock Account has been persistently poor for many years compared to this identified benchmark index (Russell 3000 Index), and also as compared to available low-cost index funds. The following chart compares the investment returns of the CREF Stock Account to its benchmark (the Russell 3000) and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. For each comparison, the CREF Stock Account dramatically underperformed the benchmarks and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.

---

[45]Available at https://benefits.jhu.edu/documents/FeeDisclosure.pdf.



197.   The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund-Inst Plus (2 bps) and the Vanguard Institutional Index-Inst Plus (2 bps).

198.   Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the

Vanguard PRIMECAP-Adm (VPMAX) and the Vanguard Capital Opp.-Adm (VHCAX).



199.    This sustained underperformance went back even further. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[46]

---

[46] For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance





were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.



200.    Despite the consistent underperformance, the CREF Stock Account,

with an expense ratio of 46 bps as of December 31, 2014, was more expensive than

better-performing actively managed alternatives: the Vanguard PRIMECAP-Adm

(35 bps) and the Vanguard Capital Opp.-Adm (40 bps).

201.    Besides this abysmal long-term underperformance of the CREF Stock

Account compared to both index funds and actively managed funds, the fund was

recognized as imprudent in the industry. In March 2012, an independent

investment consultant, AonHewitt, recognized the imprudence of the CREF Stock

Account and recommended to its clients they remove this fund from their

retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[47] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

202.   The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829. In contrast to the conduct of prudent fiduciaries, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

203.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

204.   Had the Defendant removed the CREF Stock Account and the amounts been invested in any of the passively managed lower-cost alternatives or the

---

[47] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

actively managed lower-cost alternatives, as set forth in ¶¶196–197 and 198–200, Plan participants would not have lost in excess of $142 million of their retirement savings.[48]

### B. TIAA Real Estate Account

205.    Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

206.    With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.

---

[48] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.



207.    The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[49] Despite this, Defendant selected and continues to retain it in the Plan.

---

[49] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Inst) was 5.49%.







208.   This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.



209.   As the Supreme Court unanimously ruled in *Tibble*, fiduciaries of defined contribution plans must continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, the Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

210.   Had Defendant removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT

Index, Plan participants would not have lost in excess of $23 million of their retirement savings.[50]

## CLASS ACTION ALLEGATIONS

211.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

212.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of The Johns Hopkins University 403(b) Plan from August 11, 2010, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan.

213.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 24,000 members and is so large that joinder of all its members is impracticable.

---

[50] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index (Inst) to compensate participants who have not been reimbursed for their losses.

b.      There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendant's misconduct described above.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible

136

standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

214.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

215.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.    Schlichter, Bogard & Denton has been appointed as class

counsel in 17 other ERISA class actions regarding excessive fees in large

defined contribution plans. As Chief Judge Michael J. Reagan of the

Southern District of Illinois recognized in approving a settlement which was

reached on the eve of trial after eight years of litigation, resulting in a $62

million monetary recovery and very substantial affirmative relief to benefit

the Plans, the firm had shown "exceptional commitment and perseverance in

representing employees and retirees seeking to improve their retirement

plans," and "demonstrated its well-earned reputation as a pioneer and the

leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed

Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July

17, 2015).  In that same case, Judge Reagan recognized that the law firm of

"Schlichter, Bogard & Denton has had a humungous impact over the entire

401(k) industry, which has benefited employees and retirees throughout the

entire country by bringing sweeping changes to fiduciary practices." *Abbott*,

2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

b.    Other courts have made similar findings: "It is clear to the Court

that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and

is the only firm which has invested such massive resources in this area."

