## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARGARET E. KELLY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE JOHNS HOPKINS UNIVERSITY, <br><br> Defendant. | CIVIL ACTION No. 1:16-cv-2835 |

## DEFENDANT'S ANSWER AND
## AFFIRMATIVE DEFENSES TO PLAINTIFFS' AMENDED COMPLAINT

Defendant The Johns Hopkins University ("Johns Hopkins" or "Defendant"), through its undersigned counsel and pursuant to Rule 8 of the Federal Rules of Civil Procedure, submits the following Answer and Affirmative Defenses to the Amended Complaint of Plaintiffs Margaret E. Kelly, Katrina Allen, Jeremiah M. Daley, Jr., Treva N. Boney, Tracy L. McCracken, Jerrell Baker, Lourdes Cordero, and Francine Lampros-Klein (collectively, "Plaintiffs"), as follows:[1]

1.  Plaintiffs Margaret E. Kelly, Katrina Allen, Jeremiah M. Daley, Jr., Treva N. Boney, Tracy L. McCracken, Jerrell Baker, Lourdes Cordero, and Francine Lampros-Klein, individually and as representatives of a class of participants and beneficiaries of The Johns Hopkins University 403(b) Plan ("Plan") bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plan against Defendant The Johns Hopkins University, for breach of fiduciary duties under ERISA.

**Answer:** Defendant admits that Plaintiffs purport to bring their claims as a class action under 29 U.S.C. § 1132(a)(2). Defendant denies the remaining allegations in Paragraph 1.

---

[1] Plaintiffs' Amended Complaint (Dkt. 27) contains numerous headings and sub-headings. Defendant does not consider these to be substantive allegations to which a response is required. However, to the extent that a response is required, Defendant denies any and all allegations within any such heading or sub-heading. In addition, the Amended Complaint contains numerous footnotes, and Defendant has responded to the footnotes as part of the answer to the corresponding paragraph for each footnote.

**2.**      "ERISA imposes high standards of fiduciary duty on those responsible for the administration of employee benefit plans and the investment and disposal of plan assets." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 355 (4th Cir. 2014). ERISA fiduciary duties are "the highest known to the law." *Id.* at 356 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

**Answer:**  Paragraph 2 asserts legal conclusions and purports to characterize and partially quote judicial opinions, which speak for themselves; thus, no response is required.  To the extent that a response is required, Defendant denies that it has violated any ERISA fiduciary duties with respect to the Plan.

**3.**      The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plan—which is among the largest 0.02% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As a fiduciary to the Plan, Defendant is obligated to limit the Plan's expenses to a reasonable amount, to ensure that *each* fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan; and to analyze the costs and benefits of alternatives for the Plan's administrative and investment structure. Defendant must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plan's service providers.

**Answer:**  Answering the first sentence of Paragraph 3, Defendant admits that the Plan is a defined contribution plan with over a billion dollars in assets as of June 30, 2015, but Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegation that the Plan is "among the largest 0.02% of defined contribution plans in the United States," and therefore denies that allegation.  The remainder of Paragraph 3 asserts legal argument and legal conclusions to which no response is required.  To the extent that a response is required, Defendant denies the remaining allegations in Paragraph 3.

**4.**      Instead of using the Plan's bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plan, Defendant

2

squandered that leverage by allowing the Plan's conflicted third-party service providers—TIAA-CREF, Fidelity, American Century, VALIC, and Vanguard—to dictate the Plan's investment lineup, to include over 440 of their proprietary mutual funds in the Plan, to link their recordkeeping services to the placement of those funds in the Plan, and to collect nearly unlimited asset-based compensation from their proprietary products. Defendant even admitted years ago that complying with ERISA required significant changes to the Plan, yet failed to do so, thereby knowingly allowing participants to continue to be harmed by this imprudent arrangement. *See infra* ¶¶175–176.

**Answer:** Defendant denies the allegations in Paragraph 4.

**5.** To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendant's personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendant's use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

**Answer:** Defendant admits that Plaintiffs purport to bring their claims as a class action, but denies that class treatment is appropriate. Defendant admits that Plaintiffs purport to bring their claims under 29 U.S.C. § 1132(a)(2) and seek the relief identified in this Paragraph, but denies that Plaintiffs are entitled to the relief requested under ERISA or any other law. Defendant denies the remaining allegations in Paragraph 5.

## JURISDICTION AND VENUE

**6.** **Subject-matter jurisdiction**. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

**Answer:** Paragraph 6 asserts legal conclusions to which no response is required. To the extent that a response is required, Defendant admits that this Court has subject matter jurisdiction over this action.

**7.** **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendant resides or may be found.

**Answer:** Paragraph 7 asserts legal conclusions to which no response is required. To the

extent that a response is required, Defendant admits that venue is proper in this District.

Defendant denies the remaining allegations in Paragraph 7.

**8.    Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does
not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff,
Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and
the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary,
or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on
behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered
millions of dollars in losses caused by Defendant's fiduciary breaches and remains exposed to
harm and continued future losses. Those injuries may be redressed by a judgment of this Court in
favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though
§1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an
injury, in at least the following ways:

**Answer:** Paragraph 8 asserts legal conclusions to which no response is required. To the

extent that a response is required, Defendant admits that Paragraph 8 purports to characterize a

statute and a judicial opinion, which speak for themselves. Defendant denies the remaining

allegations in Paragraph 8.

a.    The named Plaintiffs and all participants in the Plan suffered financial harm as a
result of the imprudent or excessive fee options in the Plan because Defendant's inclusion of
those options deprived participants of the opportunity to grow their retirement savings by
investing in prudent options with reasonable fees, which would have been available in the Plan if
Defendant had satisfied its fiduciary obligations. All participants continue to be harmed by the
ongoing inclusion of these imprudent and excessive cost options and payment of excessive
recordkeeping fees.

**Answer**: Defendant denies the allegations in Paragraph 8(a).

b.    The named Plaintiffs and all participants in the Plan were financially harmed by
Defendant's improper bundling of some of the Plan's investment products, improperly allowing
the companies who did recordkeeping for the Plan to require inclusion of their investment
products in the Plan, instead of each investment option being independently selected.

**Answer:** Defendant denies the allegations in Paragraph 8(b).

c.    The named Plaintiffs' individual accounts in the Plan were further harmed by
Defendant's breaches of fiduciary duties because one or more of the named Plaintiffs during the
proposed class period (1) invested in the CREF Stock and TIAA Real Estate accounts—which
were improperly bundled with TIAA's recordkeeping services and which Defendant also failed

4

to remove from the Plan when it was clear from past poor performance and their excessive fees that they were imprudent investments—at a time when those options underperformed prudent alternatives in which those assets would have been invested had Defendant not breached its fiduciary duties (Plaintiffs Kelly and McCracken), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plan's recordkeepers and higher-cost share classes of mutual funds priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available to the Plan because of its enormous size (all Plaintiffs), and (3) through the fees charged on their investments in those mutual funds and other investments, paid a portion of the Plan's excessive administrative and recordkeeping fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan (all Plaintiffs).

**Answer:** Defendant denies the allegations in Paragraph 8(c).

d.    Specifically, during the class period, Plaintiff Kelly invested in the higher-cost share classes of Vanguard Explorer, Vanguard Growth and Income, Vanguard Total Bond Market Index, as well as CREF Stock, CREF Growth, CREF Equity Index, CREF Global Equities, CREF Money Market, and TIAA Traditional; Plaintiff Allen invested in the Fidelity Asset Manager 85% Fund; Plaintiff Baker invested in the higher-cost share class of TIAA-CREF Lifecycle 2035; Plaintiff Boney invested in TIAA Traditional; Plaintiff Cordero invested in the higher-cost share classes of Vanguard FTSE Social Index, Vanguard High-Yield Corporate, Vanguard Short-Term Investment Grade, Vanguard Energy, Vanguard Long-Term Treasury, and Vanguard Total Bond Market Index (among many others). the higher-cost share classes of American Century Inflation-Adjusted Bond, Fidelity Contrafund, Fidelity Diversified International, and Fidelity Freedom 2020 (among others), as well as CREF Money Market; Plaintiff Daley invested in TIAA Traditional and VALIC Fixed Account Plus; Plaintiff Lampros-Klein invested in the higher-cost share class of Fidelity Contrafund, Fidelity Mid-Cap Stock, Fidelity Diversified International and Fidelity Balanced (among others); Plaintiff McCracken invested in CREF Stock, CREF Growth, CREF Equity Index, CREF Global Equities, CREF Money Market, CREF Social Choice, TIAA Traditional and TIAA Real Estate (among others). Through their investments in these funds, each Plaintiff paid excessive investment management fees and each was assessed a portion of the Plan's excessive administrative and recordkeeping fees. Plaintiffs would not have suffered these losses if Defendant had monitored revenue sharing, solicited competitive bids, consolidated recordkeepers, or reduced fees to reasonable levels in accordance with its fiduciary duties under ERISA.

**Answer**:  Defendant admits that during the putative class period, Plaintiff Kelly invested

in the following funds or products:  Vanguard Explorer, Vanguard Growth and Income,

Vanguard Total Bond Market Index, CREF Stock, CREF Growth, CREF Equity Index, CREF

Global Equities, CREF Money Market, and TIAA Traditional Annuity.  Defendant further

admits that during the putative class period, Plaintiff Allen invested in the Fidelity Asset

Manager 85% Fund.  Defendant further admits that during the putative class period, Plaintiff

Baker invested in the TIAA-CREF Lifecycle 2035 Fund.  Defendant further admits that during the putative class period, Plaintiff Boney invested in the TIAA Traditional Annuity.  Defendant further admits that during the putative class period, Plaintiff Cordero invested in the following funds:  Vanguard FTSE Social Index, Vanguard High-Yield Corporate, Vanguard Short-Term Investment Grade, Vanguard Energy, Vanguard Long-Term Treasury, Vanguard Total Bond Market Index, American Century Inflation-Adjusted Bond, Fidelity Contrafund, Fidelity Diversified International, Fidelity Freedom 2020, and CREF Money Market.  Defendant further admits that during the putative class period, Plaintiff Daley invested in the VALIC Fixed Account Plus Fund.  Defendant further admits that during the putative class period, Plaintiff Lampros-Klein invested in the Fidelity Contrafund, Fidelity Mid-Cap Stock, Fidelity Diversified International, and Fidelity Balanced funds.  Defendant further admits that during the putative class period, Plaintiff McCracken invested in the following funds or products:  CREF Stock, CREF Growth, CREF Equity Index, CREF Global Equities, CREF Money Market, CREF Social Choice, TIAA Traditional, and TIAA Real Estate.  Defendant lacks information or knowledge sufficient to form a belief as to whether Ms. Daley also invested in the TIAA Traditional Annuity during the putative class period, and therefore denies that allegation.  Defendant denies the remaining allegations in Paragraph 8(d).

## PARTIES

### Johns Hopkins University 403(b) Plan

**9.**     The Johns Hopkins University 403(b) Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

**Answer:**  Paragraph 9 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that The Johns Hopkins University 403(b) Plan ("Plan") is a defined contribution employee pension benefit plan.

6

10.    The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Plan was organized effective July 1, 1969 as "The Johns Hopkins University Faculty and Senior Staff Retirement Plan." Effective July 1, 2011, The Johns Hopkins University Staff Voluntary 403(b) Plan merged into and with the Plan and the Plan's name changed to The Johns Hopkins University 403(b) Plan.

**Answer**:  The first sentence of Paragraph 10 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that the Plan is established and maintained by a written plan document titled "The Johns Hopkins University 403(b) Plan," which was most recently amended and restated as of July 1, 2011.  The remaining sentences in this Paragraph purport to characterize the terms of the written Plan document, which speak for themselves; therefore, no response is required.  To the extent that a response is required, Defendant admits that the Plan was organized effective July 1, 1969 as "The Johns Hopkins University Faculty and Senior Staff Retirement Plan" and that, effective July 1, 2011, The Johns Hopkins University Staff Voluntary 403(b) Retirement Plan merged into and with the Plan and the Plan's name changed to The Johns Hopkins University 403(b) Plan.

11.    Johns Hopkins faculty and staff members are eligible to participate in the Plan. The Plan provides the only source of retirement income for many Johns Hopkins employees. An employee's retirement income is based solely upon deferrals of employee compensation, employer matching contributions, and performance of investment options net of fees and expenses. 29 U.S.C. §1002(34).