*George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816

at 8 (N.D. Ill. June 26, 2012).

c.      "As the preeminent firm in 401(k) fee litigation, Schlichter,

Bogard & Denton has achieved unparalleled results on behalf of its

clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8

(C.D. Ill. Oct. 15, 2013).

d.      "Litigating this case against formidable defendants and their

sophisticated attorneys required Class Counsel to demonstrate extraordinary

skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014

U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also

emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in

401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

e.      U.S. District Court Judge Baker acknowledged the significant

impact of the firm's work by stating that as of 2013 the nationwide "fee

reduction attributed to Schlichter, Bogard & Denton's fee litigation and the

Department of Labor's fee disclosure regulations approach *$2.8 billion in*

*annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist.

LEXIS 184622, at *6 (emphasis added).

f.      U.S. District Judge Herndon of the Southern District of Illinois,

recognized the firm's extraordinary contributions to the retirement industry:

"Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence

and perseverance, while risking vast amounts of time and money, reflect the

finest attributes of a private attorney general..." *Beesley*, 2014 U.S. Dist.

LEXIS 12037, at *8.

139

g.      The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of
> hours for the benefit of employees and retirees. No case had
> previously been brought by either the Department of Labor or
> private attorneys against large employers for excessive fees in a
> 401(k) plan. Class Counsel performed substantial work …
> investigating the facts, examining documents, and consulting
> and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the
> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

h.      Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in

ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS

157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court

again awarded Plaintiffs' attorney's fees, emphasizing the significant

contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and federal courts about the importance

of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

      i.    In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "[t]he law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

      j.    Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

k. On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

l. Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

m. The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[51] Gretchen

---

[51] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[52] Liz

Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

2015);[53] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y.

TIMES (Oct. 16, 2014);[54] Sara Randazzo, *Plaintiffs' Lawyer Takes on*

*Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[55] Jess Bravin and Liz Moyer,

*High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J.

(May 18, 2015); [56] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on*

*Trial*, NPR (Dec. 15, 2014);[57] Mark Miller*, Are 401(k) Fees Too High? The*

*High-Court May Have an Opinion*, REUTERS (May 1, 2014);[58] Greg Stohr,

*401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct.

2, 2014).[59]

---

[52] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[53] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[54] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[55] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[56] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[57] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[58] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[59] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

## COUNT I

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

216.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

217.   Defendant was required to discharge its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

218.   Defendant was required to independently assess "the prudence of *each* investment option" for the Plan on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plan's participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendant was also required to remove investments that were no longer prudent for the Plan, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

219.   By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plan, as well as the TIAA Traditional Annuity, and to require that it provide recordkeeping for its proprietary options, Defendant committed the Plan to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plan from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendant abdicated its duty to independently assess the prudence of each option in

the Plan on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plan's recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendant favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from TIAA-CREF's proprietary funds over the interest of participants.

220.   Because Defendant shackled the Plan with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decision-making process as to the prudence of those options, Defendant is liable to make good to the Plan all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plan suffered massive losses from the inclusion of the CREF Stock Account in the Plan compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plan, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

221.   Total Plan losses will be determined after complete discovery in this case and are continuing.

222.   Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

223.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

224.   Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
> > * * *
> > (C)   furnishing of goods, services, or facilities between the plan and  party in interest;
> > (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

225.   Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As a service provider to the Plan, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

226.   By allowing the Plan to be locked into an unreasonable arrangement that required the Plan to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a

146

prudent option for the Plan due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendant caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF in connection with the Plan's investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

227.    Total Plan losses will be determined after complete discovery in this case and are continuing.

228.    Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

**COUNT III**

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**Unreasonable Administrative Fees**

229.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

230.    Defendant was required to discharge its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan

participants and beneficiaries, defraying reasonable expenses of administering the

Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

231.    If a defined contribution plan overpays for recordkeeping services due

to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries

have breached their duty of prudence. *See George,* 641 F.3d at 798–99. Similarly,

failing to "monitor and control recordkeeping fees" and "paying excessive revenue

sharing" as a result of failures to "calculate the amount the Plan was paying …

through revenue sharing," to "determine whether [the recordkeeper's] pricing was

competitive," and to "leverage the Plan's size to reduce fees," while allowing the

"revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a

breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

232.    Defendant's process for monitoring and controlling the Plan's

recordkeeping fees was a fiduciary breach in that Defendant failed to adequately

monitor the amount of the revenue sharing received by the Plan's recordkeepers,

determine if those amounts were competitive or reasonable for the services provided

to the Plan, or use the Plan's size to reduce fees or obtain sufficient rebates to the

Plan for the excessive fees paid by participants. Moreover, Defendant failed to

solicit bids from competing providers on a flat per-participant fee basis. As the

Plan's assets grew, the asset-based revenue sharing payments to the Plan's

recordkeepers grew, even though the services provided by the recordkeepers

remained the same. This caused the recordkeeping compensation paid to the

recordkeepers to exceed a reasonable fee for the services provided. This conduct was

a breach of fiduciary duties.

233.   By allowing TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard to put their proprietary investments in the Plan without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendant failed to act in the exclusive interest of participants.

234.   In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendant failed to engage in a timely and reasoned decision-making process to determine whether the Plan would similarly benefit from consolidating the Plan's administrative and recordkeeping services under a single provider. Instead, Defendant continued to contract with *five* separate recordkeepers. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. Defendant's failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

235.   Total losses to the Plan will be determined after complete discovery in this case and are continuing.

236.   Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties

alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Administrative Services and Fees

237.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

238.    As service providers to the Plan, TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

239.    By causing the Plan to use TIAA-CREF, Fidelity, VALIC, American Century and Vanguard as the Plan's recordkeepers from year to year, Defendant caused the Plan to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard and in connection with the Plan's investments in funds that paid revenue sharing to TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard.

240.    Total losses to the Plan will be determined after complete discovery in

this case and are continuing.

241.    Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to
the Plan resulting from these prohibited transactions, and to provide restitution of
all proceeds from these prohibited transactions, and are subject to other appropriate
equitable or remedial relief.

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

**Unreasonable Investment Management Fees,
Unnecessary Marketing and Distribution (12b-1) Fees
and Mortality and Expense Risk Fees, and Performance Losses**

242.    Plaintiffs restate and incorporate the allegations contained in the
preceding paragraphs.

243.    Defendant is responsible for selecting prudent investment options,
ensuring that those options charge only reasonable fees, and taking any other
necessary steps to ensure that the Plan's assets are invested prudently. Defendant
had a continuing duty to evaluate and monitor the Plan's investments on an
ongoing basis and to "remove imprudent ones" regardless of how long a fund has
been in the plan. *Tibble,* 135 S. Ct. at 1829.

244.    These duties required Defendant to independently assess whether each
option was a prudent choice for the Plan, and not simply to follow the recordkeepers'
fund choices or to allow the recordkeepers to put their entire investment lineups in
the Plan's menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585, 590, 595–96 (8th Cir. 2009).

245.    In making investment decisions, Defendant was required to consider

all relevant factors under the circumstances, including without limitation

alternative investments that were available to the Plan, the recordkeepers' financial

interest in having their proprietary investment products included in the Plan, and

whether the higher cost of actively managed funds was justified by a realistic

expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension

Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b);

Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

246.    Defendant selected and retained for years as Plan investment options

mutual funds and insurance company variable annuities with high expenses and

poor performance relative to other investment options that were readily available to

the Plan at all relevant times.