**Answer:**  Paragraph 11 purports to characterize the terms of the written Plan document, which speak for themselves; therefore, no response is required.  To the extent that a response is required, Defendant admits that, pursuant to the Plan's terms, certain employees of The Johns Hopkins University ("Johns Hopkins") are eligible to participate in the Plan, which is funded through employee and employer contributions.  Defendant denies the remaining allegations in Paragraph 11.

12.    As of June 30, 2015, the Plan held $4.3 billion in assets and had 24,561 participants with account balances. It is among the largest 0.02% of all defined contribution

plans in the United States based on total assets. Plans of such great size are commonly referred to as "jumbo plans."

**Answer:** Defendant admits that the Plan held $4,284,106,342 in assets and had 24,561

participants with account balances as of June 30, 2015.  Defendant lacks information or

knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12,

and therefore denies those allegations.

### Plaintiffs

13.    Margaret E. Kelly resides in Hydes, Maryland and is an Administrative Secretary at the Maryland Space Grant Consortium at Johns Hopkins University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:** Defendant admits that Plaintiff Margaret E. Kelly is employed by Johns

Hopkins as an Administrative Secretary in the School of Arts and Sciences and is a participant in

the Plan.  On information and belief, Defendant admits that Ms. Kelly resides in Hydes,

Maryland.  Defendant denies the remaining allegations in Paragraph 13.

14.    Katrina Allen resides in Middle River, Maryland, and previously worked as a Budget Specialist in the Department of Orthopedic Surgery at Johns Hopkins University School of Medicine. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:** Defendant admits that Plaintiff Katrina Allen was previously employed by

Johns Hopkins as a Budget Specialist in the Johns Hopkins University School of Medicine and is

a participant in the Plan.  Defendant lacks information or knowledge sufficient to form a belief as

to Ms. Allen's current residence, and therefore denies that and the remaining allegations in

Paragraph 14.

15.    Jeremiah M. Daley, Jr. resides in Baltimore, Maryland, and is a Campus Police Officer at Johns Hopkins University. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:** Defendant admits that Plaintiff Jeremiah M. Daley, Jr. was (but is no longer) employed by Johns Hopkins as a member of the Campus Police and is a participant in the Plan. Defendant lacks information or knowledge sufficient to form a belief regarding Mr. Daley's current residence, and therefore denies that and the remaining allegations in Paragraph 15.

16.    Treva N. Boney resides in Severn, Maryland, and is a Facilities Manager at the Center for Talented Youth at Johns Hopkins University. She is participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:** Defendant admits that Plaintiff Treva N. Boney is employed by Johns Hopkins as a Facilities Services Supervisor in the Academic and Business Centers and is a participant in the Plan. On information and belief, Defendant admits that Ms. Boney resides in Severn, Maryland. Defendant denies the remaining allegations in Paragraph 16.

17.    Tracy L. McCracken resides in Baltimore, Maryland, and is a Senior Research Analyst at Johns Hopkins University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:** Defendant admits that Plaintiff Tracy L. McCracken is employed by Johns Hopkins as a Senior Research Analyst in the School of Medicine and is a participant in the Plan. On information and belief, Defendant admits that Ms. Kelly resides in Baltimore, Maryland. Defendant denies the remaining allegations in Paragraph 17.

18.    Jerrell Baker resides in Owings Mills, Maryland, and is a Senior Transformation Facilitator at Johns Hopkins University. He is participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:** Defendant admits that Plaintiff Jerrell Baker is employed by Johns Hopkins as a Senior Transformation Facilitator and is a participant in the Plan. On information and belief, Defendant admits that Mr. Baker resides in Ownings Mills, Maryland. Defendant denies the remaining allegations in Paragraph 18.

19.     Lourdes Cordero resides in Crofton, Maryland, and is retired. She previously was employed by Johns Hopkins University and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:**  Defendant admits that Plaintiff Lourdes Cordero was employed by Johns

Hopkins, but is now retired, and is a participant in the Plan.  On information and belief,

Defendant admits that Ms. Cordero resides in Crofton, Maryland.  Defendant denies the

remaining allegations in Paragraph 19.

20.     Francine Lampros-Klein resides in Baltimore, Maryland, and is a Research Program Manager at Johns Hopkins University School of Medicine Pulmonary Division. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Answer:**  Defendant admits that Plaintiff Francine Lampros-Klein was employed by

Johns Hopkins as a Program Manager in the School of Medicine and is a participant in the Plan.

On information and belief, Defendant admits that Ms. Lampros-Klein resides in Baltimore,

Maryland. Defendant denies the remaining allegations in Paragraph 20.

### Defendant

21.     The Johns Hopkins University is a non-profit corporation organized under Maryland law with its principal place of business in Baltimore, Maryland. The University is governed by a Board of Trustees, which currently has 38 members.

**Answer:**  Defendant admits the first sentence in Paragraph 21.  Defendant denies the

second sentence in Paragraph 21 and avers that the Johns Hopkins Board of Trustees currently

has thirty-seven members.

22.     Under Sections 1.14, 7.01, and 7.02 of the Plan, Johns Hopkins University is the Employer, Named Fiduciary, and Plan Administrator with fiduciary responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Under the terms of the Plan, Johns Hopkins University has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable Johns Hopkins to properly carry out such responsibilities. Its fiduciary responsibilities include the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

**Answer:** Paragraph 22 purports to characterize the terms of the written Plan document, which speak for themselves; therefore, no response is required. To the extent that a response is required, Defendant denies any characterization contrary to the terms of the Plan. Paragraph 22 also asserts legal conclusions to which no response is required. Defendant denies the remaining allegations in Paragraph 22.

23.    Under Section 7.02 of the Plan, Johns Hopkins as the Plan Administrator is responsible for all matters relating to the Plan, including, but not limited to: resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and resolving questions regarding the Plan's administration and operation. Section 7.03 of the Plan authorizes the Plan Administrator to delegate responsibility for any aspect of the Plan's administration to other individuals or entities. However, Johns Hopkins remains the Named Fiduciary and Plan Administrator under 29 U.S.C. §1002(16)(A)(i).

**Answer:** Paragraph 23 purports to characterize the terms of the written Plan document, which speak for themselves; therefore, no response is required. To the extent that a response is required, Defendant denies any characterization contrary to the terms of the Plan. Paragraph 23 also asserts legal conclusions to which no response is required. Defendant denies the remaining allegations in Paragraph 23.

24.    Johns Hopkins is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

**Answer:** Paragraph 24 purports to characterize the terms of the written Plan document, which speak for themselves; therefore, no response is required. To the extent that a response is required, Defendant denies any characterization contrary to the terms of the Plan. Paragraph 24 also asserts legal conclusions to which no response is required. Defendant denies the remaining allegations in Paragraph 24.

## ERISA FIDUCIARY STANDARDS

**25.**    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as a fiduciary of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A)    for the exclusive purpose of
> >
> > > (i)    providing benefits to participants and their beneficiaries; and
> > >
> > > (ii)    defraying reasonable expenses of administering the plan; [and]
> >
> > (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

**Answer:**  Paragraph 25 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that Paragraph 25 purports to characterize and/or quote a statute, which speaks for itself.  Defendant denies the remaining allegations in Paragraph 25.

**26.**    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

**Answer:**  Paragraph 26 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that Paragraph 26 purports to characterize a statute and Department of Labor ("DOL") advisory opinions, which speak for themselves.  Defendant denies the remaining allegations in Paragraph 26.

**27.**    "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros*, 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially

determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828–29.

**Answer:**  Paragraph 27 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that Paragraph 27 purports to characterize and/or quote judicial opinions, regulations, and DOL advisory opinions, which speak for themselves.  Defendant denies the remaining allegations in Paragraph 27.

**28.**     The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered per se violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

> > (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;

> > * * *

> > (C)     furnishing of goods, services, or facilities between the plan and party in interest;

> > (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ...

**Answer:**  Paragraph 28 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that Paragraph 28 purports to characterize and/or quote a statute, which speaks for itself.  Defendant denies the remaining allegations in Paragraph 28.

**29.**     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of another fiduciary:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

> (2)    if, by his failure to comply with section 1 104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**Answer:** Paragraph 29 asserts legal conclusions to which no response is required. To the extent that a response is required, Defendant admits that Paragraph 29 purports to characterize and/or quote a statute, which speaks for itself. Defendant denies the remaining allegations in Paragraph 29.

**30.**    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

**Answer:** Paragraph 30 asserts legal conclusions to which no response is required. To the extent that a response is required, Defendant admits that Paragraph 30 purports to characterize and/or quote a statute, which speaks for itself. Defendant denies the remaining allegations in Paragraph 30.

## BACKGROUND FACTS

I.    **Defined contribution plans, services, and fees.**

31.    When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).

**Answer:** Paragraph 31 asserts legal arguments to which no response is required.

Paragraph 31 also purports to partially quote a judicial opinion, which speaks for itself; thus, no

response is required.  To the extent that a response is required, Defendant denies the allegations

in Paragraph 31.

32.    Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

**Answer:** Paragraph 32 asserts legal arguments to which no response is required.

Paragraph 32 also purports to partially quote a judicial opinion, which speaks for itself; thus, no

response is required.  To the extent that a response is required, Defendant denies the allegations

in Paragraph 32.

33.    The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

**Answer:** Paragraph 33 asserts legal arguments to which no response is required.

Paragraph 33 also purports to partially quote a judicial opinion, which speaks for itself; thus, no

response is required.  To the extent that a response is required, Defendant denies the allegations

in Paragraph 33.

**34.**    A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns that participants receive on their investments.

**Answer:**  Paragraph 34 asserts legal arguments to which no response is required.  To the

extent that a response is required, Defendant denies the allegations in Paragraph 34.

**35.**    These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013). Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

**Answer:**  Paragraph 35 asserts legal arguments to which no response is required.

Paragraph 35 also purports to characterize a written publication, which speaks for itself; thus, no

response is required.  To the extent that a response is required, Defendant denies the allegations

in Paragraph 35.

**36.**    The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

**Answer:**  Defendant denies the allegations in Paragraph 36.

**37.**    Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—i.e., proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these

conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

**Answer:** Paragraph 37 asserts legal argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 37.

## II.    Defined contribution recordkeeping.

**38.**    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

**Answer:** Defendant admits that recordkeeping is a service necessary for defined contribution plans and that recordkeepers perform some of the functions indicated. Defendant denies the remaining allegations in Paragraph 38.

**39.**    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (e.g., recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

**Answer:** Paragraph 39 asserts legal argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 39.

**40.**    Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

**Answer:** Paragraph 40 asserts legal argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 40.

17

### III.    Defined contribution investment options.

41.    Defined contribution fiduciaries have exclusive control over the particular investment alternatives available in the plan to which participants direct and allocate their plan accounts, and the returns on which are credited to participants' accounts.

**Answer:** Paragraph 41 asserts legal argument to which no response is required. To the

extent that a response is required, Defendant denies the allegations in Paragraph 41.

42.    Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

**Answer:** Paragraph 42 asserts legal argument to which no response is required. To the

extent that a response is required, Defendant denies the allegations in Paragraph 42.

43.    Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

**Answer:** Defendant admits the first three sentences of Paragraph 43. Defendant denies

the remaining allegations in Paragraph 43.

44.    Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

**Answer:** Defendant admits the first two sentences of Paragraph 44. The remainder of

Paragraph 44 asserts legal argument to which no response is required.

45.    Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different

share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

**Answer:** Defendant admits the first sentence of Paragraph 45. The remainder of Paragraph 45 asserts legal argument to which no response is required.

**46.** Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

**Answer:** Defendant admits the first two sentences of Paragraph 46. The remainder of Paragraph 46 asserts legal argument and purports to characterize and partially quote a judicial opinion, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies those allegations.

**47.** The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (analyzing common law of trusts and Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; id. § 90 cmt. h(2).

**Answer:** Paragraph 47 asserts legal argument and purports to characterize and partially quote a judicial opinion and a secondary source, which speak for themselves; thus, no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 47.

**48.**    Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

**Answer:**    Paragraph 48 purports to characterize and partially quote academic

publications, which speak for themselves; thus, no response is required. To the extent a response

is required, Defendant denies the allegations in Paragraph 48.

**49.**    In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

**Answer:**    Paragraph 49 purports to characterize a treatise, which speaks for itself; thus,

no response is required. Defendant denies the remaining allegations in Paragraph 49.