247.    Many of these options included unnecessary layers of fees that

provided no benefit to participants but significant benefits to TIAA-CREF, including

marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

248.    Rather than consolidating the Plan's *over 400* investment options into

a core lineup in which prudent investments were selected for a given asset class and

investment style, as is the case with most defined contribution plans, Defendant

retained multiple investment options in each asset class and investment style,

thereby depriving the Plan of its ability to qualify for lower cost share classes of

certain investments, while violating the well-known principle for fiduciaries that

such a high number of investment options causes participant confusion and

inaction. In addition, as a fiduciary required to operate as a prudent financial

expert, *Katsaros,* 744 F.2d at 279. Defendant knew or should have known that
providing numerous actively managed duplicative funds in the same investment
style would produce a "shadow index" return before accounting for much higher fees
than index fund fees, thereby resulting in significant underperformance. The Plan's
investment offerings included the use of mutual funds and variable annuities with
retail expense ratios far in excess of other lower-cost options available to the Plan.
These lower-cost options included lower-cost share class mutual funds with the
identical investment manager and investments, lower-cost insurance company
variable annuities and insurance company pooled separate accounts. All of the
Plan's options were the recordkeepers' own proprietary investments. Thus, the use
of these funds was tainted by the recordkeepers' financial interest in including
these funds in the Plan, which Defendant failed to adequately consider. In so doing,
Defendant failed to make investment decisions based solely on the merits of the
investment funds and what was in the interest of participants. Defendant therefore
failed to discharge its duties with respect to the Plan solely in the interest of the
participants and beneficiaries and for the exclusive purpose of providing benefits to
participants and their beneficiaries and defraying reasonable expenses of
administering the Plan. This was a breach of fiduciary duties.

249.   Defendant failed to engage in a prudent process for monitoring the
Plan's investments and removing imprudent ones within a reasonable period. This
resulted in the Plan continuing to offer excessively expensive funds with inferior
historical performance compared to superior low-cost alternatives that were

available to the Plan. As of June 30, 2016, *sixty-three percent* of the Plan's investment options—270 of the 431 investment options in the Plan—underperformed their respective benchmarks over the previous 5-year period.

250.   CREF Stock Account: Defendant included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendant and TIAA told participants was the appropriate benchmark.

251.   TIAA Real Estate Account: Defendant included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

252.   Had Defendant engaged in a prudent investment review process, it would have concluded that these options were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan, and thus should be removed from the Plan or, at a minimum, frozen to new investments.

253.   Total losses to the Plan will be determined after complete discovery in this case and are continuing.

254.   Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as

appropriate.

## COUNT VI

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Investment Services and Fees

255.    Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

256.    As the plan's providers of investment services, TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

257.    By placing investment options in the Plan in investment options managed by TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard in which all of the  Plan's $4.3 billion in assets were invested, Defendant caused the Plan to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plan and TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard in connection with the Plan's investments in TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard investment options.

258.   Total losses to the Plan will be determined after complete discovery in this case and are continuing.

259.   Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

## COUNT VIII

### Failure to Monitor Fiduciaries

260.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

261.   This Count alleges breach of fiduciary duties against Defendant.

262.   Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

263.   A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those

with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

264.   To the extent any of Defendant's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

265.   Defendant breached its fiduciary monitoring duties by, among other things:

a.   Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.   Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.   Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the

recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

      d.      Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

      e.      Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

266.    Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

267.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that the Defendant has breached its fiduciary duties as described above;

- Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order the Defendant to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;

- Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plan to include only prudent investments;

- Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class, appoint each Plaintiff as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

December 2, 2016                    Respectfully submitted,

/s/ Gregory P. Care
Gregory P. Care, Bar No. 29040
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Phone: 410-962-1030, Fax: 410-385-0869
gpc@browngold.com

/s/  Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON LLP
Jerome J. Schlichter*
Michael A. Wolff*
Troy A. Doles*
Heather Lea*
Kurt C. Struckhoff*
Stephen M. Hoeplinger*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Phone: (314) 621-6115, Fax: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
kstruckhoff@uselaws.com
shoeplinger@uselaws.com
          *Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

160

**CERTIFICATE OF SERVICE**

I hereby certify that the service required by Federal Rule of Civil Procedure 5(a) has been made and that, on December 2, 2016, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to counsel of record for this case and which is available for viewing and downloading from the ECF system of the U.S. District Court for the District of Maryland.

/s/  Jerome J. Schlichter
Jerome J. Schlichter