## IV.    Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

**50.**    There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

**Answer:** Defendant admits that recordkeeping and administrative services may be paid through revenue sharing, a practice that ERISA permits. Defendant denies the remaining allegations in Paragraph 50.

51.    In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

**Answer:** Defendant admits that a flat fee is one method by which a plan may pay for recordkeeping services. Defendant denies the remaining allegations in Paragraph 51.

52.    A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

**Answer:** Paragraph 52 asserts legal argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 52.

53.    As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000-participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

**Answer:** Paragraph 53 asserts legal argument and a hypothetical to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 53.

54.    Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for

example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

      **Answer:** Paragraph 54 asserts legal argument and a hypothetical to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 54.

      **55.** Defendant uses a different method of paying for recordkeeping for the Plan, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

      **Answer:** Defendant admits that the Plan's recordkeeping services are paid through revenue sharing, a practice that ERISA permits. Defendant denies the remaining allegations in Paragraph 55.

      **56.** In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

      **Answer:** Defendant admits that in a typical revenue sharing arrangement, a portion of a mutual fund's expense ratio may be used to defray recordkeeping expenses. Defendant denies the remaining allegations in Paragraph 56.

      **57.** If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees

paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

**Answer:** Paragraph 57 asserts legal conclusions and argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 57.

**58.** As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In multi-billion dollar plans with over 10,000 participants, such as the Plan, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—i.e., a bid from another service provider— [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

**Answer:** Paragraph 58 asserts legal argument and purports to characterize and partially quote judicial opinions and industry literature, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 58.

**59.** Industry experts recognize that this principle applies fully in the 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*. Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*. Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." Id. Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

**Answer:** Paragraph 59 asserts legal argument and purports to characterize and partially quote judicial opinions and industry literature, which speak for themselves; thus, no response is

required.  To the extent that a response is required, Defendant denies the allegations in Paragraph

59.

## V.    Bundled services and open architecture.

**60.**    As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services companies entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant condition—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of handpicked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

**Answer:** Paragraph 60 asserts legal argument and makes generalized statements without

indicating any source; thus, no response is required.  To the extent that a response is required,

Defendant denies the allegations in Paragraph 60.

**61.**    In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

**Answer:**  Paragraph 61 asserts legal argument and makes generalized statements without indicating any source; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 61.

62.    Open, transparent architecture allows for greater control over revenue sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it provides revenue sharing.

**Answer:**  Paragraph 62 asserts legal conclusions and argument to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 62.

## VI.    403(b) plans share common fiduciary duties with 401(k) plans.

63.    Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

**Answer**:  Paragraph 63 asserts legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that plans qualifying under 26 U.S.C. § 401(k) are commonly referred to as 401(k) plans, and that certain tax-exempt organizations, schools, and churches may be eligible to offer plans qualified under 26 U.S.C. § 403(b), which are commonly known as 403(b) plans.  Defendant denies the remaining allegations in Paragraph 63.

64.    Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plan has never qualified for the safe harbor, and thus has long been subject to ERISA's

fiduciary requirements. In the Plan's annual reports (Forms 5500) filed with the Department of Labor, Defendant has acknowledged that the Plan is subject to ERISA.

**Answer:** Paragraph 64 asserts legal conclusions to which no response is required. To

the extent that a response is required, Defendant admits that the Plan is currently subject to

ERISA. Defendant denies the remaining allegations in Paragraph 64.

65.     Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plan that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plan's status for ERISA fiduciary purposes; ERISA already required Defendant to be actively involved in exercising care, prudence, skill, and diligence in administering the Plan for the exclusive benefit of participants.

**Answer**: Paragraph 65 asserts legal conclusions to which no response is required. To the

extent that a response is required, Defendant admits that the IRS issued regulations applicable to

certain 403(b) plans, the terms of which speak for themselves, and that such regulations took

effect on January 1, 2009. Defendant denies the remaining allegations in Paragraph 65.

66.     When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial accounts holding mutual fund shares. 26 U.S.C. §403(b)(7).

**Answer:** Paragraph 66 asserts legal conclusions to which no response is required. To

the extent that a response is required, Defendant admits those allegations.

67.     Regardless of any differences between 401(k) and 403(b) plans, both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that retirement savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment

limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

**Answer:** Paragraph 67 asserts legal conclusions and argument to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 67.

## VII.    Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.

68.    As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

**Answer:** Paragraph 68 asserts legal argument and purports to characterize a DOL Field Assistance Bulletin, which speaks for itself; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 68.

69.    Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?  Indeed, sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having excessive recordkeeping costs and structures involving multiple recordkeepers with each recordkeeper having its own investment options in the plan. This left participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees, both for recordkeeping and for investment products in the plans. *Id*. In some cases the recordkeeper insisted on its own funds being included in the plan without any resistance or analysis of those funds by the fiduciaries.

**Answer:** Paragraph 69 asserts legal argument and purports to characterize industry literature, which speaks for itself; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 69.

## VIII.   TIAA-CREF's bundled 403(b) plan services.

70.    TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans, and has heavily marketed to them. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America (TIAA), and College Retirement Equities Fund (CREF). The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

**Answer:**  Defendant admits that TIAA-CREF is a financial services company that

provides services to educational institutions.  Defendant lacks information or knowledge

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70, and

therefore denies those allegations.

71.    Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups." Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007). As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

**Answer:**  Paragraph 71 asserts legal conclusions and purports to characterize and

partially quote a newspaper article, which speaks for itself; thus, no response is required.  To the

extent that a response is required, Defendant lacks information or knowledge sufficient to form a

belief as to the truth of the allegations in Paragraph 71, and therefore denies those allegations.

72.    While CREF is organized as a New York not-for-profit corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to some of its subsidiaries as well. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.

**Answer:**  Paragraph 72 purports to summarize the contents of a written publication,

which speaks for itself; thus, no response is required.  To the extent that a response is required,

Defendant lacks information or knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 72, and therefore denies those allegations.

73.    TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA, including the following subsidiaries for which TIAA files consolidated federal income

tax returns. See 2015 Annual Statement of the Teachers Insurance and Annuity Association of America 39, 112–19 (Jan. 26, 2016).

**Answer:** Paragraph 73 purports to summarize the contents of a written publication, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 73, and therefore denies those allegations.

74. Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation, more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. *Id*. When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies.

**Answer:** Paragraph 74 asserts legal argument and purports to summarize the contents of a written publication, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 74, and therefore denies those allegations.

75. Adding to this, and undercutting any claim that it operates as a non-profit, TIAA's compensation disclosures further state that its employees' compensation and benefits programs are linked to "*profitability*." TIAA Compensation Disclosures (emphasis added).

**Answer:** Paragraph 75 asserts legal argument and purports to summarize the contents of a written publication, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 75, and therefore denies those allegations.

76. Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF responded that such extremely high pay was justified because "the company had to compete for top-level employees with major financial services corporations." Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History*. Critics found

this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id*.

     **Answer:** Paragraph 76 asserts legal argument and purports to summarize the contents of

a written publication, which speaks for itself; thus, no response is required.  To the extent that a

response is required, Defendant lacks information or knowledge sufficient to form a belief as to

the truth of the allegations in Paragraph 76, and therefore denies those allegations.

     77.    In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis: [chart omitted].

     **Answer**:  Paragraph 77 asserts legal argument and purports to summarize the contents of

a written publication, which speaks for itself; thus, no response is required.  To the extent that a

response is required, Defendant lacks information or knowledge sufficient to form a belief as to

the truth of the allegations in Paragraph 77, and therefore denies those allegations.

     78.    TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, Defendant locked the Plan into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments or would become imprudent in the future*. By accepting this arrangement, Defendant failed to implement an open architecture platform and use another recordkeeper who could provide the same administrative services at lower cost. Compounding this bundling requirement by TIAA, Defendant used multiple recordkeepers, each with their own investment products, resulting in an inefficient and excessively expensive plan structure, as described in more detail below.

     **Answer:**  Defendant admits that Johns Hopkins, as sponsor of the Plan, and TIAA-CREF

entered into an arrangement whereby TIAA-CREF provided recordkeeping services for its

investment products, and the CREF Stock Account and CREF Money Market Account were

offered as investment options under the Plan along with the TIAA Traditional Annuity.

Defendant denies the remaining allegations in Paragraph 78.

79.     There is no shortage of high-quality, low-cost alternatives to TIAA-CREF's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost. In light of TIAA-CREF's restrictions and superior alternatives in the market, fiduciaries of 403(b) defined contribution plans must evaluate each investment option and engage in a cost-benefit analysis to determine whether it is prudent and in the exclusive best interest of participants to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees. Defendant failed to perform such an evaluation of the funds and services TIAA-CREF required. Defendant also failed to evaluate whether participants would be better served by using superior low-cost alternatives to TIAA-CREF's products given that the Plan could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have engaged in this analysis and overhauled their plans for the benefit of participants.

**Answer**:  Defendant denies the allegations in Paragraph 79.

IX.     **Move to consolidation and open architecture in 403(b) plans.**

80.     Under the 2007 final regulations that became effective January 1, 2009, certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

**Answer:**  Paragraph 80 asserts legal conclusions and argument and purports to

characterize and partially quote IRS and DOL rules and regulations, which speak for themselves;

thus, no response is required.  To the extent that a response is required, Defendant denies the

allegations in Paragraph 80.

81.     Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations—whether on an ongoing basis or for the first time—required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants. While the Plan has long been subject to ERISA because the employer match was sufficient for the Plan to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed

31

Defendant has informed the Department of Labor in the Plan's Forms 5500 that the Plan is subject to ERISA— even if the Plan had not previously been subject to ERISA, there can be no doubt that 403(b) plan fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

      **Answer:** Paragraph 81 asserts legal conclusions and argument to which no response is required. To the extent that a response is required, Defendant admits that the Plan is subject to ERISA. Defendant denies the remaining allegations in Paragraph 81.

      82.     Once the regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

      **Answer:** Paragraph 82 asserts legal argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 82.

      83.     For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party." *See* LMU 403(b) Retirement Plan Project Overview, at 1. "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services." *Id*. at 2. Beginning in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF. LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009. LMU 403(b) Retirement Plan Project Overview, at 2. Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." *Id*. LMU was therefore able to offer "best in class" funds in each fund category. *Id*. at 6.

      **Answer:** Paragraph 83 asserts legal conclusions and purports to characterize and partially quote written documents, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant lacks information or knowledge sufficient to

form a belief as to the truth of the allegations in Paragraph 83, and therefore denies those

allegations.

**84.**    Similarly, following the new IRS 403(b) regulations, the fiduciaries of the
Pepperdine University Retirement Plan recognized the implications of maintaining four different
recordkeepers. In order to comply with the regulations and its fiduciary responsibilities,
Pepperdine determined that it must make certain changes to the plan, including "Consolidating
recordkeeping (by having one fund provider manage administration for multiple providers or by
moving to a sole administrator scenario)." *See* Pepperdine University Participant Q & A.
Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a
request for proposal to different 403(b) recordkeeping providers. Following the competitive
bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper
which does not offer proprietary investments, as the "sole administrator" and consolidated from
four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper.
Pepperdine found that the benefits of consolidation included lower costs and more robust
services, as well as a streamlined compliance process and simplified data coordination. *Id*.
Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective,
viable option." Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO. Recognizing the
inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine
determined that costs were "higher in a multivendor arrangement, because each vendor receives
only a portion of the ongoing total plan contributions," while a single provider allowed to
"realize true economies of scale." *Id*.

**Answer:**  Paragraph 84 asserts legal conclusions and purports to characterize and

partially quote written documents, which speak for themselves; thus, no response is required.  To

the extent that a response is required, Defendant lacks information or knowledge sufficient to

form a belief as to the truth of the allegations in Paragraph 84, and therefore denies those

allegations.

**85.**    Pepperdine also recognized that the bundled model demanded by certain
providers was not in participants' interest. Using those providers "meant being obligated to offer
some or all of that provider's proprietary funds on the plan's investment menu—*whether or not
those investments offered participants the best range of choice, value, and relative
performance.*" *Id*. (emphasis added). Acting in participants' interest required that the fiduciaries
instead have the ability to select those "funds that the university—working with an independent
financial adviser— could identify as being the 'best options in their respective asset classes.'" *Id*.
After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating
with a single vendor has been the straightforward solution to achieving" the objective of acting
"for the exclusive benefit of plan participants." *Id*. The benefits of consolidation included "[a]
better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale,"
and "[g]reater transparency of fees and lowered costs for plan participants." *Id*.

**Answer:** Paragraph 85 asserts legal conclusions and purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 85, and therefore denies those allegations.

86. In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t] he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector." James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, PURDUE UNIVERSITY (emphasis added). Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." *Id*. Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." *Id*. Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." *Id*. (emphasis added).

**Answer:** Paragraph 86 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 86, and therefore denies those allegations.

87. Likewise, the California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting. Caltech Names TIAA-CREF Recordkeeper, INSTITUTIONAL INVESTOR (Dec. 10, 2009). In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the Department of Labor, between 2013

and 2015, CalTech negotiated over $15 million in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

**Answer:** Paragraph 87 asserts legal conclusions and purports to characterize and

partially quote written documents, which speak for themselves; thus, no response is required. To

the extent that a response is required, Defendant lacks information or knowledge sufficient to

form a belief as to the truth of the allegations in Paragraph 87, and therefore denies those

allegations.

88.     Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

**Answer:** Paragraph 88 asserts legal conclusions and purports to characterize written

documents, which speak for themselves; thus, no response is required. To the extent that a

response is required, Defendant denies the allegations in Paragraph 88.

89.     In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014). Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market." *Id*. at 3.

**Answer:** Paragraph 89 purports to characterize and partially quote a written document,

which speaks for itself; thus, no response is required. To the extent that a response is required,

Defendant lacks information or knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 89, and therefore denies those allegations.

90.     Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff." *Id*. at 4. "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that

are meaningfully higher than under a single recordkeeper model." *Id*. at 5. Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants." *Id*.

**Answer:** Paragraph 90 purports to characterize and partially quote a written document,

which speaks for itself; thus, no response is required. To the extent that a response is required,

Defendant lacks information or knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 90, and therefore denies those allegations.

91.    *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." *Id*. Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." *Id*. at 6. An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id*. An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup. *Id*.

**Answer:** Paragraph 91 purports to characterize and partially quote a written document,

which speaks for itself; thus, no response is required. To the extent that a response is required,

Defendant lacks information or knowledge sufficient to form a belief as to the truth of the

allegations in Paragraph 91, and therefore denies those allegations.

92.    Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).

**Answer:** Paragraph 92 purports to characterize a written document, which speaks for

itself; thus, no response is required. To the extent that a response is required, Defendant denies

the allegations in Paragraph 92.

93.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Johns Hopkins Plan, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options. An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.

**Answer:** Paragraph 93 purports to characterize a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 93.

94.     The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009)(emphasis in original). "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from." *Id*. Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

**Answer:** Paragraph 94 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 94.

95.     AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).

**Answer:** Paragraph 95 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 95.

96.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).

**Answer:** Paragraph 96 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 96.

**97.** The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. *See, e.g.*, *Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience*, PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers."); Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").

**Answer:** Paragraph 97 asserts legal argument and purports to characterize and partially quote written documents, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 97.

**98.** Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLAN SPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").

**Answer:** Paragraph 98 purports to characterize and partially quote written documents, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 98.

## DEFENDANT BREACHED ITS FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

**99.** Defendant's longstanding retention of five recordkeepers and over 400 of their proprietary funds—which the recordkeepers required to be included in the Plan—while excluding superior low-cost alternatives from other managers, demonstrates that, in contrast with the comprehensive plan reviews conducted by the similarly situated fiduciaries described above, Defendant failed to adequately engage in a similar analysis. Had Defendant conducted such a review of the Plan, Defendant would not have allowed the Plan to continue to pay excessive administrative fees; would not have maintained an inefficient five-recordkeeper structure; would not have continued to include well over *400* investment options in the Plan, including duplicative funds in numerous investment styles and higher-cost retail share classes for which identical lower-cost versions of the same funds were available; and would not have retained investment

options which had a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

**Answer:** Defendant denies the allegations in Paragraph 99.

## I.    The Plan's 445 investment options and five recordkeepers.

**100.**    Defendant exercised and continues to exercise discretionary authority and control over the investment options that are included in the Plan.

**Answer:** Paragraph 100 asserts a legal conclusion to which no response is required. To the extent that a response is required, Defendant admits that it is a fiduciary with respect to the Plan.

**101.**    Prior to January 2016, Defendant designated as available investment alternatives over *440* different mutual funds or insurance company products from the Plan's *five* recordkeepers: American Century ("American Century"), Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), Fidelity Investments Institutional Operations Company ("Fidelity"), the Variable Annuity Life Insurance Company of America ("VALIC"), and the Vanguard Group, Inc. ("Vanguard").

**Answer:** Defendant admits that, prior to January 2016, the Plan offered more than 400 investment options, including investment options provided by American Century, TIAA-CREF, Vanguard, Fidelity, and VALIC. Defendant further admits that each of these service providers provided recordkeeping services with respect to the investment options offered on its own platform. Defendant denies the remaining allegations in Paragraph 101.

**102.**    Among the available investments, 76 were American Century options holding $256 million in Plan assets, 25 were TIAA-CREF options holding $1.9 billion, 193 were Fidelity options holding $764 million, 62 were VALIC options holding $85 million, and 89 were Vanguard options holding $1.3 billion.

**Answer:** Defendant admits that, as of June 30, 2015, the Plan offered 76 investment options provided by American Century holding $255,739,728 in Plan assets, 25 investment options provided by TIAA-CREF holding $1,878,667,686 in Plan assets, 89 investment options provided by Vanguard holding $1,301,055,486 in Plan assets, 191 investment products provided by Fidelity holding $760,016,648 in Plan assets, and 62 investment products provided by VALIC

holding $84,953,049 in Plan assets.  Defendant further admits that these investment options

included mutual funds, variable annuity products, and fixed annuity products.  Defendant denies

the remaining allegations in Paragraph 102.

103.    Defendant allowed the Plan's recordkeepers to essentially put the entirety of their investment offerings in the Plan. Specifically, Defendant agreed to include in the Plan nearly every Fidelity mutual fund available in the market, including newly-created funds. As a result, Defendant caused *hundreds* of mutual fund investments to be offered to participants in the Plan without making any independent determination that such investments were prudent, reasonably priced, and provided for the exclusive purpose of providing benefits to Plan participants. Thus, Defendant failed to employ a prudent and loyal process for the selection and retention of Plan investment options.

**Answer:**  Defendant denies the allegations in Paragraph 103.

104.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent upon the claims-paying ability of TIAA. The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan.

**Answer:**  Defendant admits the first two sentences of Paragraph 104.  Defendant further

admits that certain TIAA Traditional Annuity contracts impose restrictions on participant

withdrawals or transfers and assess charges for lump sum withdrawals, all of which restrictions

and charges are disclosed in the contract.  Defendant denies the remaining allegations in

Paragraph 104.

105.    The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

**Answer:**  Defendant admits the allegations in Paragraph 105.

106.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. An insurance company separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets.

**Answer:** Defendant admits that the TIAA Real Estate Account is a separate account of

TIAA.  The remainder of Paragraph 106 asserts legal argument to which no response is required.

To the extent that a response is required, Defendant denies the remaining allegations in

Paragraph 106.

107.    The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

**Answer:** Defendant admits that the Plan offers TIAA-CREF mutual funds and that these

mutual funds charge fees are disclosed to participants.  Defendant denies the remaining

allegations in Paragraph 107.

108.    The Vanguard, Fidelity, and American Century investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management and other expenses, depending on the type of investment and share class.

**Answer:** Defendant admits that the Plan offers Vanguard, Fidelity and American

Century mutual funds and that these mutual funds charge fees are disclosed to participants.

Defendant denies the remaining allegations in Paragraph 108.

109.    VALIC issued a fixed and variable insurance annuity program to the Plan, from which participants could direct their contributions among various fixed and variable return account options. The value of each participant's investment in these variable accounts will change over time based on the investment experience and expenses applied to the accounts. The variable accounts include insurance company pooled separate accounts that invest in underlying mutual funds advised by VALIC or other mutual fund companies, such as Vanguard. For these options, VALIC charges fees in addition to the expense ratio of the underlying mutual funds, which can reach *multiples* of the total fees charged by the mutual funds. For instance, VALIC charged 120 bps for the VALIC Vanguard LifeStrategy Conservative Growth Fund when the underlying Vanguard LifeStrategy Conservative Growth Fund (VSCGX) charged 15 bps, an increase of *700%. See infra* ¶134.

**Answer:** Defendant admits that the Plan allowed participants who had existing balances

in VALIC fixed and variable annuities as of June 30, 2011, to continue contributing to those

investments until January 1, 2016, when all VALIC annuities were closed to additional

participant contributions.  Defendant further admits that the VALIC annuities charge fees that are

41

disclosed in relevant documents.  Defendant further admits that the value of a Plan participant's

investment in a VALIC variable annuity product may change over time based on the

performance of the underlying investments selected by the participant.  Defendant denies the

remaining allegations in Paragraph 109.

**110.**    The VALIC fixed accounts invest in the general account of VALIC and depend
upon the claims-paying ability of VALIC. These options offer a fixed rate of return to
participants.

**Answer:**  Defendant lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in Paragraph 110, and therefore denies those allegations.

**111.**    In January 2016, Defendant reduced the Plan's recordkeeping and administrative
service providers from five to three. Despite this change, and as set forth in further detail below,
Defendant continues to include high-priced investment options in the Plan, and continues to
allow excessive recordkeeping fees to be charged to the Plan.

**Answer:**  Answering Paragraph 111, Defendant states that as of June 30, 2011, VALIC

options were available only to participants who were actively investing with VALIC, and as of

April 30, 2012, American Century options were available only to participants who were actively

investing with American Century.  Effective January 1, 2016, Defendant closed both VALIC and

American Century options to contributions from Plan participants or beneficiaries.  Defendant

denies the remaining allegations in Paragraph 111.

## II.    Defendant improperly allowed TIAA-CREF to require the inclusion of its investment products in the Plan and improperly allowed TIAA to require it to provide recordkeeping for its proprietary options.

**112.**    ERISA requires fiduciaries to independently evaluate the prudence of each
investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to
remove imprudent investments no matter how long they have been in a plan, *Tibble*, 135 S. Ct. at
1828–29.

**Answer:**  Paragraph 112 asserts legal conclusions and purports to characterize judicial

opinions, which speak for themselves; thus, no response is required.  To the extent that a

response is required, Defendant denies the allegations in Paragraph 112.

**113.**    As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products. By agreeing to TIAA's mandate that its recordkeeping services had to be linked to including its funds in the Plan, Defendant promoted TIAA's financial interests at the expense of participants and drove excessive and uncapped revenue to TIAA's recordkeeping arm for years.

**Answer:**    Defendant admits that the Johns Hopkins, as sponsor of the Plan, and TIAA-CREF entered into an arrangement whereby TIAA-CREF provided recordkeeping services for its investment products, and the CREF Stock Account and CREF Money Market Account were offered as investment options under the Plan along with the TIAA Traditional Annuity. Defendant denies the remaining allegations in Paragraph 113.

**114.**    By allowing the Plan to enter such a bundled arrangement with TIAA-CREF, Johns Hopkins agreed to lock its employees into funds which Johns Hopkins did not analyze. It can never be prudent to lock in a fund in a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. Defendant thus failed to discharge its duty to independently evaluate whether each investment option was prudent for the Plan; whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants; and whether it was prudent to include and retain the CREF Stock and Money Market accounts and the TIAA Traditional in the Plan. Instead of acting solely in the interest of participants, Defendant allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement. Because Defendant allowed CREF Stock to be locked into the Plan, Defendant could not satisfy its duty to evaluate the option for inclusion and retention in the Plan, whether it was prudent at the time of inclusion and whether it should be removed if imprudent. As a result of Defendant's breach in allowing CREF Stock to be retained in the Plan because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plan suffered massive losses compared to prudent alternatives, as discussed in more detail below. *See infra* ¶¶181–204.

**Answer:**    Defendant denies the allegations in Paragraph 114.

**115.**    As noted above, the Plan offers the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. An example of the restrictions and penalties for withdrawal imposed by this Annuity include a 2.5% surrender charge if a participant withdraws his or her investment in a single lump sum within 120 days of termination of employment. Participants who wish to withdraw their savings without this 2.5% penalty can only do so by spreading their withdrawal over a *ten-year period*.

**Answer:**  Defendant admits that the Plan offers the TIAA Traditional Annuity as an investment option for participants.  Defendant further admits that certain TIAA Traditional Annuity contracts impose restrictions and assess charges if participants wish to withdraw their investment from the annuity contract.  Defendant denies the remaining allegations in Paragraph 115.

116.    The Plan includes TIAA-CREF's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style.

**Answer:**  Defendant admits that the investment products listed in Paragraph 116 were accounts in which Plan participants could invest through the CREF variable annuity product and that the annuity charges certain expenses that are disclosed to participants.  Defendant denies the remaining allegations in Paragraph 116.

117.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

       a.      "administrative expense" charge (24 bps);

       b.      "distribution expense" charge (9.5 bps);

       c.      "mortality and expense risk" charge (0.5 bps); and

       d.      "investment advisory expense" charge (ranging from 4 to 12.5 bps).

**Answer:**  Paragraph 117 appears to characterize the CREF Prospectus, a written document that speaks for itself; thus, no response is required.  To the extent that a response is required, Defendant admits that the CREF Prospectus describes expenses charged in connection with each of CREF's investment accounts, but denies any characterization conflicting with the terms of the prospectus.  Defendant denies the remaining allegations in Paragraph 117.

118.    Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-

44

CREF to the Plan's participants, and the other two layers of fees pay for services that provide no benefit to the Plan's participants.

> **a.     Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plan's assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

**Answer:**  Defendant admits that, according to the CREF Prospectus, the CREF variable annuity accounts deduct administrative expenses from net assets and those expenses are calculated as a percentage of assets.  Defendant denies the remaining allegations in Paragraph 118(a).

> **b.     Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

**Answer:** Defendant admits that, according to the CREF Prospectus, the CREF variable annuity accounts deduct distribution expenses from net assets.  Defendant denies the remaining allegations in Paragraph 118(b).

> **c.     Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plan, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA-CREF do

not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

**Answer:** Defendant admits that, according to the CREF Prospectus, the CREF variable annuity accounts deduct mortality and expense risk charges from net assets. Defendant denies the remaining allegations in Paragraph 118(c).

> **d.     Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as the Johns Hopkins Plan, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plan's fiduciaries did not obtain the lower investment management fees that come with the Plan's enormous asset size. As a result, the Plan, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by Johns Hopkins' employees and retirees. The Plan subsidized these efforts for years, often at a loss—compounding their conflict and breaching their duty to participants under ERISA.

**Answer:** Defendant denies the allegations in Paragraph 118(d).

**119.**    The excessiveness of this investment management fee is even more egregious because of the way critics have documented how CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. *See supra* ¶76.

**Answer:** Defendant denies the allegations in Paragraph 119.

**120.**    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

a.    "administrative expense" charge (26.5 bps);

b.    "distribution expense" charge (8 bps);

c.    "mortality and expense risk" charge (0.5 bps);

d.    "liquidity guarantee" (18 bps); and

e.    "investment management expense" charge (36.5 bps).

**Answer:**  Paragraph 120 purports to characterize the May 1, 2013 TIAA Real Estate

Account Prospectus, a written document that speaks for itself; thus, no response is required.  To

the extent that a response is required, Defendant admits that the TIAA Real Estate Account

Prospectus describes expenses charged in connection with the TIAA Real Estate Account, but

denies any characterization conflicting with the terms of the prospectus.  Defendant denies the

remaining allegations in Paragraph 120.

**121.**    The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet
another excessive fee that is not charged by better performing and lower cost mutual funds such
as the Vanguard REIT Index (Inst), which has a total expense ratio of 8 bps. *See infra* ¶¶206–
208.

**Answer:**  Defendant denies the allegations in Paragraph 121.

**122.**    As noted, the TIAA-CREF mutual funds in the Plan charge varying amounts for
investment management, but also charge distribution, marketing, and other expenses, depending
on the type of investment and share class. Thus, Johns Hopkins Plan participants are paying for
marketing costs of funds which their employer has placed in their retirement plan when such
marketing costs provide no benefit to them. Other mutual funds that were available to the Plan
do not include such marketing costs.

**Answer:**  Defendant admits that the Plan offers TIAA-CREF mutual funds and that these

mutual funds charge fees that are disclosed to participants.  Defendant denies the remaining

allegations in Paragraph 122.

**III.    Defendant caused the Plan to pay excessive administrative and recordkeeping fees.**

**123.**    As set forth above, the market for defined contribution recordkeeping services is
highly competitive. There are numerous recordkeepers in the marketplace who are equally
capable of providing a high level of service to large defined contribution plans like the Plan and

will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

**Answer:** Defendant denies the allegations in Paragraph 123.

124.    Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put their plans' recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

**Answer:** Defendant denies the allegations in Paragraph 124.

125.    As detailed above, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees, while the use of a single recordkeeper offers many benefits such as leveraging the plan's participant base to obtain economies of scale to ensure that participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used. Instead of leveraging the size of the participant base to take advantage of economies of scale, using multiple recordkeepers eliminates a plan's leverage. Rather than obtaining pricing based on a 25,000-participant plan from one recordkeeper, Defendant spread recordkeeping of participants among five recordkeepers, who pushed each of their own products on the Plan. This took away the Plan's ability to obtain favorable pricing and resulted in the Plan including hundreds of investment options that Defendant never reviewed.

**Answer:** Defendant denies the allegations in Paragraph 125.

126.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendant continued to contract with *five* separate recordkeepers for the Plan: TIAA-CREF, Vanguard, Fidelity, American Century, and VALIC. As of January 2016, Defendant continues to contract with *three* recordkeepers (TIAA-CREF, Fidelity, and Vanguard). The inefficient and costly structure maintained by Defendant has caused Plan participants to incur, and continue to pay, duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There was no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Plan before January 2016, as well as before 2009, or to continue with three recordkeepers to the present.

**Answer:** Defendant admits that TIAA-CREF, Vanguard, Fidelity, American Century and VALIC have provided recordkeeping services to the Plan. Defendant denies the remaining allegations in Paragraph 126.

127.    The Plan's recordkeepers receive compensation through revenue sharing payments from the Plan's investments.

**Answer:** Defendant admits that, with respect to certain mutual funds offered under the Plan, a portion of the expense ratio is used to pay Plan recordkeeping and administrative expenses. Defendant denies the remaining allegations in Paragraph 127.

128. Instead of obtaining a flat per-participant rate or sufficient rebates of all excessive revenue sharing back to the Plan, Defendant allowed the Plan's five recordkeepers to collect excessive asset-based revenue sharing as payment for these duplicative administrative services.

**Answer:** Defendant admits that, with respect to certain mutual funds offered under the Plan, a portion of the expense ratio is used to pay Plan recordkeeping and administrative expenses. Defendant denies the remaining allegations in Paragraph 128.

129. Based upon information from sources including industry experts, the Plan's TIAA-CREF investments kicked back the following amounts of asset-based revenue sharing to the TIAA-CREF recordkeeping entity:

**[Table omitted]**

**Answer:** Defendant admits that a portion of the expense ratio charged on TIAA-CREF mutual funds offered under the Plan is used to pay Plan recordkeeping and administrative expenses. Defendant denies the characterization of revenue sharing as a "kick[] back." Defendant lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 129 and therefore denies those allegations.

130. Fidelity and Vanguard are also compensated for recordkeeping services based on revenue sharing payments from their proprietary Fidelity or Vanguard mutual funds, including from higher-cost retail share classes of those funds that Defendant included in the Plan instead of available lower-cost institutional class shares. Similarly, American Century and VALIC were compensated based on revenue sharing payments from their proprietary investment options.

**Answer:** Defendant admits that, with respect to certain mutual funds offered under the Plan, a portion of the expense ratio has been used to pay Plan recordkeeping and administrative expenses. Defendant denies the remaining allegations in Paragraph 130.

131.    In addition, the Plan's recordkeepers receive additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

**Answer:**  Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 131, and therefore denies those allegations.

132.    Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 25,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plan would have been a fixed amount between $500,000 and $850,000 (approximately $35 per participant with an account balance).

**Answer:**  Defendant denies the allegations in Paragraph 132.

133.    Based on schedules regarding service provider compensation in the Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Plan paid at least $4.5 million to $6.1 million per year from 2010 to 2015 (or approximately $225–$340 per participant per year), over 860% higher than a reasonable fee for these services.  This resulted in the Plan paying millions of dollars in excessive recordkeeping fees each year.

**Answer:**  Defendant denies the allegations in Paragraph 133.

134.    This is a very conservative total because this amount excludes asset-based revenue sharing payments VALIC received for recordkeeping and administrative services from the VALIC variable and fixed accounts. This information was not disclosed to Plan participants. These asset-based payments are substantial. For instance, on each of the variable accounts, VALIC charged fees 48% to 700% higher than the fees actually charged by the underlying mutual funds, and received additional compensation through revenue sharing payments from the underlying proprietary mutual funds and other third-party mutual funds. Based on information presently available to Plaintiffs, as of 2015, the amounts charged by VALIC on its variable annuity products and the expenses of the underlying mutual funds are set forth below.

**[Table omitted]**

**Answer:**  Defendant denies the allegations in Paragraph 134.

**[The Amended Complaint omits Paragraphs 135 to 139.]**

140.    Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendant also failed to adequately negotiate rebates of excessive fee payments to TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard. As a specific example, because the multi-billion dollar plans paid the same percentage of asset-based fees as

much smaller plans that used TIAA-CREF's products and services, Defendant could have demanded "plan pricing" rebates from TIAA-CREF based on the Plan's economies of scale. Just as with investment management fees, the Plan's size would have enabled Defendant to command a much lower fee. Defendant could have also demanded and obtained similar rebates of all excessive fee payments from Vanguard, VALIC, American Century, and Fidelity. Had Defendant adequately negotiated for these rebates, the Plan's recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

**Answer:** Defendant denies the allegations in Paragraph 140.

141. The impact of excessive fees on employees' and retirees' retirement assets is dramatic, as the U.S. Department of Labor has found. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013) (finding that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career).

**Answer:** Paragraph 141 purports to characterize a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 141.

142. Defendant also failed to control recordkeeping costs as Plan assets grew. From June 30, 2009 to June 30, 2015, the Plan's assets increased from $2.1 billion to over $4.2 billion, an increase of 100%. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets doubled, even though the administrative services provided to the Plan remained the same. Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other loyally and prudently administered plans do, but failed to do so.

**Answer:** Defendant admits that, as of 2009, The Johns Hopkins University Faculty and Senior Staff Retirement Plan had net assets of approximately $2.13 billion and that, as of 2015, The Johns Hopkins University 403(b) Plan had net assets of approximately $4.28 billion. Defendant denies the remaining allegations in Paragraph 142.

143. Upon information and belief, Defendant also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendant to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

**Answer:** Defendant denies the allegations in Paragraph 143.

144.     Defendant failed to prudently monitor and control the compensation paid by the Plan for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers. Had Defendant monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $35 million of their retirement savings in the last six years alone.

**Answer:** Defendant denies the allegations in Paragraph 144.

## IV.     Defendant caused the Plan to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.

145.     Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Classifying Mutual Funds*, PLANSPONSOR (Jan. 2011).

**Answer:** Paragraph 145 asserts legal argument and purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 145.

146.     Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost chare class of the same fund is available, to avoid saddling the plan with unnecessary fees.

**Answer:** Defendant denies the allegations in Paragraph 146.

147.     Jumbo investors like the Plan can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available

that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

    **Answer:** Defendant denies the allegations in Paragraph 147.

    **148.** Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plan. Institutional share classes sometimes have a minimum investment threshold to qualify for the institutional rate. However,

> For large 401(k) plans with over a billion dollars in total assets ... mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D. Cal. July 8, 2010), aff'd 729 F.3d 1110 (9th Cir. 2013).

    **Answer:** Paragraph 148 purports to characterize and partially quote a judicial opinion,

which speaks for itself; thus, no response is required.  To the extent a response is required,

Defendant denies the allegations in Paragraph 148.

    **149.** In fact, Vanguard expressly states in its SEC filings that it "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely generate substantial economies in the servicing of their accounts."

    **Answer:** Paragraph 149 purports to characterize and partially quote a written document,

which speaks for itself; thus, no response is required.  To the extent that a response is required,

Defendant denies the allegations in Paragraph 149.

    **150.** As further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plans less expensive institutional share classes of Vanguard, TIAA-CREF, Fidelity, American Century, and VALIC mutual fund options despite not meeting the minimum investment thresholds.

    **Answer:** Defendant lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in Paragraph 150 and therefore denies those allegations.

**151.**     Therefore, Defendant knew or should have known that investment providers would have allowed the Plan to provide lower-cost share classes to participants if Defendant had asked.

**Answer:**  Defendant denies the allegations in Paragraph 151.

**152.**     Defendant selected and continues to retain Plan investment options with far higher costs than were and are available for the Plan based on its size. This includes Defendant selecting and continuing to offer far higher-cost share classes even though lower-cost share classes of the exact same mutual funds were available. The following table sets forth each higher-cost mutual fund share class that was included in the Plan during the proposed class period for which a significantly lower-cost, but otherwise identical, share class of the same mutual fund was available. The expense ratios identified for the Plan's investment option and the lower-cost share class alternative are based on the earliest date during the proposed class period that the higher-cost fund was included in the Plan:

**[Table omitted]**

**Answer:**  Defendant denies the allegations in Paragraph 152.

**153.**     These lower-cost share classes have been available to the Plan for years, some dating back to the early 2000s or before.

**Answer:**  Defendant denies the allegations in Paragraph 153.

**154.**     Because the share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost, Defendant's failure to select the lower-cost share classes for the Plan's mutual fund options demonstrates that Defendant failed to prudently consider and use the size and purchasing power of the Plan when selecting the Plan's investment options.

**Answer:**  Defendant denies the allegations in Paragraph 154.

**155.**     Defendant's use of the higher-cost share classes instead of the available lower-cost versions caused Plan participants to lose millions of dollars of their retirement savings due to wholly unnecessary fees.

**Answer:**  Defendant denies the allegations in Paragraph 155.

**V.     Defendant selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.**

**156.**     Defendant provided a multitude of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to what industry experts have described as "decision paralysis" for participants. *See, e.g.*, Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed*

*Accounts, and Target-Date Investments*, T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009) ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions."). Defendant placed *over 440* investment options in the Plan, in the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and stable value.

**Answer:** Defendant admits that, as of December 31, 2015, the Plan offered more than

400 investment options, in varying asset classes, in which participants could choose to invest.

Paragraph 156 purports to characterize and partially quote a written document, which speaks for

itself; thus, no response is required. Defendant denies the remaining allegations in Paragraph

156.

**157.** As Defendant has admitted (*see infra* ¶¶174–175), it was impossible for Defendant to monitor such a large number of investment options. Thus, Defendant did not— indeed could not—discharge its duty to "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original).

**Answer:** Defendant denies the allegations in Paragraph 157.

**158.** Having such an overwhelming number of investment options also places a monumental burden on the Plan's participants in selecting options in which to invest. Mutual funds are required to offer a prospectus, which is designed to provide material information to potential investors to enable them to make an informed, prudent investment decision. The prospectus sets forth a fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information. For the Fidelity Freedom Funds alone, the prospectus and supporting materials filed with the SEC span almost *800* printed pages. If a Johns Hopkins Plan participant were to review the prospectuses of all *440-plus* investment options that were in the Plan, they would have to read many thousands of pages of materials. This is a virtually impossible burden. Even for the Plan's fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the more than 400 funds they selected and retained for the Plan.

**Answer:** The fourth sentence of Paragraph 158 purports to describe a written document,

which speaks for itself; thus, no response is required. Defendant denies the remaining

allegations in Paragraph 158.

**159.** In comparison to the more than 440 options in the Johns Hopkins Plan, defined contribution plans in 2014 had an average of 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends*, at 28 (2015). This number of

options provides participants with a choice of investment styles while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and obtaining lower fees. It also reflects an evaluation process designed to select the "best in class" investment choice in a particular investment style. Indeed, since it is the fiduciaries in a plan who ERISA holds to a standard of a prudent financial expert, it is important for fiduciaries to perform that selection role for the exclusive benefit of participants who are not financial experts.

**Answer:** Paragraph 159 asserts legal conclusions and purports to characterize a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 159.

160. A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

**Answer:** Defendant denies the allegations in Paragraph 160.

161. Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. Including a large number of alternatives removes the benefit of pooling assets consistent with the size of the Plan. Assembling a haphazard lineup of over 440 duplicative options, proprietary to the Plan's recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

**Answer:** Paragraph 161 asserts legal conclusions and purports to characterize and partially quote regulations and a judicial opinion, which speak for themselves; thus, no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 161.

162. Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendant, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are

included in a plan, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

**Answer:** Defendant denies the allegations in Paragraph 162.

163.    Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do, when many actively managed funds are included within the same investment style, this results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

**Answer:** Paragraph 163 asserts legal conclusions to which no response is required.  To

the extent that a response is required, Defendant denies the allegations in Paragraph 163.

164.    In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments*, T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").

**Answer:** Paragraph 164 purports to characterize written documents, which speak for

themselves; thus, no response is required.  To the extent that a response is required, Defendant

denies the allegations in Paragraph 164.

165.    Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

**Answer:** Defendant denies the allegations in Paragraph 165.

166.    Since 2010, the Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (37–38 options), fixed income and high yield bond (62–71 options), international (52–61 options), large cap domestic equities (87–93 options), mid cap domestic equities (30–33 options), small cap domestic equities (22–24 options), real estate (7–9 options), money market (17 options), and target date investments (4 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harms participants and can lead to decision paralysis.

**Answer:** Defendant denies the allegations in Paragraph 166.

**167.**    For illustration purposes, in the large cap blend investment style, Defendant included 24 actively managed or passively managed investment options in the Plan, for a combined asset amount of $692 million as of June 30, 2015. Those investments are summarized below and compared to a single lower-cost investment alternative that was available to the Plan, the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

**[Table omitted]**

**Answer:**  Defendant admits that the Plan offers large-cap blend investment options as

part of the overall investment lineup available to participants.  The allegations in Paragraph 167

regarding the particular investment options and fees purport to summarize information set forth

in fee disclosures and other documents, which speak for themselves; thus, no response is

required.  Defendant denies the remaining allegations in Paragraph 167.

**168.**    With over *$500 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive respectively than the lower-cost Vanguard option, with an expense ratio of 2 bps.

**[Chart omitted]**

**Answer:**  Defendant denies the allegations in Paragraph 168.

**169.**    Many other large cap index funds were also available at far lower costs than the Plan's large cap blend funds. If the Plan's 24 funds were consolidated into a single large cap domestic blend investment, the Plan would have saved millions of dollars in investment management expenses. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment, such as the Vanguard Institutional Index Fund (Inst Plus), Plan participants would have avoided losing in excess of $3 million in fees for Plan-year 2014 alone, and many more millions since 2010.

**Answer:**  Defendant denies the allegations in Paragraph 169.

**170.**    In addition, Defendant selected and continues to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as the S&P 500, by holding a representative sample of securities in the index. Because no stock selection or research is needed, index fund fees are much lower than the fees of actively-managed funds in the same investment style, as set forth in ¶¶47– 49, 183– 187.

**Answer:** Paragraph 170 asserts legal argument to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 170.

171.    For example, in the large cap blend investment style, Defendant provided ten index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

**Answer:** Defendant denies the allegations in Paragraph 171.

172.    Since index funds merely hold the same securities in the same proportions as the index, having multiple index funds of the same category or investment style in the Plan provides no benefit to participants. As Morningstar CEO Joe Mansueto recently observed, "[b]asic market indexes are virtually interchangeable." Lewis Braham, *Morningstar Announces Free Use of Its Indexes*, Barron's (Nov. 5, 2016). Including multiple similar index funds in the same investment style hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

**Answer:** Paragraph 172 asserts legal conclusions and purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 172.

173.    Had Defendant combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, as set forth in ¶167, the Plan would have generated higher investment returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

**Answer:** Defendant denies the allegations in Paragraph 173.

## VI.    Defendant has admitted that the Plan's prior structure was imprudent and that it had "no ability" to monitor the Plan's investment options.

174.    Defendant expressly acknowledged that the Plan's five recordkeepers and over four hundred investments made it impossible to monitor each fund as required under ERISA. According to minutes of a February 17, 2010 Faculty Senate meeting, Senior Director of Benefits Heidi Conway presented a preview of proposed changes to the University retirement plans for faculty and staff. The proposed changes were necessary for the University "to comply with new federal defined contribution plan regulations with regard to fund offerings and reasonable and transparent fees." The proposed arrangement would "permit the University to consolidate plan recordkeepers from the current five vendors down to one or two." *Id.*

**Answer:** Paragraph 174 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 174.

175. Defendant acknowledged that the proposed changes would result in "more investment fee transparency which will allow participants to better understand and make decisions based on investment expenses associated with their investment options." Id. Defendant expressly admitted that it could not monitor the four hundred-plus investment options in the Plan: "The University currently offers 413 investment options through five vendors with *no ability to effectively monitor the funds*." *Id.* (emphasis added).

**Answer:** Paragraph 175 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 175.

176. Plaintiffs had no knowledge of this admission until counsel discovered it on the Hopkins Medicine website in the process of preparing this amended complaint. According to internet archives, these meeting minutes were not posted on the Hopkins Medicine website until approximately June 2015.

**Answer:** Defendant lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 176, and therefore denies those allegations.

177. Despite this unambiguous admission that it could not fulfill its duty to monitor the more than four hundred options in the Plan, as ERISA requires, and recognition of the clear benefits of consolidation, Defendant did not reduce the Plan's five recordkeepers, or implement any lineup restructuring until January 2016. Thus, Defendant knowingly allowed participants to continue to be harmed by this imprudent arrangement for an *additional six years*. Even to this day Defendant continues to contract with three separate recordkeepers, causing the Plan's participants to incur duplicative and excessive recordkeeping expenses. Had Defendant implemented a prudent consolidation of recordkeepers, and reduced the overwhelming number of options in the lineup as of 2010 when it recognized it had "no ability to effectively monitor the funds[,]" Plan participants would have avoided millions of dollars in lost retirement savings due to unreasonable investment and administrative fees and performance losses.

**Answer:** Defendant denies the allegations in Paragraph 177.

**VII.    Defendant imprudently and disloyally retained historically underperforming Plan investments.**

178. The excessive fees in the Plan's investments were not justified by superior investment returns. Defendant's failure to conduct appropriate due diligence in selecting and

monitoring the Plan's investments resulted in options being retained in the Plan despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives.

**Answer:** Defendant denies the allegations in Paragraph 178.

179.    As of June 30, 2016, of the Plan's investment options which had at least a five-year performance history, *seventy percent* of those funds—270 out of 388—underperformed their respective benchmarks over the previous 5-year period. These underperforming funds include the following:

**[Table omitted]**

**Answer:** Defendant denies the allegations in Paragraph 179.

180.    Had Defendant conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plan or replaced. Defendant's failure to do so caused the Plan substantial losses compared to prudent alternative investments that were available to the Plan. Two funds in particular demonstrate the severe harm to the Plan resulting from Defendant's breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

**Answer:** Defendant denies the allegations in Paragraph 180.

a.    CREF Stock Account

181.    The CREF Stock Account is one of the largest investment options, by asset size, in the Plan with almost $500 million in assets, and has been included in the Plan from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark TIAA and Defendant told participants was the proper one, and underperformed lower-cost actively and passively managed investments that were available to the Plan, yet has not been removed from the Plan nor frozen to new investments.

**Answer:** Defendant admits that the CREF Stock Account has been offered as an

investment option under the Plan since at least 2010.  Defendant further admits that as of June

30, 2015, Plan participants held investments of $455,814,787 in the CREF Stock Account.

Defendant admits that TIAA-CREF classifies the CREF Stock Account as a U.S. equity

investment in the large blend Morningstar category.  Defendant denies the remaining allegations in Paragraph 181.

**182.**    TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. For its benefit, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plan and acting for the sole benefit of the Plan's participants as ERISA requires, Defendant allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plan. Defendant did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

**Answer:**  Defendant admits that Johns Hopkins, as sponsor of the Plan, and TIAA-CREF entered into an arrangement whereby TIAA-CREF provided recordkeeping services for its investment products, and the CREF Stock Account and CREF Money Market Account were offered as investment options under the Plan along with the TIAA Traditional Annuity.  The second sentence of Paragraph 182 purports to characterize TIAA-CREF's fund fact sheets and participant fee disclosures, which speak for themselves; thus, no response is required.  Defendant denies the remaining allegations in Paragraph 182.

**183.**    As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap market because such companies are the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

**Answer:**  Paragraph 183 purports to characterize and partially quote written documents, which speak for themselves; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 183.

**184.**    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly

measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management*, 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991); Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

**Answer:** Paragraph 184 asserts legal argument to which no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 184.

**185.** To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns, at 1931–34; see also Russ Wermers, Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

**Answer:** Paragraph 185 purports to characterize and partially quote written documents, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 185.

**186.** If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

**Answer:** Paragraph 186 purports to characterize and partially quote written documents, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 186.

**187.** Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

**Answer:** Defendant denies the allegations in Paragraph 187.

**188.**    Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J. FIN. 549, 571 (1995).

**Answer:**  Paragraph 188 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 188.

**189.**    Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks ... The median active fund underperformed the passive index in 12 out of 18 years [for the large- cap fund universe] ... The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

**Answer:**  Paragraph 189 purports to characterize and partially quote a written document, which speaks for itself; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 189.

**190.**    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management.

**Answer:** Paragraph 190 asserts legal conclusions and arguments to which no response is

required.  To the extent that a response is required, Defendant denies the allegations in Paragraph

190.

**191.**    Defendant failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in the Plan. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. By allowing the Plan to be bound by this requirement, Defendant failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plan.

**Answer:** Defendant denies the allegations in Paragraph 191.

**192.**    Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plan's participants. Defendant failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plan invested over $450 million in the CREF Stock Account.

**Answer:** Defendant admits that as of December 31, 2014, the CREF Stock Account had

a gross expense ratio of 46 bps and that its gross expense ratio has decreased over time.

Defendant denies the remaining allegations in Paragraph 192.

**193.**    Had Defendant engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

**Answer:** Defendant denies the allegations in Paragraph 193.

**194.**    The CREF Stock Account did not merely experience poor performance in a single year or two. Its historical performance has been persistently poor for many years compared to both available lower-cost index funds and the Russell 3000 Index benchmark, provided to the Plan's participants as the appropriate benchmark in participant communications.

**Answer:** Defendant denies the allegations in Paragraph 194.

195.    Defendant and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results, as shown in the excerpt below that was provided to the Plan's participants.

[Chart omitted]

**Answer:**  Paragraph 195 purports to characterize participant disclosures, which speak for themselves; thus, no response is required.  To the extent that a response is required, Defendant admits that the TIAA-CREF disclosures provided to Plan participants identified the Russell 3000 Index as the benchmark for the CREF Stock Account.  Defendant denies the remaining allegations in Paragraph 195.

196.    The CREF Stock Account did not merely underperform in a single year or two. Historical performance of the CREF Stock Account has been persistently poor for many years compared to this identified benchmark index (Russell 3000 Index), and also as compared to available low-cost index funds. The following chart compares the investment returns of the CREF Stock Account to its benchmark (the Russell 3000) and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. For each comparison, the CREF Stock Account dramatically underperformed the benchmarks and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.

**Answer:**  Defendant denies the allegations in Paragraph 196.

[Chart omitted]

197.    The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund-Inst Plus (2 bps) and the Vanguard Institutional Index-Inst Plus (2 bps).

**Answer:**  Defendant admits that as of December 31, 2014, the CREF Stock Account had a gross expense ratio of 46 bps and that its gross expense ratio has decreased over time.

Defendant denies the remaining allegations in Paragraph 197.

198.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one¬, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying

asset allocations to the CREF Stock Account include the Vanguard PRIMECAP-Adm (VPMAX) and the Vanguard Capital Opp.-Adm (VHCAX).

**[Chart omitted]**

**Answer:** Defendant denies the allegations in Paragraph 198.

199.    This sustained underperformance went back even further. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.

**[Charts omitted]**

**Answer:** Defendant denies the allegations in Paragraph 199.

200.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better-performing actively managed alternatives: the Vanguard PRIMECAP-Adm (35 bps) and the Vanguard Capital Opp.-Adm (40 bps).

**Answer:** Defendant admits that as of December 31, 2014, the CREF Stock Account had

a gross expense ratio of 46 bps and that its gross expense ratio has decreased over time.

Defendant denies the remaining allegations in Paragraph 200.

201.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012). This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

**Answer:** Paragraph 201 purports to characterize a written document, which speaks for

itself; thus, no response is required.  To the extent a response is required, Defendant denies the

allegations in Paragraph 201.

202.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829. In contrast to the conduct of prudent fiduciaries, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite

continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

**Answer:** The first sentence in Paragraph 202 asserts legal conclusions and purports to characterize and partially quote a judicial opinion, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in the first sentence. Defendant denies the remaining allegations in Paragraph 202.

203. Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

**Answer:** Defendant denies the allegations in Paragraph 203.

204. Had the Defendant removed the CREF Stock Account and the amounts been invested in any of the passively managed lower-cost alternatives or the actively managed lower-cost alternatives, as set forth in ¶¶196–197 and 198–200, Plan participants would not have lost in excess of $142 million of their retirement savings.

**Answer:** Defendant denies the allegations in Paragraph 204.

b. TIAA Real Estate Account

205. Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

**Answer:** Defendant admits that the TIAA Real Estate Account is one of the investment options offered under the Plan. Defendant denies the remaining allegations in Paragraph 205.

206. With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.

**[Chart omitted]**

**Answer:** Defendant admits that as of December 31, 2014, the TIAA Real Estate Account had a gross expense ratio of 87 bps and that its gross expense ratio has decreased over time. Defendant denies the remaining allegations in Paragraph 206.

207. The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009. Despite this, Defendant selected and continues to retain it in the Plan.

**[Charts omitted]**

**Answer:** Defendant admits that the TIAA Real Estate Account is one of the investment options offered under the Plan. Defendant denies the remaining allegations in Paragraph 207.

208. This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.

**[Chart omitted]**

**Answer:** Defendant denies the allegations in Paragraph 208.

209. As the Supreme Court unanimously ruled in *Tibble*, fiduciaries of defined contribution plans must continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, the Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

**Answer:** The first sentence of Paragraph 209 asserts legal conclusions and purports to characterize a judicial opinion, which speaks for itself; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in the first sentence. Defendant denies the remaining allegations in Paragraph 209.

210. Had Defendant removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plan participants would not have lost in excess of $23 million of their retirement savings.

**Answer:** Defendant denies the allegations in Paragraph 210.

## CLASS ACTION ALLEGATIONS

**211.**    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

**Answer:**  Paragraph 211 asserts legal conclusions and purports to characterize certain statutes, which speak for themselves; thus, no response is required.  To the extent that a response is required, Defendant admits that 29 U.S.C. § 1132(a)(2) states that a "civil action may be brought" by "a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title," but denies that Plaintiffs or the Plan are entitled to any relief under this or any other provision of ERISA, or any other law.  Defendant denies the remaining allegations in Paragraph 211.

**212.**    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of The Johns Hopkins University 403(b) Plan from August 11, 2010, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan.

**Answer:**  Paragraph 212 asserts legal conclusions and purports to characterize certain provisions of ERISA, which speak for themselves; thus, no response is required.  To the extent that a response is required, Defendant admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23 on behalf of the proposed class stated in Paragraph 212.  Defendant denies that class certification is appropriate and further denies the remaining allegations in Paragraph 212.

**213.**    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 24,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c.    Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendant's misconduct described above.

d.    Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

**Answer:**  Paragraph 213 and its subparts (a) through (e) assert legal conclusions to which no response is required.  To the extent that a response is required, Defendant admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter and further denies the remaining allegations in Paragraph 213.

**214.**    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no

class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

**Answer:** Paragraph 214 asserts legal conclusions to which no response is required. To the extent that a response is required, Defendant admits that Plaintiffs purport to bring their claims as a class action under Federal Rule of Civil Procedure 23, but denies that class certification is appropriate in this matter and further denies the remaining allegations in Paragraph 214.

**215.** Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a. Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015). In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." Abbott, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

b. Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

c. "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

d. "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

e.      U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

f.      U.S. District Judge Herndon of the Southern District of Illinois, recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general..." *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

g.      The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work ... investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

h.      Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring

> recordkeeping fees and separating a fiduciary's corporate interest
> from its fiduciary obligations."

*Tussey v. ABB, Inc.*, No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

   i. In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "[t]he law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

   j. Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

   k. On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

   l. Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

   m. The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, Lockheed Martin Case Puts 401(k) Plans on Trial, NPR (Dec. 15, 2014); Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May

1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

**Answer:** Paragraph 215 and its subparts (a) through (m) assert legal conclusions and purport to characterize and partially quote various judicial opinions and other written documents, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant admits that Plaintiffs' counsel has been appointed as class counsel in ERISA class actions, including those cited in Paragraph 215. Defendant denies the remaining allegations in Paragraph 215 and further denies that class certification is appropriate in this matter.

## COUNT I

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

**216.** Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

**Answer:** Defendant incorporates its responses to the previous Paragraphs as though fully set forth herein.

**217.** Defendant was required to discharge its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

**Answer:** Defendant denies the allegations in Paragraph 217.

**218.** Defendant was required to independently assess "the prudence of *each* investment option" for the Plan on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plan's participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendant was also required to remove investments that were no longer prudent for the Plan, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

**Answer:** Defendant denies the allegations in Paragraph 218.

**219.** By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plan, as well as the TIAA Traditional Annuity, and to require

that it provide recordkeeping for its proprietary options, Defendant committed the Plan to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plan from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendant abdicated its duty to independently assess the prudence of each option in the Plan on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plan's recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendant favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from TIAA-CREF's proprietary funds over the interest of participants.

**Answer:** Defendant denies the allegations in Paragraph 219.

**220.** Because Defendant shackled the Plan with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decision-making process as to the prudence of those options, Defendant is liable to make good to the Plan all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plan suffered massive losses from the inclusion of the CREF Stock Account in the Plan compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plan, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

**Answer:** Defendant denies the allegations in Paragraph 220.

**221.** Total Plan losses will be determined after complete discovery in this case and are continuing.

**Answer:** Defendant denies the allegations in Paragraph 221.

**222.** Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**Answer:** Defendant denies the allegations in Paragraph 222.

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

**223.** Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

**Answer:** Defendant incorporates its responses to the previous Paragraphs as though fully

set forth herein.

**224.** Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A)  sale or exchange, or leasing, of any property between the plan and a party in interest;
* * *

(C)  furnishing of goods, services, or facilities between the plan and party in interest;

(D)  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ...

29 U.S.C. §1106(a)(1).

**Answer:**  Paragraph 224 purports to characterize and partially quote a statute, which

speaks for itself; thus, no response is required.  To the extent that a response is required,

Defendant denies the allegations in Paragraph 224.

225.    Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As a service provider to the Plan, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

**Answer:**  Paragraph 225 asserts legal conclusions to which no response is required.  To

the extent a response is required, Defendant denies the allegations in Paragraph 225.

226.    By allowing the Plan to be locked into an unreasonable arrangement that required the Plan to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plan due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendant caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF in connection with the Plan's investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

**Answer:**  Paragraph 226 asserts legal conclusions to which no response is required.  To

the extent a response is required, Defendant denies the allegations in Paragraph 226.

**227.**    Total Plan losses will be determined after complete discovery in this case and are continuing.

**Answer:**  Defendant denies the allegations in Paragraph 227.

**228.**    Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

**Answer:**  Defendant denies the allegations in Paragraph 228.

**COUNT III**

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)**

**Unreasonable Administrative Fees**

**229.**    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

**Answer:**  Defendant incorporates its responses to the previous Paragraphs as though fully

set forth herein.

**230.**    Defendant was required to discharge its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

**Answer:**  Defendant denies the allegations in Paragraph 230.

**231.**    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George*, 641 F.3d at 798–99. Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying ... through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a breach of fiduciary duties. *Tussey*, 746 F.3d at 336.

**Answer:**  Paragraph 231 asserts legal argument and purports to characterize and partially

quote judicial opinions, which speak for themselves; thus, no response is required.  To the extent

that a response is required, Defendant denies the allegations in Paragraph 231.  Defendant denies

the remaining allegations in Paragraph 231.

**232.**    Defendant's process for monitoring and controlling the Plan's recordkeeping fees was a fiduciary breach in that Defendant failed to adequately monitor the amount of the revenue sharing received by the Plan's recordkeepers, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Defendant failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plan's assets grew, the asset-based revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

**Answer:**  Defendant denies the allegations in Paragraph 232.

**233.**    By allowing TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard to put their proprietary investments in the Plan without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendant failed to act in the exclusive interest of participants.

**Answer:**  Defendant denies the allegations in Paragraph 233.

**234.**    In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendant failed to engage in a timely and reasoned decision-making process to determine whether the Plan would similarly benefit from consolidating the Plan's administrative and recordkeeping services under a single provider. Instead, Defendant continued to contract with *five* separate recordkeepers. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. Defendant's failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. George, 641 F.3d at 788.

**Answer:**  Paragraph 234 asserts legal argument and purports to characterize and partially

quote judicial opinions, which speak for themselves; thus, no response is required.  To the extent

that a response is required, Defendant denies the allegations in Paragraph 234.

**235.**    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

**Answer:**  Defendant denies the allegations in Paragraph 235.

**236.**    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**Answer:**  Defendant denies the allegations in Paragraph 236.

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Administrative Services and Fees

**237.**    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

**Answer:**  Defendant incorporates its responses to the previous Paragraphs as though fully

set forth herein.

**238.**    As service providers to the Plan, TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

**Answer:**  Paragraph 238 asserts legal conclusions to which no response is required.  To

the extent a response is required, Defendant denies the allegations in Paragraph 238.

**239.**    By causing the Plan to use TIAA-CREF, Fidelity, VALIC, American Century and Vanguard as the Plan's recordkeepers from year to year, Defendant caused the Plan to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard and in connection with the Plan's investments in funds that paid revenue sharing to TIAA-CREF, Fidelity, VALIC, American Century, and Vanguard.

**Answer:**  Defendant denies the allegations in Paragraph 239.

**240.**    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

**Answer:**  Defendant denies the allegations in Paragraph 240.

**241.**    Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

**Answer:**  Defendant denies the allegations in Paragraph 241.

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Unreasonable Investment Management Fees,

### Unnecessary Marketing and Distribution (12b-1) Fees

### and Mortality and Expense Risk Fees, and Performance Losses

**242.**    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

**Answer:**  Defendant incorporates its responses to the previous Paragraphs as though fully set forth herein.

**243.**    Defendant is responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. Defendant had a continuing duty to evaluate and monitor the Plan's investments on an ongoing basis and to "remove imprudent ones" regardless of how long a fund has been in the plan. *Tibble*, 135 S. Ct. at 1829.

**Answer:**  Paragraph 243 asserts legal argument and purports to characterize and partially quote a judicial opinion, which speaks for itself; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 243.

**244.**    These duties required Defendant to independently assess whether each option was a prudent choice for the Plan, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plan's menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

**Answer:**  Paragraph 244 asserts legal argument and purports to characterize and partially quote judicial opinions, which speak for themselves; thus, no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 244.

**245.**    In making investment decisions, Defendant was required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plan, the recordkeepers' financial interest in having their proprietary investment products included in the Plan, and whether the higher cost of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

**Answer:** Paragraph 245 asserts legal argument and purports to characterize and partially quote judicial opinions, regulations, and a secondary source, which speak for themselves; thus, no response is required. To the extent that a response is required, Defendant denies the allegations in Paragraph 245.

246. Defendant selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

**Answer:** Defendant denies the allegations in Paragraph 246.

247. Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

**Answer:** Defendant denies the allegations in Paragraph 247.

248. Rather than consolidating the Plan's *over 400* investment options into a core lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendant retained multiple investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction. In addition, as a fiduciary required to operate as a prudent financial expert, *Katsaros*, 744 F.2d at 279. Defendant knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plan. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. All of the Plan's options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plan, which Defendant failed to adequately consider. In so doing, Defendant failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendant therefore failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. This was a breach of fiduciary duties.

**Answer:** Defendant denies the allegations in Paragraph 248.

**249.**    Defendant failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan. As of June 30, 2016, *sixty-three percent* of the Plan's investment options—270 of the 431 investment options in the Plan— underperformed their respective benchmarks over the previous 5-year period.

**Answer:**  Defendant denies the allegations in Paragraph 249.

**250.**    CREF Stock Account:  Defendant included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendant and TIAA told participants was the appropriate benchmark.

**Answer:**  Defendant admits that the CREF Stock Account is one of the investment

options offered to participants under the Plan.  Defendant further admits that the TIAA-CREF

disclosures provided to Plan participants identified the Russell 3000 Index as the benchmark for

the CREF Stock Account.  Defendant denies the remaining allegations in Paragraph 250.

**251.**    TIAA Real Estate Account: Defendant included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

**Answer:**  Defendant admits that the TIAA Real Estate Account is one of the investment

options offered to participants under the Plan.  Defendant denies the remaining allegations in

Paragraph 251.

**252.**    Had Defendant engaged in a prudent investment review process, it would have concluded that these options were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan, and thus should be removed from the Plan or, at a minimum, frozen to new investments.

**Answer:**  Defendant denies the allegations in Paragraph 252.

**253.**    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

**Answer:**  Defendant denies the allegations in Paragraph 253.

**254.**    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**Answer:**  Defendant denies the allegations in Paragraph 254.

## COUNT VI

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Investment Services and Fees

**255.**    Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

**Answer:**  Defendant incorporates its responses to the previous Paragraphs as though fully set forth herein.

**256.**    As the plan's providers of investment services, TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

**Answer:**  Defendant denies the allegations in Paragraph 256.

**257.**    By placing investment options in the Plan in investment options managed by TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard in which all of the Plan's $4.3 billion in assets were invested, Defendant caused the Plan to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plan and TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard in connection with the Plan's investments in TIAA-CREF, VALIC, American Century, Fidelity, and Vanguard investment options.

**Answer:**  Defendant denies the allegations in Paragraph 257.

**258.**    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

**Answer:**  Defendant denies the allegations in Paragraph 258.

**259.**    Under 29 U.S.C. §1109(a), Defendant is liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

**Answer:** Defendant denies the allegations in Paragraph 259.

## COUNT VII

### Failure to Monitor Fiduciaries

**260.** Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

**Answer:** Defendant incorporates its responses to the previous Paragraphs as though fully set forth herein.

**261.** This Count alleges breach of fiduciary duties against Defendant.

**Answer:** Defendant denies the allegations in Paragraph 261.

**262.** Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

**Answer:** Defendant denies the allegations in Paragraph 262.

**263.** A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge its duties.

**Answer:** Defendant denies the allegations in Paragraph 263.

**264.** To the extent any of Defendant's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

**Answer:** Defendant denies the allegations in Paragraph 264.

**265.** Defendant breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.      Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.      Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.      Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

e.      Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

**Answer:** Defendant denies the allegations in Paragraph 265 and its subparts.

**266.**    Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members lost tens of millions of dollars of retirement savings.

**Answer:** Defendant denies the allegations in Paragraph 266.

## JURY TRIAL DEMANDED

**267.**    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury.

**Answer:** Defendant denies that Plaintiffs are entitled to a jury trial.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan

participants and beneficiaries, respectfully request that the Court:

- Find and declare that the Defendant has breached its fiduciary duties as described above;

86

- Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;
- Order the Defendant to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;
- Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under § 1109(a);
- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;
- Reform the Plan to include only prudent investments;
- Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;
- Certify the Class, appoint each Plaintiff as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;
- Award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

**Answer:** In response to the PRAYER FOR RELIEF, Defendant denies that Plaintiffs or any potential class member is entitled to any type of remedy, relief, or damages whatsoever, including the relief requested in Plaintiffs' Prayer for Relief. Defendant denies the remaining allegations in this Paragraph.

## DEFENDANT'S AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiffs and the purported class members, and expressly denying any and all wrongdoing, Defendant alleges the following defenses to the Amended Complaint:

## First Defense

Plaintiffs fail to state a claim upon which relief may be granted.

## Second Defense

Defendant is not, or was not acting as, a fiduciary within the meaning of 29 U.S.C. § 1102(21)(A) with respect to certain purported misconduct alleged by Plaintiffs.

## Third Defense

The claims of Plaintiffs and the members of the putative class against Defendant are barred in whole or in part by the applicable statutes of repose or limitations, including but not limited to 29 U.S.C. § 1113.

## Fourth Defense

The claims of Plaintiffs and/or any other members of the putative class who have executed a waiver or release of claims against Defendant may be barred by that waiver or release of claims.

## Fifth Defense

The claims of Plaintiffs and/or other members of the putative class are barred, in whole or in part, by their lack of standing.

## Sixth Defense

Defendant is relieved of any alleged liability based on Plan participants' exercise of control over their individual accounts pursuant to 29 U.S.C. § 1104(c), and/or because neither the Plaintiffs, nor the Plan, nor anyone else suffered a loss as a result of the actions or inactions of Defendant within the meaning of 29 U.S.C. § 1104(c).

## Seventh Defense

Any losses alleged by Plaintiffs were not caused by any alleged breach of fiduciary duty by Defendant, as set forth in 29 U.S.C. § 1109(a) and elsewhere, but resulted from economic

causes and events not related to any alleged breaches of fiduciary duty and from matters over which Defendant had no control.

### Eighth Defense

Any losses alleged by Plaintiffs were not caused by any fault, act or omission by Defendant, as set forth in 29 U.S.C. § 1109(a) and elsewhere, but were caused by circumstances, entities or persons, including Plaintiffs, for which Defendant is not responsible and cannot be held liable.

### Ninth Defense

To the extent Plaintiffs have stated a claim on which relief can be granted, Plaintiffs have proximately caused, contributed to, or failed to mitigate any and all losses claimed by them.

### Tenth Defense

Defendant received no benefit as a result of any of the transactions alleged in the Amended Complaint and engaged in no prohibited transactions within the meaning of 29 U.S.C. § 1106.

### Eleventh Defense

To the extent that Plaintiffs can establish any transactions prohibited by 29 U.S.C. § 1106, some or all of those claims are barred under the exemptions set forth in 29 U.S.C. § 1108 or elsewhere.

### Twelfth Defense

To the extent that Plaintiffs can establish any transactions prohibited by 29 U.S.C. § 1106, some or all of those claims are barred by the prohibited transaction exemptions promulgated by the Department of Labor.

Defendant explicitly reserves the right to assert, and hereby gives notice that it intends to rely upon, any other defense that may become available or appear during discovery proceedings or otherwise in this case, and hereby reserves the right to amend its Answer to assert any such defense.

WHEREFORE, having answered Plaintiffs' Amended Complaint in its entirety, Defendant prays that all of Plaintiffs' claims be dismissed with prejudice; that the Court enter judgment against Plaintiffs and/or any other putative class action member and in favor of Defendant on all causes of action; that all of Defendant's costs and fees, including attorneys' fees, be awarded to Defendant; and that the Court grant such other relief as the Court may deem just and proper.

Dated: October 26, 2017                    Respectfully submitted,

                                          By: /s/_____

                                          Jeremy P. Blumenfeld (pro hac vice)
                                          1701 Market Street
                                          Philadelphia, PA 19103
                                          Telephone: (215) 963-5000
                                          Fax: (215) 963-5001
                                          jeremy.blumenfeld@morganlewis.com

                                          Melissa D. Hill (pro hac vice)
                                          101 Park Avenue
                                          New York, NY 10178-0060
                                          Telephone: (212) 309-6000
                                          Fax: (212) 309-6001
                                          melissa.hill@morganlewis.com

                                          Christopher A. Weals, Bar No. 08411
                                          Morgan, Lewis & Bockius LLP
                                          1111 Pennsylvania Avenue, NW
                                          Washington, DC  20004
                                          Telephone: (202) 739-3000
                                          Fax: (202) 739-3001

christopher.weals@morganlewis.com

*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that the service required by Federal Rule of Civil Procedure 5(a) has been made and that, on October 26, 2017, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to counsel of record for this case and which is available for viewing and downloading from the ECF system of the U.S. District Court for the District of Maryland.  In addition, I certify that, pursuant to the Court's individual rules regarding courtesy copies, a paper copy of the foregoing document will be delivered to the Clerk's Office within 48 hours of the electronic filing of this document.

/s/
Jeremy P. Blumenfeld